IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

CHIKE UZUEGBUNAM,

|                                                                 |                                      |
| --------------------------------------------------------------- | ------------------------------------ |
| *Plaintiff,*                                                    |                                      |
| v.                                                              |                                      |
| **STANLEY C. PRECZEWSKI**, President of Georgia Gwinnett College, in his official and individual capacities; **LOIS C. RICHARDSON**, Acting Senior Vice President of Academic and Student Affairs and Provost at Georgia Gwinnett College, in her official and individual capacities; **JIM B. FATZINGER**, Senior Associate Provost for Student Affairs for Georgia Gwinnett College, in his official and individual capacities; **TOMAS JIMINEZ**, Dean of Students at Georgia Gwinnett College, in his official and individual capacities; **AILEEN C. DOWELL**, Director of the Office of Student Integrity at Georgia Gwinnett College, in her official and individual capacities; **GENE RUFFIN**, Dean of Library Services at Georgia Gwinnett College, in his official and individual capacities; **CATHERINE JANNICK DOWNEY**, Head of Access Services and Information Commons, in her official and individual capacities; **TERRANCE SCHNEIDER**, Associate Vice President of Public Safety and Emergency Preparedness/Chief of Police at Georgia Gwinnett College, in his | Case No. _____  **JURY TRIAL DEMANDED** |

official and individual capacities;
**COREY HUGHES**, Campus Police
Lieutenant at Georgia Gwinnett
College, in his individual and official
capacities; **REBECCA A. LAWLER**,
Community Outreach and Crime
Prevention Sergeant at Georgia
Gwinnett College, in her official and
individual capacities; **SHENNA
PERRY**, Campus Safety/Security
Officer at Georgia Gwinnett College,
in her official and individual
capacities.

*Defendants*.

## VERIFIED COMPLAINT

Plaintiff Chike Uzuegbunam, by and through counsel, and for his Verified Complaint against Defendants, hereby states as follows:

### INTRODUCTION

1.     The cornerstone of higher education is the ability of students to participate in the "marketplace of ideas" on campus. That marketplace depends on free and vigorous debate and expression between students—debate and expression that is spontaneous, ubiquitous, and often anonymous—and is carried out through spoken word, flyers, signs, and displays.

2.     By policy and practice, Georgia Gwinnett College ("GGC" or "College") claims the unchecked right to restrict the free speech rights of students and to regulate the location of student expression and assembly on campus. The College claims to encourage free discourse and debate on campus, but its *Freedom of Expression Policy* restricts all types of student speech to two small

speech zones that occupy less than 0.0015% of campus. To use these speech zones, students must submit a "free speech area request" form three days in advance and submit any publicity materials and literature they want to distribute to administrators for review. If students want to speak—whether through oral or written communication—anywhere else on campus, then they must obtain a permit from College officials. Thus, students may not speak spontaneously anywhere on campus. If students violate this policy, they violate the College's *Student Code of Conduct* and expose themselves to a variety of sanctions, including expulsion. Through the permitting process, GGC retains unfettered discretion to determine both whether students may speak at all and where they may speak. In so doing, it fails to protect students against content and viewpoint discrimination. These policies and practices chill protected student speech and disable spontaneous student speech on campus.

3.    By policy and practice, Georgia Gwinnett College claims the unchecked right to restrict the content and viewpoint of what students say on campus. Despite their claims to celebrate free speech, Defendants' *Student Code of Conduct* defines "disorderly conduct" to include any expression "which disturbs the peace and/or comfort of person(s)." Defendants enforce this speech code to prohibit students from saying anything that prompts complaints from listeners. In so doing, Defendants have created and have enforced a heckler's veto that effectuates content and viewpoint discrimination. This policy and its related practices chill protected student speech on campus.

4.    When Plaintiff Chike Uzuegbunam, a student at GGC, sought to

distribute religious literature in an open, generally accessible area of the campus outside the library, Defendants required him to stop because he was outside of the two tiny speech zones and because he had not first obtained a permit.

5. When Mr. Uzuegbunam tried to share his religious views in one of the speech zones after reserving it for this purpose, Defendants required him to stop because his speech had generated complaints, informed him that his speech constituted "disorderly conduct" because it had generated complaints, and instructed him to use the methods of other religious denominations to communicate his beliefs and viewpoints.

6. Defendants took these actions because of the content and viewpoint of Mr. Uzuegbunam's expression, because his expression prompted complaints and they believed it would continue to do so, and because they wanted to pacify those who were or might be offended by his expression. In taking these actions, they implemented the challenged GGC policies, violated Mr. Uzuegbunam's constitutional rights, and inflicted irreparable injury upon him.

7. This action is premised on the United States Constitution and concerns the denial of Mr. Uzuegbunam's fundamental and clearly established rights under the Free Speech and Free Exercise Clauses of the First Amendment and the Due Process and Equal Protection Clauses of the Fourteenth Amendment.

8. The aforementioned policies and practices are challenged on their face and as applied to Mr. Uzuegbunam.

9.      Defendants' policies and practices have deprived and will continue to deprive Mr. Uzuegbunam of his paramount rights and guarantees under the United States Constitution.

10.     Each and every act of Defendants alleged herein was committed by Defendants, each and every one of them, under the color of state law and authority.

## JURISDICTION & VENUE

11.     This civil rights action raises federal questions under the United States Constitution, particularly the First and Fourteenth Amendments, and the Civil Rights Act of 1871, 42 U.S.C. § 1983.

12.     This Court has original jurisdiction over these federal claims pursuant to 28 U.S.C. §§ 1331 and 1343.

13.     This Court has authority to award the requested damages pursuant to 28 U.S.C. § 1343; the requested declaratory relief pursuant to 28 U.S.C. §§ 2201–02; the requested injunctive relief pursuant to 28 U.S.C. § 1343 and FED. R. CIV. P. 65; and costs and attorneys' fees under 42 U.S.C. § 1988.

14.     This Court has supplemental jurisdiction over the state law claims made herein pursuant to 28 U.S.C. § 1367.

15.     Venue is proper in this district and division pursuant to 28 U.S.C. § 1391(b) and L.R. 3.1, N.D. Ga., because Defendants reside in this district and division and/or all of the acts described in this Complaint occurred in this district and division.

## PLAINTIFF

16.    Mr. Chike Uzuegbunam is a resident of the State of Georgia and a student at GGC.

17.    Mr. Uzuegbunam is a professing evangelical Christian who strives to live out his faith on a daily basis.

18.    Mr. Uzuegbunam's Christian faith governs the way he thinks about marriage, morality, politics, and social issues, and it causes him to hold sincerely-held religious beliefs in these areas.

19.    As an evangelical Christian, Mr. Uzuegbunam believes that the Bible is God's Word and sets out the plan of salvation for all people. He believes that the Bible teaches that all people are sinners and therefore deserve God's wrath, but that anyone can receive salvation and eternal life by believing in Jesus Christ.

20.    Because of his firmly-held Christian beliefs, Mr. Uzuegbunam believes it is his duty to inform others, including members of the GGC community, for their own benefit, that they have sinned and need salvation through Jesus Christ. He looks for opportunities to share his beliefs with his fellow students and community members.

21.    Mr. Uzuegbunam's message is purely evangelistic in nature. Through personal conversations, the distribution of religious tracts, and open-air speaking, he communicates in a loving way that all people (including himself) are sinners and that salvation and eternal life are available only through Jesus Christ.

22.    Mr. Uzuegbunam does not seek monetary gain with his expressive

activity. He does not try to sell products or services, seek donations, or solicit signatures. He merely wishes to expose others to his religious beliefs.

23.    Mr. Uzuegbunam's expressive activities do not create a disturbance or cause congestion. He merely wishes to express his religious beliefs peacefully, without being confrontational and without using amplification devices, to those who are willing to listen.

## DEFENDANTS

24.    Defendant Stanley C. Preczewski is, and was at all times relevant to this Complaint, the President of Georgia Gwinnett College, a public college organized and existing under the laws of the State of Georgia.

25.    As president, Defendant Preczewski is the Chief Executive Officer of GGC.

26.    Defendant Preczewski's duties include, among others, authorizing, executing, enforcing, and implementing the policies governing students at GGC and overseeing the operation and management of GGC.

27.    Defendant Preczewski has the responsibility for final policymaking authority concerning students at GGC.

28.    Defendant Preczewski is responsible for the enactment, amendment, enforcement, execution, and implementation of College policies, including policies challenged herein, and their application to students in restricting their ability to speak freely and without a permit on campus.

29.    As president of the College, Defendant Preczewski possesses the authority to change and enforce the policies challenged herein.

30.    Defendant Preczewski possesses the authority and responsibility for coordination and approval of campus expression by students on campus.

31.    All changes in campus policies concerning student expression are made only with the prior approval of Defendant Preczewski.

32.    Defendant Preczewski has not instructed GGC personnel, including the other Defendants, to change or alter the policies and practices governing student expression on campus, including the policies and practices challenged herein, to comply with the Constitution.

33.    As president, Defendant Preczewski has the authority to review, approve, or reject the decisions of other College officials and the other Defendants regarding the policies challenged herein.

34.    Defendant Preczewski not only authorized, approved, or implemented the policies used to restrict Mr. Uzuegbunam's expression, but he also failed to stop any GGC officials from applying those policies to Mr. Uzuegbunam.

35.    Defendant Preczewski is ultimately responsible for administration and policymaking at GGC.

36.    Defendant Preczewski is sued in his individual and official capacities.

37.    Defendant Lois C. Richardson is, and was at all times relevant to this Complaint, Acting Senior Vice President of Academic and Student Affairs and Provost at Georgia Gwinnett College, a public college organized and existing under the laws of the State of Georgia.

38.    Defendant Richardson is responsible for administration and policymaking for the College, including the policies challenged herein.

39.    Defendant Richardson is responsible for the enactment and enforcement of College policies, including the policies challenged herein that restrict the ability of students to speak freely on campus and without a permit.

40.    Defendant Richardson is responsible for overseeing the College's Office of Student Affairs and Defendant Jim B. Fatzinger, and for creating, reviewing, changing, authorizing, and enforcing the policies of that office, including GGC's *Freedom of Expression Policy* and *Student Code of Conduct*.

41.    Defendant Richardson has failed to stop College officials, including the other defendants, from applying the policies challenged herein to students, including Mr. Uzuegbunam.

42.    Defendant Richardson possesses the authority to change and enforce the policies challenged herein.

43.    Defendant Richardson has failed to recommend any changes to the policies challenged herein.

44.    Defendant Richardson is sued in her official and individual capacities.

45.    Defendant Jim B. Fatzinger is, and was at all times relevant to this Complaint, Senior Associate Provost for Student Affairs at Georgia Gwinnett College, a public college organized and existing under the laws of the State of Georgia.

46.    Defendant Fatzinger is responsible for administration and policymaking for the College, including the policies challenged herein.

47.    Defendant Fatzinger is responsible for the enactment and enforcement of College policies, including the policies challenged herein, that

restrict the ability of students to speak freely on campus and without a permit.

48.    Defendant Fatzinger, under the direction of Defendants Preczewski and Richardson, instructs the Office of Student Affairs when to create, review, change, authorize, and enforce student speech policies and procedures.

49.    Defendant Fatzinger is responsible for overseeing the College's Office of Student Affairs and Defendant Tomas Jiminez, and for creating, reviewing, changing, authorizing, and enforcing the policies of that office, including GGC's *Freedom of Expression Policy* and *Student Code of Conduct*.

50.    Defendant Fatzinger has failed to stop College officials, including the other defendants, from applying the policies challenged herein to students, including Mr. Uzuegbunam.

51.    Defendant Fatzinger possesses the authority to change and enforce the policies challenged herein.

52.    Defendant Fatziner has failed to recommend any changes to the policies challenged herein.

53.    Defendant Fatzinger is sued in his official and individual capacities.

54.    Defendant Tomas Jiminez is, and was at all times relevant to this Complaint, Dean of Students at Georgia Gwinnett College, a public college organized and existing under the laws of the State of Georgia.

55.    Defendant Jiminez is responsible for administration and policymaking for the College, including the policies challenged herein.

56.    Defendant Jiminez is responsible for the enactment and enforcement of College policies, including the policies challenged herein, that restrict the

ability of students to speak freely on campus and without a permit.

57.    Defendant Jiminez, under the direction of Defendants Preczewski, Richardson, and Fatzinger, leads the Office of Student Affairs and directs it when to create, review, change, authorize, and enforce student speech policies and procedures.

58.    Under Defendant Jiminez's leadership, the Office of Student Affairs created and enforced the policies challenged herein.

59.    Defendant Jiminez is responsible for overseeing the College's Office of Student Integrity and Defendant Aileen C. Dowell, and for creating, reviewing, changing, authorizing, and enforcing the policies of that office, including GGC's *Freedom of Expression Policy* and *Student Code of Conduct*.

60.    Defendant Jiminez has failed to stop College officials, including the other defendants, from applying the policies challenged herein to students, including Mr. Uzuegbunam.

61.    Defendant Jiminez possesses the authority to change and enforce the policies challenged herein.

62.    Defendant Jiminez has failed to recommend any changes to the policies challenged herein.

63.    Defendant Jiminez is sued both in his individual and official capacities.

64.    Defendant Aileen C. Dowell is, and was at all times relevant to this Complaint, Director of the Office of Student Integrity at Georgia Gwinnett College, a public college organized and existing under the laws of the State of Georgia.

11

65. Defendant Dowell is responsible for administration and policymaking for the College, including the policies challenged herein.

66. Defendant Dowell is responsible for the enactment and enforcement of College policies, including the policies challenged herein, that restrict the ability of students to speak freely on campus and without a permit.

67. Defendant Dowell, under the direction of Defendants Preczewski, Richardson, Fatzinger, and Jiminez, is responsible for applying and interpreting the policies challenged herein, including processing requests by students for permits under those policies.

68. Defendant Dowell continues to enforce the policies challenged herein to students, including Mr. Uzuegbunam.

69. Defendant Dowell has failed to recommend any changes to the policies challenged herein.

70. Defendant Dowell enforced the policies challenged herein against Mr. Uzuegbunam by stopping him from peacefully distributing religious literature and engaging interested students in conversation in an open, generally accessible location outside of the library and by stopping him from sharing his religious beliefs in the speech zone he reserved for that purpose.

71. Defendant Dowell is sued both in her individual and official capacities.

72. Defendant Gene Ruffin is, and was at all times relevant to this Complaint, Dean of Library Services at Georgia Gwinnett College, a public college organized and existing under the laws of the State of Georgia.

73.    Defendant Ruffin is responsible for the enforcement of College policies, including the *Freedom of Expression Policy* challenged herein, that restrict the ability of students to speak freely on campus and without a permit.

74.    Defendant Ruffin, under the direction of Defendant Preczewski, is responsible for applying and enforcing the *Freedom of Expression Policy*.

75.    Defendant Ruffin continues to enforce the *Freedom of Expression Policy* to students, including Mr. Uzuegbunam.

76.    Defendant Ruffin is sued both in his individual and official capacities.

77.    Defendant Catherine Jannick Downey is, and was at all times relevant to this Complaint, Head of Access Services and Information Commons at Georgia Gwinnett College, a public college organized and existing under the laws of the State of Georgia.

78.    Defendant Downey is responsible for the enforcement of College policies, including the *Freedom of Expression Policy* challenged herein, that restrict the ability of students to speak freely on campus and without a permit.

79.    Defendant Downey, under the direction of Defendant Ruffin, is responsible for enforcing the *Freedom of Expression Policy*.

80.    Defendant Downey enforced the *Freedom of Expression Policy* against Mr. Uzuegbunam by stopping him from peacefully distributing religious literature and engaging interested students in conversation in an open, generally accessible location outside of the library.

81.    Defendant Downey continues to enforce the *Freedom of Expression Policy* against students, including Mr. Uzuegbunam.

82.   Defendant Downey is sued both in her individual and official capacities.

83.   Defendant Terrance Schneider, is, and was at all times relevant to this Complaint, the Associate Vice President of Public Safety and Emergency Preparedness/Chief of Police at Georgia Gwinnett College, a public college organized and existing under the laws of the State of Georgia.

84.   As Chief of Police, Defendant Schneider is charged with responsibility for enforcing GGC's policies and practices governing student expression taking place on public property at the College.

85.   As Chief of Police, Defendant Schneider is responsible for enforcing all GGC policies that govern student expression, including the policies challenged herein.

86.   As Chief of Police, Defendant Schneider oversees all law enforcement officers on campus, as they also enforce GGC policies that govern student expression.

87.   Defendant Schneider is sued both in his individual and official capacities.

88.   Defendant Corey Hughes, is, and was at all times relevant to this Complaint, a lieutenant for Campus Police at GGC.

89.   As a law enforcement officer, Defendant Hughes is charged with responsibility for enforcing GGC's policies and practices governing student expression taking place on public property at the College, including the policies challenged herein.

90.   Defendant Hughes enforced GGC's policies and practices regarding

student expression on campus, including the policies challenged herein, against Mr. Uzuegbunam when he stopped Mr. Uzuegbunam from speaking publicly inside the speech zones on the GGC campus.

91.    Defendant Hughes is sued both in his individual and official capacities.

92.    Defendant Rebecca A. Lawler, is, and was at all times relevant to this Complaint, a Community Outreach and Crime Prevention Sergeant for Campus Police at GGC.

93.    As a law enforcement officer, Defendant Lawler is charged with responsibility for enforcing GGC's policies and practices governing student expression taking place on public property at the College, including the policies challenged herein.

94.    Defendant Lawler enforced GGC's policies and practices regarding student expression on campus, including the policies challenged herein, against Mr. Uzuegbunam when she stopped Mr. Uzuegbunam from speaking publicly inside the speech zones on the GGC campus.

95.    Defendant Lawler is sued both in her individual and official capacities.

96.    Defendant Shenna Perry, is, and was at all times relevant to this Complaint, a Campus Safety/Security Officer for Campus Police at GGC.

97.    As a law enforcement officer, Defendant Perry is charged with responsibility for enforcing GGC's policies and practices governing student expression taking place on public property at the College, including the policies challenged herein.

98.    Defendant Perry enforced GGC's *Freedom of Expression Policy*

against Mr. Uzuegbunam by stopping him from peacefully distributing religious literature and engaging interested students in conversation in an open, generally accessible area of campus outside the library.

99.   Defendant Perry is sued both in her individual and official capacities.

## FACTUAL BACKGROUND

100.   GGC is a public college organized and existing under the laws of the State of Georgia and receives funding from the State of Georgia to operate.

101.   The College's campus in Lawrenceville, Georgia is composed of various publicly-accessible buildings and outdoor areas, including streets, sidewalks, open-air quadrangles, and park-like lawns. Copies of two maps of the GGC campus are attached as Exhibit 1 to this Complaint. A Google Maps satellite view of GGC's campus is attached as Exhibit 2 to this Complaint.

102.   GGC's campus is located on 260 acres, which is approximately 11,325,600 square feet.

103.   GGC's campus has many suitable streets, sidewalks, open-air quadrangles and plazas, and park-like lawns where expressive activity will not interfere with or disturb the College's activities, its campus environment, or access to its buildings or sidewalks.

104.   For all of the College's students—and especially for the many who live on campus—the College's campus is their town square where they socialize and engage in a variety of expressive activities.

## I.   DEFENDANTS' UNCONSTITUTIONAL POLICIES
### A. DEFENDANTS' UNCONSTITUTIONAL SPEECH ZONE POLICY

105.   The College regulates student expressive activity on campus through

the *Freedom of Expression Policy* ("Speech Zone Policy"). A true and accurate copy of Defendants' Speech Zone Policy is attached as Exhibit 3 to this Complaint.

106.   Defendants' Speech Zone Policy claims that GGC "is committed to providing a forum for free and open expression of divergent points of view by students [and] student organizations." Ex. 3 at 1.

107.   But Defendants' Speech Zone Policy strictly curtails where students and student organizations may exercise their First Amendment rights in the outdoor areas of campus.

108.   Defendants' Speech Zone Policy also gives GGC officials unbridled discretion over whether, when, and where students and student organizations may speak and express themselves in the outdoor areas of campus.

109.   As detailed in subsequent paragraphs, Plaintiff challenges, facially and as-applied, the provisions of Defendants' Speech Zone Policy that:

- Restrict student expression to two tiny areas of campus, *see* Ex. 3 at 2 (identifying "the concrete area/walkway between Student Housing and the Student Center or the concrete in front of the Food Court area, Building A as 'free speech expression areas'"); Ex. 3 at 4 (permitting literature distribution only "on a person-to-person basis in the free speech expression areas designated above"); *see also infra* ¶¶ 111–23, 152–53;

- Allow student expression in those areas for only two to four hours per day during the week and close those areas to student

17

expression entirely on the weekends, *see* Ex. 3 at 2 (opening the speech zones "from 11:00 a.m. to 1:00 p.m. and 5:30 p.m. to 7:30 p.m., Monday through Thursday, and 11:00 a.m. to 1:00 p.m. on Friday"); *see also infra* ¶¶ 112–14, 125–26, 129–30;

- Require students to get a permit to engage in expression in any other outdoor location on campus, *see* Ex. 3 at 2 ("On occasion upon written request, other areas . . . may be authorized. . . ."); *see also infra* ¶¶ 124, 126–28;

- Require students to get a permit to engage in expression at any time the speech zones are closed, *see* Ex. 3 at 2 ("On occasion upon written request, . . . other times may be authorized. . . ."); *see also infra* ¶¶ 125–26, 129–30;

- Grant Defendants unbridled discretion to decide on a case-by-case basis which students and student organizations may engage in expression outside the speech zones or during times the speech zones are closed *see* Ex. 3 at 2 ("On occasion upon written request, other areas and other times may be authorized. . . ."); *see also infra* ¶¶ 125–130;

- Grant Defendants unbridled discretion to modify the speech zones from time to time for different speakers, *see* Ex. 3 at 2 ("[T]he College reserves the right to modify the free speech areas based on the operational needs of the institution."); *see also infra* ¶¶ 131– 33;

- Require students to seek permission to utilize the speech zones three days in advance, *see* Ex. 3 at 2 ("The designated free speech forms (PDF) must be completed and any publicity materials submitted to the Student Affairs official at least three (3) business days prior to the free expression speech, program, event or gathering in accordance with this policy."); *see also infra* ¶¶ 134–37;

- Grant Defendants unbridled discretion in deciding who may reserve the speech zones, *see* Ex. 3 at 2 ("A designated Student Affairs official is responsible for reservation scheduling and authorization of the free speech expression areas in order to accommodate all interested users."); *see also infra* ¶¶ 138–46;

- Require students to submit to College officials any written materials they want to distribute for review and grant College officials unbridled discretion in that review process, *see* Ex. 3 at 2 ("[A]ny publicity materials submitted to the Student Affairs official at least three (3) business days prior to the free expression speech, program, event or gathering in accordance with this policy."); Ex. 3 at 3 ("All publicity material s must be submitted with the application form. . . . Upon authorization, copies of the application form and any publicity material shall be distributed to the campus Senior Associate Provost for Student Affairs, the Director of Public Services/Campus Police, the Office of Public

Relations[,] the Dean of Students[,] and the applicant."); *see also infra* ¶¶ 147–51; and

- Prohibit a student from utilizing the speech zones again for thirty days after utilizing them once, even if no one else want to use them in the meantime, *see* Ex. 8 at 1 (specifying that "requests received within 30 days of the last date of use by an organization and/or individual will be declined"); *see also infra* ¶¶ 157–58.

110.   Defendants' Speech Zone Policy states that it "is applicable to students, student organizations, faculty, staff and visitors." Ex. 3 at 1.

111.   Defendants Speech Zone Policy designates two areas as "free speech expression areas," referred to hereafter as "speech zones."

112.   The two speech zones are only open eighteen hours per week.

113.   The two speech zones are "generally available from 11:00 a.m. to 1:00 p.m. and 5:30 p.m. to 7:30 p.m., Monday through Thursday, and 11:00 a.m. to 1:00 p.m. on Friday." Ex. 3 at 2.

114.   According to Defendants' Speech Zone Policy, at all other times of the week, the two speech zones cannot be used for expressive activities without a permit, though students and others may continue to access them.

115.   The first of the two speech zones is "the concrete area/walkway between Student Housing and the Student Center." Ex. 3 at 2. This will be referred to hereafter as the Sidewalk Speech Zone.

116.   The Sidewalk Speech Zone comprises approximately 11,718 square feet.

117.   The Sidewalk Speech Zone occupies approximately 0.001% of the College's campus.

118.   The Sidewalk Speech Zone does not include any of the expansive, grassy, park-like areas along either side of the sidewalk. True and accurate pictures of the Sidewalk Speech Zone and surrounding areas of campus are attached as Exhibit 4 to this Complaint.

119.   The second of the two speech zones is "the concrete in front of the Food Court area, Building A." Ex. 3 at 2. This will be referred to hereafter as the Patio Speech Zone, as it encompasses the patio of the Food Court area.

120.   The Patio Speech Zone comprises approximately 0.0004% of the College's campus.

121.   The Patio Speech Zone does not include the sidewalks extending down either side of the Food Court area (*i.e.*, Building A). It includes only the patio area on the westernmost edge of this building. True and accurate pictures of the Patio Speech Zone and surrounding areas are attached as Exhibit 5 to this Complaint.

122.   Altogether, the two speech zones set forth in Defendants' Speech Zone Policy comprise less than 0.0015% of the College's campus. A map of the GGC campus with the two speech zones highlighted in red is attached to this Complaint as Exhibit 6.

123.   The 99.9985% of the College's campus that is not included in the "free speech expression areas" includes a variety of open, generally accessible, parklike areas where students naturally and freely congregate and where

students' expressive activity would not disrupt College activities and functions (including classes). True and accurate pictures of some of these areas of campus that are off-limits to student speech are attached as Exhibit 7 to this Complaint.

124.   If students wish to engage in expressive activities outside of the two tiny speech zones, they must first submit a written request to College officials and seek permission from those officials.

125.   If students wish to engage in expressive activities outside of the few hours the two tiny speech zones are open, they must first submit a written request to College officials and seek permission from those officials.

126.   Defendants' Speech Zone Policy states:  "On occasion upon written request, other areas and other times may be authorized. . . ." Ex. 3 at 2.

127.   Defendants' Speech Zone Policy contains no objective and comprehensive guidelines, standards, or criteria to limit the discretion of Defendants or other College officials in granting, denying, or modifying student requests to use areas outside of the two speech zones for expressive activities.

128.   Upon information and belief, Defendants do not possess any policies that set forth objective or comprehensive guidelines, standards, or criteria to limit the discretion of Defendants or other College officials in granting, denying, or modifying student requests to use areas outside of the two speech zones for expressive activities

129.   Defendants' Speech Zone Policy contains no objective and comprehensive guidelines, standards, or criteria to limit the discretion of Defendants or

other College officials in granting, denying, or modifying student requests to engage in expressive activities outside of the few hours that the two speech zones are open.

130.   Upon information and belief, Defendants do not possess any policies that set forth objective or comprehensive guidelines, standards, or criteria to limit the discretion of Defendants or other College officials in granting, denying, or modifying student requests to engage in expressive activities outside of the few hours that the two speech zones are open.

131.   According to Defendants' Speech Zone Policy, the "College reserves the right to modify the free speech areas based on the operational needs of the institution." Ex. 3 at 2.

132. Defendants' Speech Zone Policy contains no objective and comprehensive guidelines, standards, or criteria to limit how or when Defendants or other College officials may modify the two speech zones.

133.   Upon information and belief, Defendants do not possess any policies that set forth objective or comprehensive guidelines, standards, or criteria to limit how or when Defendants or other College officials may modify the two speech zones.

134.   If students wish to use the two speech zones for expressive activity, they must first submit a written request to College officials and receive permission to use those zones.

135.   Defendants' Speech Zone Policy outlines the "reservation procedures for use of free expression areas." Ex. 3 at 2 (capitalization altered).

23

136.   Those reservation procedures specify that "[a]ll requests must follow the appropriate facility reservation process." Ex. 3 at 2.

137. The "appropriate facility reservation process" means that the "designated free speech forms (PDF) must be completed and any publicity materials must be attached and submitted to the Student Affairs official at least three (3) business days prior to the free expression speech, program, event or gathering in accordance with this policy." Ex. 3 at 2. A true and correct copy of the "designated free speech forms" is attached as Exhibit 8 to this Complaint.

138.   According to Defendants' Speech Zone Policy, a "designated Student Affairs official is responsible for reservation schedule and authorization of the free speech expression areas." Ex. 3 at 2.

139.   According to Defendants' Speech Zone Policy, this designated Student Affairs official is charged with reviewing requests to reserve the speech zones so as to "accommodate all interested users." Ex. 3 at 2.

140. Defendants' Speech Zone Policy contains no objective and comprehensive guidelines, standards, or criteria for this designated Student Affairs official to use when determining how to "accommodate all interested users."

141.   Upon information and belief, Defendants do not possess any policies that set forth objective or comprehensive guidelines, standards, or criteria for this designated Student Affairs official to use when determining how to "accommodate all interested users."

142. Defendants' Speech Zone Policy contains no objective and

comprehensive guidelines, standards, or criteria that limit the discretion of this designated Student Affairs official in granting, denying, or modifying requests to reserve the speech zones.

143.   Upon information and belief, Defendants do not possess any policies that set forth objective or comprehensive guidelines, standards, or criteria that limit the discretion of this designated Student Affairs official in granting, denying, or modifying requests to reserve the speech zones.

144.   Defendants' Speech Zone Policy notes that College officials will limit student expression so that it does "not interfere with the operation of the College or the rights of others," and it lists fifteen considerations that all speakers "must meet" (two of which are challenged in this lawsuit). Ex. 3 at 3–5.

145.   Defendants' Speech Zone Policy does not provide that these are the only reasons that reservation and permit requests may be denied, it does not guarantee that requests that satisfy these considerations will be granted, and it does not prohibit College officials from basing their decisions on other unspecified and unwritten considerations.

146.   Thus, the Speech Zone Policy allows Defendants to deny a student's request for a reservation or permit even if it satisfied all fifteen considerations.

147.   One of the fifteen considerations allows Defendants' to review the content and viewpoint of a student's expression.

148.   According to the Policy, "[a]ll publicity materials must be submitted with the application form." Ex. 3 at 3.

149.   If Defendants approve a student's request to engage in expressive activities, the Speech Zone Policy specifies that "copies of the application form and any publicity material shall be distributed to the campus Senior Associate Provost for Student Affairs, the Director of Public Services/Campus Policy, the Office of Public Relations[,] the Dean of Students[,] and the applicant." Ex. 3 at 3.

150.   Defendants' Speech Zone Policy contains no objective and comprehensive guidelines, standards, or criteria to limit the discretion of Defendants or other College officials when evaluating the written materials submitted along with a request to utilize the speech zones.

151.   Upon information and belief, Defendants do not possess any policies that set forth objective and comprehensive guidelines, standards, or criteria to limit the discretion of Defendants or other College officials when evaluating the written materials submitted along with a request to utilize the speech zones.

152.   Another of the fifteen considerations makes it clear that students may only distribute literature in the two speech zones and only if they reserve those speech zones.

153.   According to Defendants' Speech Zone Policy, "[n]on-commercial pamphlets, handbills, circulars, newspapers, magazines and other written materials may be distributed on a person-to-person basis in the free speech expression areas designated above, as long as the reservation procedures for use of the free expression areas have been completed." Ex. 3 at 4.

154.   Defendants' Speech Zone Policy contains no deadlines or timetables

in which College officials must respond to a permit or reservation request.

155.   Defendants' Speech Zone Policy does not require the "designated Student Affairs official" to provide students the reason any request for a reservation or permit is denied.

156.   If a student is displeased with the decision of the "designated Student Affairs official," Defendants' Speech Zone Policy allows the student to appeal that decision to the Dean of Students (*i.e.*, Defendant Jiminez), whose decision is final. Ex. 3 at 2.

157.   Once a student has utilized a speech zone for expressive activity, Defendants prohibit him from using those zones again for at least thirty days, even if no one else has reserved the speech zones during that period of time.

158.   According to Defendants' "Free Speech Area Request Form," "requests received within 30 days of the last date of use by an organization and/or individual will be declined." Ex. 8 at 1.

## B. DEFENDANTS' UNCONSTITUTIONAL SPEECH CODE POLICY

159.   Defendants' regulate student conduct through their *Student Handbook*. This document contains comprehensive student conduct guidelines that regulate the bounds of permissible speech and expression on campus, including GGC's *Student Code of Conduct*. A true, correct, and complete copy of GGC's *Student Handbook 2016–2017*, which includes the *Student Code of Conduct* on pages 23–39, is attached as Exhibit 9 to this Complaint.

160.   All students are required to comply with GGC's *Student Code of Conduct* both on and off campus.

161.   GGC's *Student Code of Conduct* states that its conduct regulations shall apply to conduct that "occur[s] on GGC property or at GGC-sponsored or affiliated events, or otherwise violate GGC's student conduct policies at non-GGC sponsored events." Ex. 9 at 25.

162.   GGC's *Student Code of Conduct* contains a list of actions that "are prohibited and constitute a violation of the Georgia Gwinnett College Student Code of Conduct." Ex. 9 at 25.

163.   Any student who commits one of these violations exposes himself to disciplinary action.

164.   GGC's *Student Code of Conduct* states that "[a]ny student, club or organization found to have committed a violation of these conduct regulations is subject to the sanctions outlined in this Code." Ex. 9 at 25.

165.   GGC's *Student Code of Conduct* prohibits students from engaging in "disorderly conduct." Ex. 9 at 26.

166.   The definition of "disorderly conduct" in GGC's *Student Code of Conduct* includes elements that prohibit or restrict expression that is protected by the First Amendment.

167.   GGC's *Student Code of Conduct* defines "disorderly conduct" to include "behavior which disturbs the peace and/or comfort of person(s)." Ex. 9 at 26. This provision of GGC's *Student Code of Conduct* will hereafter be referred to as Defendants' Speech Code or Defendants' Speech Code Policy, and Plaintiff challenges this provision facially and as-applied.

168.   Defendants' Speech Code contains no objective or comprehensive

guidelines, standards, or criteria to limit the discretion of Defendants or other College officials when deciding whether specific expression "disturbs the peace and/or comfort of person(s)."

169.   Upon information and belief, Defendants do not possess any policies that set forth objective or comprehensive guidelines, standards, or criteria to limit the discretion of Defendants or other College officials when deciding whether specific expression "disturbs the peace and/or comfort of person(s)."

170.   When enforcing their Speech Code, Defendants do not exempt expression protected by the First Amendment from disciplinary action.

171. According to GGC's *Student Code of Conduct*, Defendants merely "consider[]" students' First Amendment freedoms when "investigating and reviewing these types of alleged conduct violations." Ex. 9 at 27.

172. Defendants' Speech Code prohibits students, including Mr. Uzuegbunam, from engaging in any expression that happens to offend, disturb, or discomfort anyone who witnesses it.

173. Students run the risk of disciplinary action—ranging from a reprimand to expulsion—if they engage in any form of expression that runs afoul of Defendants' Speech Code. *See* Ex. 9 at 36.

174. As a student, Mr. Uzuegbunam's expression is governed by Defendants' Speech Code both on and off campus.

175. Mr. Uzuegbunam desires to engage in conversations and other expressive activities, both on and off campus, that cover a range of social, cultural, political, and/or religious topics that some might find offensive,

disturbing, or discomforting.

176.   Defendants have enforced their Speech Code against Mr. Uzuegbunam.

177.   Defendants Hughes and Lawler enforced this Speech Code against Mr. Uzuegbunam when he was engaging in religious expression in the Patio Speech Zone, as discussed in more detail later.

178.   Upon information and belief, Defendants Hughes and Lawler enforced the Speech Code at the direction of Defendants Dowell and Schneider.

179.   Mr. Uzuegbunam fears that his expression will expose him to further enforcement and disciplinary actions due to Defendants' Speech Code.

### C. DEFENDANTS' STUDENT CODE OF CONDUCT

180.   It is GGC's policy and practice to enforce its Speech Zone Policy against its students.

181.   Defendants implement and enforce their Speech Zone Policy in part through GGC's *Student Code of Conduct*.

182.   It is GGC's policy that any student who fails to comply with its regulations and guidelines regarding student expression violates the *Student Code of Conduct*.

183.   As detailed in subsequent paragraphs, Plaintiff challenges, facially and as-applied, the provisions of GGC's *Student Code of Conduct* that implement Defendants' Speech Zone policy, namely the provisions that:

- Prohibit students from distributing literature on campus without first getting permission from College officials, *see* Ex. 9 at 26

(defining "disorderly conduct" to include "[c]irculating any advertising media without approval from proper College officials or in a manner that violates or is contrary to the policies of Georgia Gwinnett College."); *see also infra* ¶¶ 184–86, 190–91; and

- Prohibit students from using the open, generally accessible areas of the campus for peaceful expression without first getting authorization from College officials, *see* Ex. 9 at 29 (prohibiting students from "[m]aking or attempting to make unauthorized use of College facilities."); *see also infra* ¶¶ 187–89, 191.

184. GGC's *Student Code of Conduct* also defines "disorderly conduct" to include "[c]irculating any advertising media without approval from proper College officials or in a manner that violates or is contrary to the policies of Georgia Gwinnett College." Ex. 9 at 26.

185. When enforcing this provision of the *Student Code of Conduct*, Defendants do not exempt expression protected by the First Amendment from disciplinary action.

186. According to GGC's *Student Code of Conduct*, Defendants merely "consider[]" students' First Amendment freedoms when "investigating and reviewing these types of alleged conduct violations." Ex. 9 at 27.

187. Another of the "violations" of GGC's *Student Code of Conduct* is "[m]aking or attempting to make unauthorized use of College facilities." Ex. 9 at 29. Plaintiff challenges this provision as it applies to student expression in the outdoor, generally accessible areas of campus.

188.  It is GGC's policy—as expressed in the *Student Code of Conduct*—that students who engage in expressive activities outside of the two speech zones have violated the provision of the *Student Code of Conduct* that prohibits "making or attempting to make unauthorized use of College facilities."

189.  It is GGC's policy—as expressed in the *Student Code of Conduct*—that students who engage in expressive activities without reserving one of the two speech zones have violated the provision of the *Student Code of Conduct* that prohibits "making or attempting to make unauthorized use of College facilities."

190.  It is GGC's policy—as expressed in the *Student Code of Conduct*—that students who distribute written materials on campus without first submitting them to College officials and obtaining a permit violate the provision of the *Student Code of Conduct* that prohibits "[c]irculating any advertising media without approval from proper College officials or in a manner that violates or is contrary to the policies of Georgia Gwinnett College."

191.  Students who violate GGC's *Student Code of Conduct* expose themselves to a variety of disciplinary sanctions, ranging from a reprimand to possible expulsion. *See* Ex. 9 at 36.

## II.  DEFENDANTS' REFUSAL TO CHANGE THEIR UNCONSTITUTIONAL SPEECH ZONE POLICY

192.  On June 28, 2013, Plaintiff's counsel sent an informational letter to GGC officials, informing them that the College maintained and enforced policies that violated the First Amendment rights of its students. A true and correct copy of this letter is attached as Exhibit 10 to this Complaint.

193.   One of the two policies highlighted in the letter Plaintiff's counsel sent to GGC officials was Defendants' Speech Zone Policy.

194.   Plaintiff's counsel explained at significant length the constitutional infirmities of Defendants' Speech Zone Policy.

195.   Plaintiff's counsel offered to assist GGC officials in revising Defendants' Speech Zone Policy so that it would comply with the First Amendment in the hopes that "no need for litigation to protect student expression will arise." Ex. 10 at 4.

196.   None of the GGC officials addressed on this letter, including GGC's president and general counsel, ever responded to this letter.

197.   In the more than three years since Plaintiff's counsel sent that letter, none of the Defendants have taken any steps to revise their Speech Zone Policy to protect and respect the First Amendment rights of their students.

198.   In the more than three years since Plaintiff's counsel sent that letter, Defendants have maintained and enforced their Speech Zone Policy to limit and curtail student expression on campus.

## III. DEFENDANTS' UNCONSTITUTIONAL SILENCING OF MR. UZUEGBUNAM

### A. DEFENDANTS RESTRICT LITERATURE DISTRIBUTION & CONVERSATIONS

199.   In late July 2016, Mr. Uzuegbunam decided that he needed to inform his fellow students and other passersby of their need for salvation through Jesus Christ by distributing religious literature in the open, outdoor areas of the GGC campus.

200.   Mr. Uzuegbunam desired to communicate his religious views to his

fellow classmates and instructors at GGC because of his sincerely held religious beliefs and because he practices his religion by doing so.

201.   To communicate his views, Mr. Uzuegbunam stood in the expansive concrete plaza just outside the library and distributed religious literature to the passing students and other individuals who were willing to accept it.

202.   Mr. Uzuegbunam also engaged willing students and other passing individuals in conversation, explaining to them that they could find salvation through Jesus Christ.

203.   Mr. Uzuegbunam was careful to stand in an area of the plaza that would not block the entrances and exits of any buildings, block pedestrian traffic, or create any congestion. He stood over forty feet away from the entrance to the library.

204.   Mr. Uzuegbunam chose to utilize this plaza because it is a central location on GGC's campus near the library, and thus, it is a hub of student pedestrian traffic.

205.   Students commonly walk through this plaza and speak to one another, often stopping friends and classmates passing through to speak to them about their classes, extracurricular activities, and any number of other topics of conversation.

206.   Students also frequently utilize this plaza to play music while they sit on the benches provided in this area. This music is played using amplification, and often at a high volume.

207.   When Mr. Uzuegbunam was distributing his literature, he was not

engaging in any form of expression that would have disturbed anyone inside the library, as he was speaking in nothing louder than an average, conversational tone of voice.

208.   When Mr. Uzuegbunam was distributing his religious literature, he did not force his literature on anyone who was unwilling to take it, harass those who were not interested, or chase anyone down so that they would take it.

209.   When Mr. Uzuegbunam was engaging people in conversation, he did not force anyone to participate in a conversation, berate those who were not interested in conversing, or denigrate those who disagreed with him.

210.   A short time after Mr. Uzuegbunam began his expressive activities, Defendant Perry stopped him.

211.   Defendant Perry explained that Mr. Uzuegbunam was not allowed to distribute religious literature at that location.

212.   Defendant Perry instructed Mr. Uzuegbunam to come inside the library and speak with Defendant Downey to learn more about the limits on his expressive activities.

213.   Mr. Uzuegbunam complied with Defendant Perry's instructions and sought out Defendant Downey.

214.   Defendant Downey confirmed Defendant Perry's statement that Mr. Uzuegbunam could not distribute religious literature outside the library.

215.   Defendant Downey explained that Mr. Uzuegbunam could not distribute any written materials outside of GGC's two speech zones.

216.   During this conversation, Defendant Downey pulled up Defendants'

Speech Zone Policy on the computer and explained it to Mr. Uzuegbunam.

217.   In the process, Defendant Downey made it clear that Mr. Uzuegbunam's expressive activities violated Defendants' Speech Zone Policy and that he was stopped from continuing those activities because of Defendants' Speech Zone Policy.

218.   Defendant Downey instructed Mr. Uzuegbunam that he could get further information about Defendants' Speech Zone Policy and the restrictions on his expression by going to the Office of Student Integrity.

219.   Shortly after this conversation, Mr. Uzuegbunam and an acquaintance visited the Office of Student Integrity and spoke with Defendant Dowell.

220.   Mr. Uzuegbunam recounted how Defendants Perry and Downey had stopped him from distributing religious literature outside the library.

221.   Defendant Dowell confirmed that Defendants' Speech Zone Policy prohibits Mr. Uzuegbunam from distributing religious literature outside of the library because that location is not within one of the two speech zones.

222.   Defendant Dowell explained that religious literature constitutes "written materials" under Defendants' Speech Zone Policy.

223.   Defendant Dowell explained that, due to Defendants' Speech Zone Policy, Mr. Uzuegbunam must reserve one of the speech zones before he can distribute any religious literature.

224.   In saying this, Defendant Dowell referenced and enforced the provision of Defendants' Speech Zone Policy that reads:  "Non-commercial

pamphlets, handbills, circulars, newspapers, magazines and other written materials may be distributed on a person-to-person basis in the free speech expression areas designated above, as long as the reservation procedures for use of the free expression areas have been completed." Ex. 3 at 4.

225. Mr. Uzuegbunam's acquaintance then asked Defendant Dowell if Mr. Uzuegbunam could continue engaging interested individuals in conversations about his religious views while standing outside of the two speech zones.

226. In response, Defendant Dowell shook her head and stated that Defendants' Speech Zone Policy prohibits such conversations outside of the speech zones.

227. Defendant Dowell also explained that Mr. Uzuegbunam would have to reserve one of the two speech zones before engaging in any such religious conversations on the GGC campus.

228. In saying this, Defendant Dowell was enforcing Defendants' Speech Zone Policy against Mr. Uzuegbunam.

229. At the end of this conversation, Mr. Uzuegbunam and his acquaintance thanked Defendant Dowell for her information and left the office.

230. After all of these conversations, Mr. Uzuegbunam stopped trying to distribute literature and engage people in conversations outside the library for fear that he would be disciplined for violating Defendants' Speech Zone Policy and the analogous provisions of the *Student Code of Conduct*.

231. If it were not for Defendants' Speech Zone Policy, the analogous provisions of the *Student Code of Conduct*, and Defendants' actions enforcing

these policies, Mr. Uzuegbunam would continue his expressive activities outside the library.

### B. DEFENDANTS RESTRICT OPEN-AIR SPEAKING

232.  In August 2016, Mr. Uzuegbunam again decided that he needed to inform his fellow students and other passersby of their need for salvation through Jesus Christ by expressing these religious beliefs on campus through open-air speaking.

233.  Mr. Uzuegbunam desired to communicate his religious views to his fellow classmates and instructors at GGC because of his sincerely-held religious beliefs and because he practices his religion by doing so.

234.  After having his efforts to distribute religious literature outside the library thwarted, Mr. Uzuegbunam sought to reserve a speech zone in order to share his religious beliefs.

235.  On or about August 22, 2016, Mr. Uzuegbunam visited the Office of Student Integrity to reserve the speech zones.

236.  The official at the front desk, Mrs. Charlisa Powell Hall, asked Mr. Uzuegbunam to indicate which days he wanted to reserve the speech zone and which speech zone he wanted to reserve.

237.  Mr. Uzuegbunam reserved the Patio Speech Zone for August 25, 2016; September 8, 2016; and September 22, 2016.

238.  During the conversation, Mr. Uzuegbunam explained that he wanted to use the Patio Speech Zone to share his religious beliefs with the people congregated in that area.

239.   During the conversation, Mr. Uzuegbunam explained that he was not acting as a member of a student organization but that one to three people would accompany him as he shared his religious beliefs in the Patio Speech Zone.

240.   Mr. Uzuegbunam completed Defendants' "Free Speech Area Request Form," attached copies of two tracts he intended to distribute, and submitted the form to Mrs. Hall. A true and correct copy of the "Free Speech Area Request Form" that Mr. Uzuegbunam completed is attached as Exhibit 11 to this Complaint.

241.   Mrs. Hall stapled the two tracts to the form Mr. Uzuegbunam submitted, approved his request, and signed the form confirming his reservation of the Patio Speech Zone.

242.   On August 25, 2016, Mr. Uzuegbunam went to the Patio Speech Zone to communicate his religious views by speaking publicly and distributing religious literature.

243.   The Patio Speech Zone is the patio area outside the Food Court, with tables and benches distributed at various points where students routinely congregate to eat and socialize. *See* Ex. 5 (picturing the area).

244.   Mr. Uzuegbunam was careful to stand in an area of the Patio Speech Zone that did not did not block the entrances and exits to the building, block pedestrian traffic, or create any congestion.

245.   Mr. Uzuegbunam stood on a small stool and began publicly speaking about the Gospel to the students and other individuals in the Patio Speech

Zone at that time.

246.   Mr. Uzuegbunam was accompanied by a friend.

247.   Mr. Uzuegbunam's friend prayed and distributed religious literature while Mr. Uzuegbunam shared his religious beliefs.

248.   Mr. Uzuegbunam chose to utilize the Patio Speech Zone because Defendants require him to use a speech zone.

249.   When Mr. Uzuegbunam began to speak, many students were lingering in the Patio Speech Zone, eating, studying, or visiting with each other on the tables in the area.

250.   When Mr. Uzuegbunam spoke in the Patio Speech Zone, he did not carry signs or utilize amplification. He merely spoke loudly enough to be heard, using his unaided voice, for about fifteen or twenty minutes to the students congregated in the area at the time.

251.   When Mr. Uzuegbunam spoke in the Patio Speech Zone, he did not utilize inflammatory rhetoric or personally attack any individual.

252.   Mr. Uzuegbunam began by discussing the brevity of life and how all men and women have fallen short of God's commands. He continued by explaining how Jesus Christ had come to earth to die on the cross and rise again from the dead in order to provide men and women the only means of obtaining salvation and eternal life. He also explained how this gift of eternal life is available to all by God's grace and that it is the only way to avoid the penalty for our sins.

253.   After Mr. Uzuegbunam had been speaking for about twenty minutes,

40

Defendant Hughes drove up and approached him, asking him to stop speaking so that the two of them could talk.

254. Mr. Uzuegbunam immediately complied with Defendant Hughes' instructions.

255. Defendant Hughes explained that he had come to the scene because "we just got some calls on you" and asked what Mr. Uzuegbunam was doing.

256. Mr. Uzuegbunam explained that he was "preaching the love of Christ" and that he had reserved the Patio Speech Zone for this purpose with the Office of Student Integrity.

257. After asking Mr. Uzuegbunam to provide his first and last names, Defendant Hughes asked Mr. Uzuegbunam to produce his student identification card.

258. Mr. Uzuegbunam complied with Defendant Hughes' instructions.

259. Defendant Hughes took this information and returned to his patrol vehicle.

260. While in his patrol vehicle, Defendant Hughes called the Office of Student Integrity and spoke with an official there.

261. Upon information and belief, the official at the Office of Student Integrity who spoke with Defendant Hughes either was Defendant Dowell or acted at the direction of Defendant Dowell.

262. Approximately ten minutes later, Defendant Hughes returned and informed Mr. Uzuegbunam that he could not speak publicly in the Patio Speech Zone.

263.   As he returned, Defendant Hughes was accompanied by Defendant Lawler.

264.   Defendant Hughes explained that the Office of Student Integrity claimed that Mr. Uzuegbunam had only reserved the Patio Speech Zone in order to distribute literature and have one-on-one conversations with individuals.

265.   Defendant Hughes also told Mr. Uzuegbunam that the only reason Defendant Hughes interrupted Mr. Uzuegbunam's open-air speaking was because GGC officials had received calls from people complaining about his expression.

266.   Defendant Hughes instructed Mr. Uzuegbunam to stop speaking publicly and to restrict his expressive activities to distributing literature and having one-on-one conversations with individuals.

267.   Mr. Uzuegbunam explained that he had clearly informed the Office of Student Integrity that he was reserving the Patio Speech Zone in order to share his religious beliefs with the people congregated there.

268.   Defendant Hughes responded by reiterating what the Office of Student Integrity had told him.

269.   Because Mr. Uzuegbunam had allegedly reserved the Patio Speech Zone for select forms of expression (*i.e.,* literature distribution and one-on-one conversations), Defendant Hughes declared that he could not use it for another, closely related form of expression (*i.e.*, open-air speaking) because he had not obtained permission to conduct that additional mode of expression.

270.   Defendant Hughes stated that Mr. Uzuegbunam's right to free speech in the Patio Speech Zone was limited to having conversations with people and distributing literature and that it did not include the right to engage in some form of open-air, public address.

271.   Defendant Hughes stated that Mr. Uzuegbunam's speaking in the Patio Speech Zone constituted "disorderly conduct" because it was disturbing the peace and tranquility of individuals who were congregating in that area.

272.   Defendant Hughes stated that Mr. Uzuegbunam's speaking was disturbing the peace and tranquility of individuals who were congregating in that area because it had generated complaints.

273.   In saying this, Defendant Hughes enforced Defendants' Speech Code against Mr. Uzuegbunam.

274.   Defendant Hughes instructed Mr. Uzuegbunam to go back to the Office of Student Integrity and clarify whether he could use the Patio Speech Zone for open-air speaking.

275.   Defendant Hughes also stated that he anticipated receiving additional complaints about Mr. Uzuegbunam's open-air speaking.

276.   Defendant Hughes stated that if Mr. Uzuegbunam continued speaking publicly in the Patio Speech Zone, he could face discipline under the *Student Code of Conduct*, particularly if GGC officials received additional complaints about his speaking.

277.   Defendant Hughes stated that if Mr. Uzuegbunam's friend started speaking publicly in the Patio Speech Zone, he could be prosecuted for

"disorderly conduct."

278.   Defendant Hughes instructed Mr. Uzuegbunam and his friend to "respect the community" by ceasing any efforts to share their religious beliefs through open-air speaking in the Patio Speech Zone.

279.   Mr. Uzuegbunam noted that GGC has allowed other events and speakers to use amplified sound, both inside and outside the speech zones, without interference. Many of these speakers and events have used offensive language (including the broadcasting of vulgar, lewd, and obscene music), but were still allowed to continue expressing their message.

280.   Defendant Hughes responded by saying that Mr. Uzuegbunam had an obligation to comply with GGC policies, but did not identify any policies that Mr. Uzuegbunam had allegedly violated.

281.   At this point, Defendant Lawler also stated that Mr. Uzuegbunam's open-air speaking in the Patio Speech Zone constituted disorderly conduct.

282.   Defendant Lawler stated that Mr. Uzuegbunam's open-air speaking in the Patio Speech Zone would constitute "disorderly conduct" because it was disturbing people's peace and tranquility, as shown by the complaints GGC officials received.

283.   Defendant Lawler stated that Mr. Uzuegbunam's open-air speaking was "disorderly conduct" because "people are calling us because their peace and tranquility is being disturbed and we've asked you to stop."

284.   Defendant Lawler stated that the mere fact that someone complains about expression converts that expression into disorderly conduct.

285.   In saying this, Defendant Lawler enforced Defendants' Speech Code against Mr. Uzuegbunam.

286.   Defendant Hughes then instructed Mr. Uzuegbunam that he should cease speaking publicly in the Patio Speech Zone because it was not an effective method of communicating his message.

287.   Defendant Hughes noted that members of the Church of Jesus Christ of Latter-Day Saints ("LDS") regularly visit the GGC campus and get approval to express their religious views on campus.

288.   Defendant Hughes noted that members of the LDS church spread their religious views through one-on-one conversations, not through open-air speaking.

289.   Defendant Hughes stated that Mr. Uzuegbunam should communicate his religious views using the same methods that members of the LDS Church uses, rather than through speaking publicly.

290.   Defendant Hughes observed that GGC officials do not receive complaints about the activities of members of the LDS Church when they express their religious viewpoints.

291.   Defendant Hughes summarized the conversation by ordering Mr. Uzuegbunam to stop speaking publicly and to go back to the Office of Student Integrity to get permission to resume speaking publicly.

292.   Defendant Hughes reiterated that if Mr. Uzuegbunam ignored these instructions, he could be disciplined under the *Student Code of Conduct* and other GGC policies.

293.   Defendant Hughes also reiterated that if Mr. Uzuegbunam did not want to return to the Office of Student Integrity, he needed to confine his expressive activities to literature distribution and one-on-one conversations.

294.   Mr. Uzuegbunam questioned whether returning to the Office of Student Integrity would serve any purpose because even if that office authorized him to speak publicly, people could still call with complaints, which would prompt further interference from Defendant Hughes, Defendant Lawler, and their colleagues.

295.   Defendant Hughes responded by saying that he did not think open-air speaking would be approved in the Patio Speech Zone "because it disturbs people."

296.   Defendant Hughes concluded the conversation by stating again that Mr. Uzuegbunam's speech would qualify as "disorderly conduct" and by ordering him again to stop speaking publicly and to revert to literature distribution and one-on-one conversations.

297.   After Defendant Hughes left, Mr. Uzuegbunam and his friend left the Patio Speech Zone.

298.   After leaving the Patio Speech Zone, Mr. Uzuegbunam went to the Office of Student Integrity and spoke with Defendant Dowell.

299.   During the conversation, Defendant Dowell stated that it is a violation of GGC policy for anyone to express a "fire and brimstone message" on campus, even within the speech zones.

300.   Upon information and belief, this prohibition on "fire and brimstone

messages" would also prohibit students from conveying such messages, however they might be defined, to fellow students in private, one-on-one conversations.

301.   Mr. Uzuegbunam has frequently observed a percussion group that plays its drums and other instruments very loudly, especially as it utilizes amplification, approximately once a week outside Building B on campus.

302.   Building B is not within either of the two speech zones on campus.

303.   Upon information and belief, no GGC official has ever interrupted this percussion group or required it to stop performing its music, even though it is outside of the two speech zones.

304.   Mr. Uzuegbunam has frequently observed representatives of the LDS church distribute literature, engage students in conversation about their religious beliefs, and conduct other forms of religious expression, both inside and outside the speech zones.

305.   Upon information and belief, no GGC official has ever required these representatives of the LDS church to stop their religious expression, even when it was outside of the two speech zones.

### C. IMPACT OF DEFENDANTS' POLICIES & ACTIONS ON MR. UZUEGBUNAM

306.   Since Defendants stopped him from distributing literature outside of the speech zones in July 2016, Mr. Uzuegbunam has not attempted to speak publicly in any open, outdoor, generally accessible areas of campus that are outside of the two speech zones.

307.   Since Defendants stopped him from distributing literature outside of

the speech zones in July 2016, Mr. Uzuegbunam has greatly curtailed, restricted, and limited any efforts to share religious literature with fellow students in any open, outdoor, generally accessible areas of campus that are outside of the two speech zones.

308.   Since Defendants Hughes and Lawler stopped him from speaking publicly in the Patio Speech Zone, Mr. Uzuegbunam has not attempted to engage in open-air speaking or other expressive activities in the speech zones.

309.   Mr. Uzuegbunam desires to resume freely using open, outdoor, generally accessible areas of the GGC campus that are outside of the two tiny speech zones for expressive activities, including literature distribution, at the earliest opportunity.

310.   Mr. Uzuegbunam desires to resume his open-air speaking both in the speech zones and in other open, outdoor, generally accessible areas of the GGC campus at the earliest opportunity.

311.   Mr. Uzuegbunam would like to continue speaking publicly not only in the speech zones, but also in other open, outdoor areas of campus that are generally open to students.

312.   Mr. Uzuegbunam would like to use the open, outdoor, generally accessible areas of campus for expressive activities, even at times when the two tiny speech zones are closed.

313.   For example, Mr. Uzuegbunam would like to speak to different groups of students by conducting expressive activities in the open, outdoor, generally accessible areas of campus, including the following:

48

- The expansive lawns and green space bordered by Buildings B, the Student Center (*i.e.*, Building E), the library (*i.e.*, Building L);

- The patios and green spaces just north of Building H;

- The sidewalks and pedestrian pathways between the library (*i.e.*, Building L) and the Food Court (*i.e.*, Building A);

- The lawns and between Buildings B and C; and

- The lawns to the east of Building B.

*See* Exs. 1–2, 6–7.

314.   Each of these locations is outside of the speech zones set forth in Defendants' Speech Zone Policy.

315.   Mr. Uzuegbunam desires to engage in peaceful expressive activities on campus—including public oral communication—without first seeking permission to do so from GGC three days in advance and without agreeing to limit his activities to the speech zones or methods of communication that GGC officials specify, but he has not done so for fear of punishment.

316.   Mr. Uzuegbunam desires to engage in peaceful literature distribution without first seeking permission to do so from GGC three days in advance and without agreeing to limit his activities to the speech zones GGC officials specify, but he has greatly limited these activities for fear of punishment.

317.   Since July 2016, Mr. Uzuegbunam has not attempted to speak publicly in the open, outdoor, generally accessible areas of the GGC campus that are outside of the two speech zones because numerous GGC officials, including Defendants, have told him that engaging in this activity would

violate GGC policies. Thus, he would risk disciplinary action if he were to engage in such activities in those locations.

318. Since July 2016, Mr. Uzuegbunam has greatly curtailed, restricted, and limited his efforts to engage in other expressive activities (especially literature distribution) in the open, outdoor, generally accessible areas of the GGC campus that are outside of the two speech zones because numerous GGC officials, including Defendants, have told him that engaging in these activities would violate GGC policies. Thus, he would risk disciplinary action, including possible expulsion, if he were to engage in such activities in those locations.

319. Since approximately August 25, 2016, Mr. Uzuegbunam has not attempted to speak publicly inside the speech zones because numerous GGC officials, including Defendants, have told him that doing so would violate GGC policies if someone in the area happened to complain. Thus, he would risk disciplinary action if he were to engage in such expression in those speech zones.

320. Since July 2016, Mr. Uzuegbunam has greatly curtailed, restricted, and limited any efforts to engage in any form of spontaneous expressive activities because GGC policies state that he would expose himself to disciplinary action, including possible expulsion, if he engaged in these activities without requesting permission three days in advance from GGC officials and without obtaining that permission.

321. Defendants' enforcement of their Speech Code against Mr. Uzuegbunam burdens his free speech because he is prohibited from saying

anything that might offend, disturb, or discomfort anyone who happens to hear him lest he be punished for "disorderly conduct."

322. Defendants' enforcement of their Speech Zone Policy and related provisions of GGC's *Student Code of Conduct* against Mr. Uzuegbunam burdens his speech for multiple reasons.

323. Mr. Uzuegbunam wants to speak publicly, discuss religious issues, and distribute religious literature while he stands on public ways and open areas on GGC's campus without first having to obtain permission from GGC officials and without having to confine his activities to one of two speech zones.

324. Mr. Uzuegbunam's speech is further frustrated because he cannot speak publicly, speak publicly, or distribute literature at GGC until he first requests permission from GGC officials three days in advance, restricts his activities to the speech zone, and complies with any other restrictions they impose.

325. The permit requirement, in and of itself, is unduly burdensome as it requires three days advanced notice for processing.

326. If Mr. Uzuegbunam learns of breaking news and wants to share his views about that news with fellow students by speaking publicly, engaging interested passersby in conversations, or distributing literature outside the two speech zones, Defendants' Speech Zone Policy prohibits him from doing so.

327. It is repugnant to Mr. Uzuegbunam that he, as an individual citizen and student at a public college, must notify the government in order to speak on campus when he feels convicted by his religious faith to speak and distribute

literature on campus.

328.   Mr. Uzuegbunam also likes to spread his message about his faith as it relates to current events.

329.   Mr. Uzuegbunam and all students at GGC require the ability to speak spontaneously in reaction to news. And yet, Defendants' Speech Zone Policy and the related provisions of GGC's *Student Code of Conduct* prohibit such spontaneous speech because they force Mr. Uzuegbunam to obtain a permit prior to engaging in expressive activities and to request that permit three days in advance.

330.   Mr. Uzuegbunam is bound to comply with the terms of Defendants' Speech Zone Policy and GGC's *Student Code of Conduct* at all times on campus, in part because it is incorporated into GGC's *Student Code of Conduct*.

331.   Mr. Uzuegbunam is not engaging in any public speaking or other forms of public address in the open, outdoor, generally accessible areas of campus that are outside of the two speech zones due to Defendants' Speech Zone Policy, the related provisions of GGC's *Student Code of Conduct*, Defendants' enforcement of those policies against him, and the accompanying threat of punishment under GGC's *Student Code of Conduct*.

332.   Mr. Uzuegbunam has greatly curtailed, restricted, and limited his efforts to engaging in any literature distribution in the open, outdoor, generally accessible areas of campus that are outside of the two speech zones due to Defendants' Speech Zone Policy, the related provisions of GGC's *Student Code*

*of Conduct*, Defendants' enforcement of those policies against him, and the accompanying threat of punishment under GGC's *Student Code of Conduct*.

333.   Mr. Uzuegbunam is not engaging in open-air speaking or publicly discussing religious topics inside the speech zones due to Defendants' Speech Code, Defendants' enforcement of that policy against him, and the accompanying threat of punishment under GGC's *Student Code of Conduct*.

334.   Mr. Uzuegbunam is not engaging in open-air speaking or publicly discussing religious topics outside the speech zones due to Defendants' Speech Code, Defendants' enforcement of that policy against him, and the accompanying threat of punishment under GGC's *Student Code of Conduct*.

335.   Mr. Uzuegbunam is chilled in his ability to engage in expressive activities outside of the two speech zones due to Defendants' Speech Zone Policy, the related provisions of GGC's *Student Code of Conduct*, Defendants' enforcement of those policies against him, and the accompanying threat of punishment under GGC's *Student Code of Conduct*.

336.   Mr. Uzuegbunam is chilled in his ability to speak publicly and discuss religious topics on campus that might offend, disturb, or discomfort any listener due to Defendants' Speech Code, Defendants' enforcement of that policy against him, and the accompanying threat of punishment under GGC's *Student Code of Conduct*.

337.   If not for Defendants' Speech Zone Policy, the related provisions of GGC's *Student Code of Conduct*, and the actions of Defendants, Mr. Uzuegbunam would immediately return to the open, outdoor areas of the GGC

campus and engage in expressive activities like public speaking and discussing religious topics with fellow students and passersby.

338.   If not for Defendants' Speech Zone Policy, the related provisions of GGC's *Student Code of Conduct*, and the actions of Defendants, Mr. Uzuegbunam would immediately stop curtailing, restricting, and limiting his efforts to distribute literature to fellow students and passersby in the open, outdoor areas of the GGC campus.

339.   Mr. Uzuegbunam refrains for fear of punishment under Defendants' Speech Zone Policy and the related provisions of GGC's *Student Code of Conduct*.

340.   If not for Defendants' Speech Code and the actions of Defendants, Mr. Uzuegbunam would immediately return to the open, outdoor areas of the GGC campus and engage in expressive activities like public speaking and discussing religious topics with fellow students and passersby.

341.   Mr. Uzuegbunam refrains for fear of punishment under Defendants' Speech Code and the related provisions of GGC's *Student Code of Conduct*.

342.   The fear of arrest or punishment severely limits Mr. Uzuegbunam's constitutionally-protected expression on campus.

### ALLEGATIONS OF LAW

343.   At all times relevant to this Complaint, each and all of the acts alleged herein were attributed to the Defendants who acted under color of a statute, regulation, custom, or usage of the State of Georgia.

344.   Defendants knew or should have known that by disallowing Mr.

Uzuegbunam's expressive activity on campus without him obtaining prior permission, by limiting his expression to two tiny speech zones, and by prohibiting him from speaking publicly because some people complained, Defendants violated his constitutional rights.

345. Defendants knew or should have known that by disallowing Mr. Uzuegbunam's expressive activity on campus because some people complained about it, Defendants violated his constitutional rights.

346. The policies and practices that led to the violation of Mr. Uzuegbunam's constitutional rights remain in full force and effect.

347. Mr. Uzuegbunam is suffering irreparable harm from the policies and practices of Defendants which cannot be fully compensated by an award of money damages.

348. Mr. Uzuegbunam has no adequate or speedy remedy at law to correct or redress the deprivation of his rights by Defendants.

349. Defendants' actions and policies, as set forth above, do not serve any legitimate or compelling state interest.

350. Defendants have deprived, and continue to deprive, Mr. Uzuegbunam of his clearly established rights under the United States Constitution, as set forth in the causes of action below.

351. Unless the policies and conduct of Defendants are enjoined, Mr. Uzuegbunam will continue to suffer irreparable injury.

352. Pursuant to 42 U.S.C. §§ 1983 and 1988, Mr. Uzuegbunam is entitled to appropriate relief invalidating Defendants' Speech Zone and Speech Code

Policies, along with the related policies and practices.

### FIRST CAUSE OF ACTION
### Violation of Plaintiff's First Amendment Right to Freedom of Speech
### (42 U.S.C. § 1983)

353.   Plaintiff repeats and realleges each of the allegations contained in paragraphs 1–352 of this Complaint, as if set forth fully herein.

354.   Speech, including public oral expression, is entitled to comprehensive protection under the First Amendment.

355.   Religious speech—including public speaking and preaching—is also fully protected by the First Amendment.

356.   The First Amendment rights of free speech and press extend to the campuses of state colleges.

357.   The sidewalks and open spaces of the GGC campus are designated public fora—if not traditional public fora—for speech and expressive activities by students enrolled at GGC.

358.   The First Amendment's Free Speech Clause, incorporated and made applicable to the states by the Fourteenth Amendment to the United States Constitution, prohibits content and viewpoint discrimination in the public fora for student speech and expression on the campus of a public college.

359.   A public college's ability to restrict speech—particularly student speech—in a public forum is limited.

360.   The First Amendment's Free Speech Clause prohibits censorship of religious expression.

361.   The First Amendment prohibits the government from prohibiting or

limiting speech because it might offend, disturb, or discomfort the sensibilities of listeners, and any governmental attempts to do so are inherently content and/or viewpoint based.

362.   Under the First Amendment's Free Speech Clause, a prior restraint on citizens' expression is presumptively unconstitutional, unless it (1) does not delegate overly broad licensing discretion to a government official, (2) contains only content and viewpoint neutral reasonable time, place, and manner restrictions, (3) is narrowly tailored to serve a significant governmental interest, and (4) leaves open ample alternative means for communication.

363.   Thus, the government may not regulate speech based on policies that permit arbitrary, discriminatory, or overzealous enforcement.

364.   Unbridled discretion to discriminate against speech based on its content or viewpoint violates the First Amendment regardless of whether that discretion has ever been unconstitutionally applied in practice.

365.   The First Amendment's Free Speech Clause guarantees a citizen the right to express his views anonymously and spontaneously.

366.   Defendants' Speech Zone Policy, the related provisions of GGC's *Student Code of Conduct*, and their practice of requiring students to obtain a permit from College officials before engaging in any expressive activities and of restricting student speech to two tiny speech zones violate the First Amendment facially and as applied because they are prior restraints on speech in areas of campus that are traditional or designated public fora for GGC students.

367.   Defendants' Speech Zone Policy, the related provisions of GGC's *Student Code of Conduct*, and their practice of requiring students to obtain a permit from College officials before engaging in any expressive activities and of restricting student speech to two tiny speech zones violate the First Amendment facially and as applied because they grant College officials unbridled discretion to discriminate against speech based on its content or viewpoint.

368.   Defendants' Speech Zone Policy, the related provisions of GGC's *Student Code of Conduct*, and their practice of requiring students to obtain a permit from College officials before engaging in any expressive activities and of restricting student speech to two tiny speech zones violate the First Amendment facially and as applied because they are vague and overbroad.

369.   Defendants' Speech Zone Policy, the related provisions of GGC's *Student Code of Conduct*, and associated practices that require students to seek a permit for a proposed expressive activity at least three days in advance and that limit the activity to two tiny speech zones are unconstitutional "time, place, and manner" restrictions that violate Plaintiff's and other students' right to freedom of speech and expression because they are not content-neutral, they are not narrowly tailored to serve a significant government interest, and they do not leave open ample alternative channels of communication.

370.   Defendants' Speech Zone Policy, the related provisions of GGC's *Student Code of Conduct*, and associated practices provide no guidelines or standards to limit the discretion of GGC officials in granting, denying,

relocating, or restricting requests by students to engage in expressive activity.

371.   Defendants' Speech Zone Policy, the related provisions of GGC's *Student Code of Conduct*, and associated practices require students to seek a permit for proposed expressive activities from Defendants and then delegate authority to Defendants to determine whether and where students may engage in these expressive activities, thus giving Defendants unbridled discretionary power to limit student speech in advance of such expression on campus and to do so based on the content and viewpoint of the speech.

372.   These grants of unbridled discretion to GGC officials violate the First Amendment because they create a system in which speech is reviewed without any standards, thus giving students no way to prove that a denial, restriction, or relocation of their speech was based on unconstitutional considerations.

373.   The First Amendment's prohibition against content and viewpoint discrimination requires Defendants to provide adequate safeguards to protect against the improper exclusion, restriction, or relocation of student speech based on its content or viewpoint.

374.   Because Defendants have failed to establish neutral criteria governing the granting, denial, or relocation of student speech applications (including requests to use campus facilities), there is a substantial risk that GGC officials will engage in content and viewpoint discrimination when addressing those applications.

375.   Defendants exercised the unbridled discretion granted them under their Speech Zone Policy, the related provisions of GGC's *Student Code of*

*Conduct*, and associated practices when they prohibited Plaintiff from distributing religious literature and engaging passing students in conversation in the open, generally accessible areas of campus outside the library because he had not first obtained a permit and because he was outside of the two speech zones.

376. Defendants' Speech Zone Policy, the related provisions of GGC's *Student Code of Conduct*, and associated practices do not contain any definite time period in which GGC officials must grant or deny students' requests to engage in expressive activities.

377. Defendants' Speech Zone Policy, the related provisions of GGC's *Student Code of Conduct*, and associated practices that require students to seek a permit three days before any expressive activity prohibit spontaneous expression.

378. Defendants' Speech Zone Policy, the related provisions of GGC's *Student Code of Conduct*, and associated practices are neither reasonable nor valid time, place, and manner restrictions on speech because they are not content-neutral, they are not narrowly tailored to serve a significant government interest, and they do not leave open ample alternative channels of communication.

379. Defendants' Speech Zone Policy, the related provisions of GGC's *Student Code of Conduct*, and associated practices are also overbroad because they prohibit and restrict protected expression.

380. Defendants' Speech Zone Policy, the related provisions of GGC's

*Student Code of Conduct*, and associated practices unconstitutionally censor or restrict all private speech (including, but not limited to, literature distribution) that occurs outside the two speech zones, require students to obtain a permit for all expressive activities from Defendants in advance, and ban a student from utilizing the speech zones for thirty days after each use (even if no one else is utilizing them during that time).

381.   The government may not regulate speech based on overbroad policies that encompass a substantial amount of constitutionally protected speech.

382.   Defendants' Speech Zone Policy, the related provisions of GGC's *Student Code of Conduct*, and associated practices prohibit a substantial amount of constitutionally protected speech in that they prohibit students from engaging in expressive activities in the public fora of campus outside the two speech zones, they require students to seek a permit from College officials at least three days in advance, they require students to confine their expressive activities to the speech zones, and they ban students from utilizing the speech zones for thirty days after each use (even if no one else is utilizing them during that time).

383.   The overbreadth of Defendants' Speech Zone Policy, the related provisions of GGC's *Student Code of Conduct*, and their associated practices chills the speech of students not before the Court who seek to engage in private expression (including public speaking, conversations, and literature distribution) in the open, outdoor area of campus.

384.   Defendants' Speech Zone Policy, the related provisions of GGC's

*Student Code of Conduct*, and associated practices chill, deter, and restrict Plaintiff from freely expressing his religious beliefs.

385.   The Free Speech Clause of the First Amendment protects speech that is provocative and challenging and prohibits the government from restricting speech simply because listeners find it offensive or discomforting.

386.   Defendants' Speech Code and associated practices violate the First Amendment, facially and as applied, because they create a heckler's veto on campus, allowing any student to silence a speaker and expose him to discipline for engaging in "disorderly conduct" simply by complaining about the speaker's expression.

387.   Defendants' Speech Code and associated practices violate the First Amendment, facially and as applied, because they are inherently content- and viewpoint-discriminatory because they prohibit students from engaging in any expression that creates complaints.

388.   Defendants' Speech Code and associated practices violate the First Amendment, facially and as applied, because they are vague and overbroad.

389.   Defendants' Speech Code and associated practices prohibit a substantial amount of constitutionally protected speech in that they declare that any expression that prompts complaints from a listener constitutes "disorderly conduct" and subject students to discipline for engaging in such expression.

390.   Defendants' Speech Code and associated practices provide no guidelines or standards to limit the discretion of GGC officials when

determining whether a student's expression has "disturb[ed] the peace and/or comfort of person(s)."

391.   Defendants exercised the unbridled discretion granted them under their Speech Code and associated practices when they prohibited Plaintiff from sharing his religious beliefs inside the speech zone he reserved for that purpose because people complained about his expression.

392.   Defendants engaged in content and viewpoint discrimination when they applied their Speech Code to prohibit Plaintiff from communicating his religious views inside the speech zone despite allowing members of other religious organizations to communicate their different religious views freely and without interference on campus.

393.   Defendants' Speech Code and associated practices are also overbroad because they prohibit and restrict protected expression.

394.   Defendants' Speech Code and associated practices unconstitutionally censor all private speech that prompts complaints from any listener.

395.   The overbreadth of Defendants' Speech Code and related practices chills the speech of students not before the Court who seek to engage in private expression on campus that some might find offensive or discomforting.

396.   Defendants' Speech Code and related practices chill, deter, and restrict Plaintiff from freely expressing his religious beliefs.

397.   Defendants' Speech Zone and Speech Code Policies, along with the associated policies and practices, do not satisfy strict scrutiny because they

support no compelling governmental interest and they are not narrowly tailored to meet any such concerns.

398.   Defendants' Speech Zone and Speech Code Policies, along with the associated policies and practices, violate Plaintiff's right to free speech as guaranteed by the First Amendment to the United States Constitution.

399.   Because of Defendants' actions, Plaintiff has suffered, and continues to suffer irreparable harm. He is entitled to an award of monetary damages and equitable relief.

400.   Pursuant to 42 U.S.C. §§ 1983 and 1988, Plaintiff is entitled to a declaration that Defendants violated his First Amendment right to freedom of speech and an injunction against Defendants' policy and actions. Additionally, Plaintiff is entitled to damages in an amount to be determined by the evidence and this Court and the reasonable costs of this lawsuit, including his reasonable attorneys' fees.

## SECOND CAUSE OF ACTION
### Violation of Plaintiff's First Amendment Right to Free Exercise of Religion
### (42 U.SC. § 1983)

401.   Plaintiff repeats and realleges each of the allegations contained in paragraphs 1–352 of this Complaint, as if set forth fully herein.

402.   The First Amendment's Free Exercise Clause, incorporated and made applicable to the states by the Fourteenth Amendment to the United States Constitution, guarantees Plaintiff the free exercise of religion.

403.   Laws that burden the free exercise of religion must be neutral and

generally applicable, and even then, they must have a rational basis.

404. If they are not neutral and generally applicable, then laws that burden the free exercise of religion must be justified by a compelling state interest.

405. Plaintiff's decision to distribute religious literature, engage interested students and other individuals in conversations, and engage in open-air speaking is motivated by his sincerely held religious beliefs, is an avenue through which he exercises his religious faith, and constitutes a central component of his sincerely held religious beliefs.

406. Defendants' Speech Zone and Speech Code Policies are neither neutral nor generally applicable but allow Defendants to target religious expression and activities specifically.

407. Defendants' Speech Zone and Speech Code Policies and associated practices are neither neutral nor generally applicable because they represent a system of individualized assessments. For the same reason, they are subject to strict scrutiny.

408. Defendants' Speech Zone Policy and the associated policies and practices grant College officials unbridled discretion when evaluating students' requests to utilize the speech zones for expressive activities, and thus, they establish a system of individualized assessments.

409. Defendants' Speech Zone Policy and the associated policies and practices grant College officials unbridled discretion when evaluating students' requests to engage in expressive activities outside the speech zones, and thus,

they establish a system of individualized assessments.

410.   Defendants' Speech Zone Policy and the associated policies and practices grant College officials unbridled discretion when evaluating students' requests to engage in expressive activities during hours the speech zones are closed, and thus, they establish a system of individualized assessments.

411.   Defendants' Speech Code and associated practices provide no guidelines or standards to limit the discretion of GGC officials when determining whether a student's expression has "disturb[ed] the peace and/or comfort of person(s)," and thus, they establish a system of individualized assessments.

412.   Defendants' Speech Code and Speech Zone policies and their associated policies and practices are underinclusive, prohibiting some speech while leaving other speech equally harmful to GGC's asserted interests unprohibited.

413.   Defendants' Speech Zone and Speech Code Policies burden several of the constitutional rights of all of its students, including Mr. Uzuegbunam, in addition to their rights under the Free Exercise Clause (*e.g.*, freedom of speech, freedom from an establishment of religion, due process rights, equal protection rights).

414.   Defendants' infringement of Plaintiff's free exercise of religion fails to satisfy strict scrutiny because it is not narrowly tailored to promote a compelling government interest.

415.   Defendants, acting under color of state law, and by policy and practice

have explicitly and implicitly infringed Plaintiff's free exercise of religion and deprived Plaintiff of his clearly established rights to freedom of religious expression secured by the First Amendment to the United States Constitution.

416.   Because of Defendants' actions, Plaintiff has suffered, and continues to suffer, irreparable harm. He is entitled to an award of monetary damages and equitable relief.

417.   Pursuant to 42 U.S.C. §§ 1983 and 1988, Plaintiff is entitled to a declaration that Defendants violated their First Amendment right to free exercise of religion and an injunction against Defendants' policy and actions. Additionally, Plaintiff is entitled to damages in an amount to be determined by the evidence and this Court and the reasonable costs of this lawsuit, including his reasonable attorneys' fees.

### THIRD CAUSE OF ACTION
**Violation of Plaintiff's Fourteenth Amendment Right to
Due Process of Law
(42 U.S.C. § 1983)**

418.   Plaintiff repeats and realleges each of the allegations contained in paragraphs 1–352 of this Complaint, as if set forth fully herein.

419.   The Fourteenth Amendment to the United States Constitution guarantees Plaintiff the right to due process of law and prohibits Defendants from promulgating and employing vague and overbroad standards that allow for viewpoint discrimination in Defendants' handling of Plaintiff's open-air speaking, conversations, and literature distribution.

420.   The government may not regulate speech based on policies that

permit arbitrary, discriminatory, and overzealous enforcement.

421.   The government may not regulate speech based on policies that cause persons of common intelligence to guess at their meaning and differ as to their application.

422.   The government also may not regulate speech in ways that do not provide persons of common intelligence fair warning as to what speech is permitted and what speech is prohibited.

423. Defendants' Speech Zone Policy, the related provisions of GGC's *Student Code of Conduct*, and associated practices contain no criteria to guide administrators when deciding whether to grant, deny, relocate, or restrict student speech (including public speaking, conversations, and literature distribution) on campus.

424. Defendants' Speech Zone Policy, the related provisions of GGC's *Student Code of Conduct*, and associated practices contain no criteria to limit the discretion of administrators in deciding when or how to modify the speech zones.

425. Defendants' Speech Zone Policy, the related provisions of GGC's *Student Code of Conduct*, and associated practices contain no criteria to guide administrators in deciding how to schedule use of the speech zones to "accommodate all interested users."

426. Defendants' Speech Zone Policy, the related provisions of GGC's *Student Code of Conduct*, and associated practices contain no criteria to guide administrators in reviewing the literature students are required to submit in

order to obtain a permit to engage in literature distribution on campus.

427.   Defendants' Speech Zone Policy, the related provisions of GGC's *Student Code of Conduct*, and associated practices are impermissibly vague and ambiguous and are thus incapable of providing meaningful guidance to Defendants.

428.   The lack of criteria, factors, or standards in Defendants' Speech Zone Policy, the related provisions of GGC's *Student Code of Conduct*, and associated practices renders these policies and practices unconstitutionally vague and in violation of Plaintiff's right to due process of law under the Fourteenth Amendment.

429.   Defendants' Speech Code and associated practices contain no criteria to limit the discretion of GGC officials when determining whether a student's expression has "disturb[ed] the peace and/or comfort of person(s)."

430.   Defendants' Speech Code and associated practices are impermissibly vague and ambiguous. Thus, they are incapable of providing meaningful guidance to Defendants, and they force students to guess as to whether expression that the First Amendment protects is in fact allowed on campus.

431.   The lack of criteria, factors, or standards in Defendants' Speech Code and associated practices renders these policies and practices unconstitutionally vague and in violation of Plaintiff's right to due process of law under the Fourteenth Amendment.

432.   Because of Defendants' actions, Plaintiff has suffered, and continues to suffer irreparable harm. He is entitled to an award of monetary damages

and equitable relief.

433.   Pursuant to 42 U.S.C. §§ 1983 and 1988, Plaintiff is entitled to a declaration that Defendants violated his Fourteenth Amendment right to due process of law and an injunction against Defendants' policy and actions. Additionally, Plaintiff is entitled to damages in an amount to be determined by the evidence and this Court and the reasonable costs of this lawsuit, including his reasonable attorneys' fees.

**FOURTH CAUSE OF ACTION**
**Violation of Plaintiff's Fourteenth Amendment Right to**
**Equal Protection of the Law**
**(42 U.SC. § 1983)**

434.   Plaintiff repeats and realleges each of the allegations contained in paragraphs 1–352 of this Complaint, as if set forth fully herein.

435.   The Fourteenth Amendment to the United States Constitution guarantees Plaintiff the equal protection of the laws, which prohibits Defendants from treating Plaintiff differently than similarly situated students.

436.   The government may not treat someone disparately as compared to similarly situated persons when such disparate treatment burdens a fundamental right, targets a suspect class, or has no rational basis.

437.   Plaintiff is similarly situated to other students at the College.

438.   Defendants have allowed students to engage in various expressive activities outside of the two speech zones, but denied the same to Plaintiff.

439.   Defendants have allowed students to engage in loud forms of expressive activities inside the speech zones, including the use of amplified

sound, but prohibited Plaintiff from engaging in comparatively quieter forms of expression.

440.   Defendants have allowed students to engage in loud forms of expression outside the speech zones, including permitting a percussion group to play approximately once a week, but prohibited Plaintiff from engaging in far quieter forms of expression both inside and outside the speech zones.

441.   Defendants have allowed students to engage in offensive forms of speech, including the broadcasting of vulgar, lewd, and obscene music, but stopped Plaintiff from speaking publicly, claiming that someone's complaint converted his expression into "disorderly conduct."

442.   Defendants have allowed other religious groups, including but not limited to members of the LDS church, to distribute literature and engage students in conversations in the outdoor areas of campus, inside and outside the speech zones, but they prohibited Mr. Uzuegbunam from doing the same things in the same locations.

443.   Defendants have allowed other religious groups, including but not limited to members of the LDS church to engage in religious advocacy on campus but have stopped Mr. Uzuegbunam from doing the same because his activities provoked complaints while those of other religious groups did not.

444.   Defendants' Speech Zone and Speech Code Policies, along with their related policies and practices violate various fundamental rights of Plaintiff, such as his freedom of speech, his rights under the Establishment Clause, and his right to due process of law.

445.   When government regulations, like Defendants' Speech Zone and Speech Code Policies, along with their related policies and practices, infringe on fundamental rights, discriminatory intent is presumed.

446.   Defendants' Speech Zone and Speech Code Policies, along with their related policies and practices, have also been applied to discriminate intentionally against Plaintiff's rights to freedom of speech and the free exercise of religion.

447.   Defendants' Speech Code and Speech Zone policies and their associated policies and practices are underinclusive, prohibiting some speech while leaving other speech equally harmful to GGC's asserted interests unprohibited.

448.   Defendants lack a rational or compelling state interest for such disparate treatment of Plaintiff.

449.   Defendants' Speech Zone and Speech Code Policies, along with their related policies and practices, are not narrowly tailored as applied to Plaintiff because Plaintiff's speech does not implicate any of the legitimate interests Defendants might have.

450.   Defendants have applied their Speech Zone and Speech Code Policies, along with their related policies and practices, to Plaintiff in a discriminatory and unequal matter, allowing other students to speak freely in and out of the speech zones when Defendants say that Plaintiff cannot do the same, in violation of Plaintiff's right to equal protection of the laws under the Fourteenth Amendment.

451.   Because of Defendants' actions, Plaintiff has suffered, and continues to suffer, irreparable harm. He is entitled to an award of monetary damages and equitable relief.

452.   Pursuant to 42 U.S.C. §§ 1983 and 1988, Plaintiff is entitled to a declaration that Defendants violated his Fourteenth Amendment right to equal protection of law and an injunction against Defendants' policy and actions. Additionally, Plaintiff is entitled to damages in an amount to be determined by the evidence and this Court and the reasonable costs of this lawsuit, including his reasonable attorneys' fees.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment against Defendants and provide Plaintiff with the following relief:

A.   A declaratory judgment that Defendants' Speech Zone Policy, the related provisions of GGC's *Student Code of Conduct* (*i.e.*, those prohibiting "circulating any advertising media without approval from proper College officials" and "making or attempting to make unauthorized use of College facilities"), and associated practices, facially and as-applied, violate Plaintiff's rights under the First and Fourteenth Amendments;

B.   A declaratory judgment that Defendants' Speech Code Policy and associated practices, facially and as-applied, violate Plaintiff's rights under the First and Fourteenth Amendments;

C.   A declaratory judgment that the Defendants' restriction of Plaintiff's literature distribution violated Plaintiff's rights under the First and

Fourteenth Amendments;

D. A declaratory judgment that the Defendants' restriction of Plaintiff's open-air speaking violated Plaintiff's rights under the First and Fourteenth Amendments;

E. A preliminary and permanent injunction prohibiting the Defendants, their agents, officials, servants, employees, and any other persons acting in their behalf from enforcing Defendants' Speech Zone Policy, the related provisions of GGC's *Student Code of Conduct* (*i.e.*, those prohibiting "circulating any advertising media without approval from proper College officials" and "making or attempting to make unauthorized use of College facilities"), and associated practices challenged in this Complaint;

F. A preliminary and permanent injunction prohibiting the Defendants, their agents, officials, servants, employees, and any other persons acting in their behalf from enforcing Defendants' Speech Code Policy and associated practices challenged in this Complaint;

G. Nominal damages for the violation of Plaintiff's First and Fourteenth Amendment rights from the Defendants sued in their individual capacities;

H. Plaintiff's reasonable attorneys' fees, costs, and other costs and disbursements in this action pursuant to 42 U.S.C. § 1988; and

I. All other further relief to which Plaintiff may be entitled.

74

Respectfully submitted this 19th day of December 2016.

*/s/ Travis C. Barham*

DAVID A. CORTMAN
Georgia Bar No. 188810
TRAVIS C. BARHAM
Arizona Bar No. 024867
Georgia Bar No. 753251
ALLIANCE DEFENDING FREEDOM
1000 Hurricane Shoals Rd. NE,
Suite D-1100
Lawrenceville, Georgia 30043
Telephone:  (770) 339–0774
Facsimile:  (770) 339–6744
dcortman@ADFlegal.org
tbarham@ADFlegal.org

CASEY MATTOX*
Virginia Bar No. 47148
ALLIANCE DEFENDING FREEDOM
440 1st Street, NW, Ste. 600
Washington, D.C. 20001
Telephone:  (202) 393–8690
Facsimile:  (202) 347–3622
cmattox@ADFlegal.org

* Application for admission to be filed.

*Attorneys for Plaintiffs*

## DEMAND FOR TRIAL BY JURY

Plaintiff demands trial by jury for all matters so triable herein.

*/s/ Travis C. Barham*

TRAVIS C. BARHAM
*Attorney for Plaintiffs*

### DECLARATION UNDER PENALTY OF PERJURY

I, CHIKE UZUEGBUNAM, a citizen of the United States and a resident of the State of Georgia, hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct to the best of my knowledge, except as to statements made on information and belief, and those I believe to be true and correct.

Executed this _12_ day of December, 2016, at Lawrenceville, Georgia.

CHIKE UZUEGBUNAM