# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| **CHIKE UZUEGBUNAM and** | ) | |
| **JOSEPH BRADFORD,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| **v.** | ) | **Civil Action No.:** |
| | ) | **1:16-cv-04658-ELR** |
| **STANLEY C. PRECZEWSKI, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT

## I.    INTRODUCTION

Plaintiffs, students at Georgia Gwinnett College ("GGC"), are challenging the college's Speech Policy, as well as its Disorderly Conduct Policy.[1]  Plaintiffs claim that both policies are facially unconstitutional and unconstitutional as applied to their speech. (Doc. 13).  Plaintiffs generally assert four causes of action with respect to the policies:  (1) First Amendment right to freedom of speech; (2) First Amendment right to free exercise of religion; (3) Fourteenth Amendment right to due process; and (4) Fourteenth Amendment right to equal protection. Defendants now move to dismiss Plaintiffs' lawsuit in its entirety.

---

[1] Defendants note that GGC has recently revised both policies.  The revised policies will be further discussed in a Motion to Dismiss all claims for injunctive and declaratory relief pursuant to Fed. R. Civ. Pro. 12 (b)(1).  Thus, all references in this brief to the Speech Policy and Disorderly Conduct Policy refer to the former policies that were in place at the time of the alleged constitutional violations.

## II.   THE COLLEGE'S PRIOR SPEECH POLICY

The prior Speech Policy (Doc. 13-3) expressly stated that its purpose was to "provid[e] a forum for free and open expression of divergent points of view by students, student organizations, faculty, staff and visitors," while simultaneously fostering a "secure learning environment which allows members of the community to express their views in ways which do not disrupt the operation of the College." (Doc. 13-3 at 1).   To that end, Plaintiffs contend that the prior Speech Policy provided all individuals (students and non-students alike) with two Speech Zones[2] on campus for "speeches, gatherings, distribution of written materials, and marches." (Id. at 1).   The policy applied only to these types of public expression, and not to one-on-one conversations between individuals, whether planned or spontaneous.   (Id. at 2).

The Speech Zones are available "from 11:00 a.m. to 1:00 p.m. and 5:30 p.m. to 7:30 p.m., Monday through Thursday, and 11:00 a.m. to 1:00 p.m. on Friday"— i.e., eighteen hours each week. (Id.).   Individuals may utilize the Speech Zones at least once every thirty days.   (Id.).   Additionally, upon written request, the prior Speech Policy also allowed individuals to engage in expressive activity in other areas and during different times.   (Id.).

---

[2] The Free Speech Zones are located: (1) in "the concrete area/walkway between Student Housing and the Student Center," and (2) the concrete area in front of the Food Court. (Doc. 13-3 at 2).

To utilize the Speech Zones (or to engage in expressive activity outside of the zones), individuals must submit a "free speech form," along with any publicity materials, to a designated Student Affairs official three business days in advance. (Doc. 13-3 at 2). The expressive activity will be authorized if it meets the following criteria (Id. at 5):

- Publicity materials must be submitted with the application form. Admission charges, if any, or suggested donations which are used as a condition of admission, must be included in all publicity for the event. No publicity for a speaker or program may be released prior to authorization of the registration form. Unauthorized use of the College's name, other than to indicate the location of the event, is strictly prohibited. Upon authorization, the copies of the application form and any publicity material shall be distributed to the campus Senior Associate Provost for Student Affairs, the Director of Public Services/Campus Police, the Office of Public Relations, the Dean of Students, and the applicant. (Id. at 3).

- If a speaker is being sponsored by a student organization, an Advisor (or designee, who must be a full-time faculty or designated staff member) if applicable, must be present at the event. (Id. at 3).

- No interference with the free flow of traffic nor the ingress and egress to buildings on campus is permitted and no use of microphones, bullhorns, or any sound amplification device is allowed. (Id. at 3).

- No interruption of the orderly conduct of college classes or other college activities is permitted. (Id. at 3).

- No impediment of passersby or other disruption of normal activities is permitted. (Id. at 3).

- No intimidation or harassment, verbal or otherwise, of passersby is permitted. (Id. at 3).

- Marches, either independent or related to an event or speech, must be authorized at least 3 business days prior to the program or event in

accordance with this policy and local ordinances, and may only take place on the streets or sidewalks of the campus.  (Id. at 4).

- No commercial solicitations, campus sales, or fundraising activities shall be undertaken which are not authorized by GGC.  (Id. at 4).

- Non-commercial pamphlets, handbills, circulars, newspapers, magazines, and other written materials may be distributed on a person-to-person basis in the free speech expression areas designated above, as long as the reservation procedures for use of the free expression have been completed.   Such distribution shall not violate any campus solicitation policies or government ordinances.  (Id. at 4).

- The individual who makes the reservation shall be responsible for seeing that the area is left clean and in good repair.  If not accomplished, persons or organizations responsible for the event may be held financially responsible for cleanup costs.  (Id. at 4).

- The individual/organization using the area must supply their own tables, chairs, etc. (unless already part of the facility).  No sound amplification devices may be used at any time (unless already part of the facility).  No camping is allowed and temporary structures (tents, etc.) are prohibited.  (Id. at 4).

- Malicious or unwarranted damage or destruction of property owned or operated by the College, or property belonging to students, faculty, staff, or guests of the College is prohibited.  Persons or organizations causing such damage may be held financially and/or criminally responsible.  (Id. at 4).

- Disorderly conduct is prohibited.  Examples of disorderly conduct can be found in the Georgia Gwinnett College Student Handbook.  (Id. at 4).

- Individuals and programs using the free speech expression area must comply with all applicable state and federal laws and institutional policies, rules, and regulations.  (Id. at 5).

The former Speech Policy expressly states that requests to engage in expressive activity "will be granted in accordance with the principle of content

neutrality." (Doc. 13-3 at 2). Additionally, the policy emphasized that GGC "in no way supports, fails to support, neither agrees nor disagrees with ideas that may be voiced, but allows for a diversity of viewpoints to be expressed." (Id. at 1).

## III.   THE COLLEGE'S PRIOR DISORDERLY CONDUCT POLICY

GGC also regulates its students' conduct through a Student Code of Conduct, which is set forth in its Student Handbook. (Doc. 13-9). The Student Code of Conduct prohibits students from, *inter alia*, engaging in disorderly conduct, and lists thirteen examples of such conduct. (Id. at 26). The first example of disorderly conduct in the *prior* policy, which is the only one at issue in this case, prohibited "behavior which disturbs the peace and/or comfort of person(s)." (Id.). When determining whether a student has engaged in disorderly conduct, GGC officials are mandated to apply First Amendment principles of free speech:

> In recognition and support of the First Amendment of the United States Constitution, freedom of expression and academic freedom *shall* be considered in investigating and reviewing these types of alleged conduct violations.

Id. at 27 (emphasis added).

## IV.   PLAINTIFFS' SPEECH

As alleged in the Amended Complaint, Plaintiffs are evangelical Christians and GGC students who wish to express their personal religious belief that "they have sinned and need salvation through Jesus Christ." (Doc. 13 at ¶¶ 18-21). To that end, in late July 2016, Plaintiff Chike Uzuegbunam ("Plaintiff Uzuegbunam")

stood outside of the GGC library and distributed religious literature to the pedestrian traffic that informed them of their "need for salvation through Jesus Christ." (Doc. 13 at ¶¶ 204, 206-207). It is undisputed that Plaintiff Uzuegbunam was distributing the literature in an area that fell *outside* of the Speech Zones and that Plaintiff Uzuegbunam had not submitted a request to distribute the literature. (Id. at ¶¶ 220, 228). As a result, Defendant Shenna Perry (a Campus Safety/Security Officer for Campus Police at GGC) approached Plaintiff Uzuegbunam and asked him to stop, explaining that he was "not allowed to distribute religious literature at that location." (Id. at ¶¶ 98, 216).

Officer Perry then instructed Plaintiff Uzuegbunam to come inside the library and speak with Defendant Catherine Jannick Downey (Head of Access Services and Information Services at GGC) to learn about the Speech Policy. (Id. at ¶¶ 79, 217). Inside the library, Defendant Downey pulled the Speech Policy up on her computer and explained it to Plaintiff Uzuegbunam. (Id. at ¶ 221). According to Plaintiff Uzuegbunam, Defendant Downey then "confirmed" that he could not distribute his religious literature outside of the library. (Id. at ¶ 219). Shortly thereafter, Plaintiff Uzuegbunam contends he went to the Office of Student Integrity and spoke with its director, Defendant Aileen Dowell, about the Speech Policy. (Id. at ¶¶ 66, 224). Defendant Dowell explained that he could not distribute his religious literature unless he submitted a request to reserve one of the Speech Zones. (Id. at ¶ 228).

6

The following month (August 2016), Plaintiff Uzuegbunam submitted a "Free Speech Area Request Form" to the Office of Student Integrity. (Doc. 13 at ¶¶ 238,246). On the form, he requested that he be able to use one of the Speech Zones on August 25, 2016; September 8, 2016; and September 22, 2016, from 10:00 A.M. to 4:00 P.M. (Doc. 13-17). He also attached to the form a religious tract that he intended to distribute in the Speech Zone. (Id.). Other than the tract, however, the subject matter of Plaintiff Uzuegbunam's proposed expression is not mentioned on the form. (Id.). *GGC approved all three of Plaintiff Uzuegbunam's requests.* (Doc. 13 at ¶ 247).

Thus, on August 25, 2016, Plaintiff Uzuegbunam arrived at the Speech Zone outside of the food court, where students were congregating to eat and socialize. (Doc. 1 at ¶¶ 248-249). According to the Amended Complaint, while Plaintiff Uzuegbunam's friend prayed and distributed literature, Plaintiff Uzuegbunam stood on a stool and began to publicly speak "about the Gospel." (Id. at ¶¶ 251-253). More specifically, Plaintiffs allege that:

> [Plaintiff Uzuegbunam] began by discussing the brevity of life and how all men and women have fallen short of God's commands. He continued by explaining how Jesus Christ had come to earth to die on the cross and rise again from the dead in order to provide men and women the only means of obtaining salvation and eternal life. He also explained how this gift of eternal life is available to all by God's grace and that it is the only way to avoid the penalty for our sins.

(Id. at ¶ 258). Plaintiff Uzuegbunam alleges that he had been speaking for approximately twenty minutes when Defendant Corey Hughes (a lieutenant for

Campus Police) approached him and asked him to stop his open-air speaking. (Id. at ¶¶ 90, 259).    According to Plaintiffs, Lt. Hughes explained that Plaintiff Uzuegbunam had obtained permission only to distribute literature and have one-on-one conversations with individuals.    (Id. at ¶ 270).    Lt. Hughes further explained that several people had called and complained about Plaintiff Uzuegbunam's open-air speaking.    (Id. at ¶¶ 261, 271). As a result, Plaintiff contends in the Amended Complaint that Lt. Hughes explained that Plaintiff Uzuegbunam was engaging in disorderly conduct and, hence, could be disciplined under the Student Code of Conduct if he did not cease his open-air speaking. (Id. at ¶¶ 277, 278, 282).  Plaintiff Uzuegbunam alleges that Defendant Rebecca Lawler (a Community Outreach and Crime Prevention Sergeant for Campus Police) confirmed that his open-air speaking constituted disorderly conduct because "people are calling us because their peace and tranquility is being disturbed and we've asked you to stop." (Id. at ¶¶ 94, 288, 289). Lt. Hughes then suggested that Plaintiff Uzuegbunam engage in one-on-one conversations with people and distribute literature, which is what members of the Church of Jesus Christ of Latter-Day Saints do when they reserve a Speech Zone.  (Id. at ¶¶ 293-295).

Plaintiff Uzuegbunam alleges that he ceased his open-air speaking and left the Speech Zone. (Doc. 13 at ¶ 303).  He went directly to the Office of Student Integrity and avers that he spoke with Defendant Dowell, who allegedly informed him that "it is a violation of GGC policy for anyone to express a 'fire and

8

brimstone message' on campus." (<u>Id.</u> at ¶¶ 304-305).   Since then, Plaintiff Uzuegbunam allegedly has not attempted to express his religious views while on campus.

As for Plaintiff Joseph Bradford ("Plaintiff Bradford"), he would like to engage in expressive activities similar to those that Plaintiff Uzuegbunam engaged in on August 25, 2016.  (Doc. 13, ¶ 7).  Plaintiff Bradford is, however, aware of Defendants' Speech Policy and how it was enforced against Plaintiff Uzuegbunam, with the result that he "fears that the expression in which he desires to engage would expose him to enforcement and disciplinary actions." (<u>Id.</u> at ¶ 184).  As a result, Plaintiff Bradford alleges that he has not attempted to express his religious views while on campus, even though he "immediately wishes to do so." (<u>Id.</u>).

## V.   <u>PLAINTIFFS' LAWSUIT</u>

Based on the foregoing, Plaintiffs' Amended Complaint challenges the constitutionality of the first example in the former Disorderly Conduct Policy, along with various components of the former Speech Policy. Plaintiffs claim that both policies, facially and as-applied to their conduct, violate their First Amendment freedom of speech, their First Amendment right to the free exercise of religion, the Fourteenth Amendment Due Process Clause, and the Equal Protection Clause.  Defendants now move to dismiss all of Plaintiffs' claims for the reasons set forth below.

## VI.   <u>LEGAL ARGUMENT AND CITATION OF AUTHORITY</u>

### A.   **Plaintiffs Fail to State a Claim Upon Which Relief May be Granted**

### 1.   **Motion to Dismiss Standard**

When reviewing a motion to dismiss, the Court must take the allegations of the complaint as true, and must construe those allegations in the light most favorable to the plaintiff.  <u>Riven v. Private Health Care Sys., Inc.</u>, 520 F.3d 1308, 1309 (11th Cir. 2008).  However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009); <u>see also</u> <u>Amer. Dental Assoc. v. Cigna Corp.</u>, 605 F.3d 1283, 1290 (11th Cir. 2010) (courts are to "eliminate any allegations in the complaint that are merely legal conclusions").  Additionally, "unwarranted deductions of fact in a complaint are not admitted as true for purposes of testing the sufficiency of plaintiff's allegations." <u>Sinaltrainal v. The Coca-Cola Co.</u>, 578 F.3d 1252, 1260 (11th Cir. 2009) (internal quotations omitted).

"The mere possibility the defendant acted unlawfully is insufficient to survive a motion to dismiss." <u>Sinaltrainal</u>, 578 F.3d at 1260.  Instead, the "[f]actual allegations must be enough to raise a right to relief above the speculative level." <u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. 544, 555 (2007).  "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief." 556 U.S. at 679.

## 2.    The Prior Speech Policy Does Not Violate the First Amendment Right to Freedom of Speech

The law is well-settled that the First Amendment does not "guarantee the right to communicate one's views at all times and places or in any manner that may be desired." Heffron v. Int'l Soc'y for Krishna Consciousness, Inc., 452 U.S. 640, 647 (1981); see also Snyder v. Phelps, 562 U.S. 443, 456 (2011) ("Even protected speech is not equally permissible in all places and at all times."). As a result, the government, "like any private landowner, may preserve the property under its control for the use to which it is lawfully dedicated." Sentinel Commc'ns Co. v. Watts, 936 F.2d 1189, 1201 (11th Cir. 1991); see also Bloedorn, 631 F.3d at 1230 ("It is by now clear that the First Amendment does not guarantee access to property just because it is owned by the government.").

The extent to which the government can regulate speech depends on the nature of the forum. See Cornelius, 473 U.S. at 800. To that end, the Supreme Court has established three "categories of government property for First Amendment purposes: traditional public fora, designated public fora, and limited public fora." Bloedorn, 631 F.2d at 1230 (citing Christian Legal Soc'y Chapter of the Univ. of Cal., Hastings College of the Law v. Martinez, 561 U.S. 661 (2010)). Traditional public fora are public areas such as streets and parks that, "since time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." Id. at 1231. A designated

public forum is "government property that has not traditionally been regarded as a public forum but that has been intentionally opened up for that purpose." Id. at 1231. "[A] limited public forum may be established when the government limits its property to use by certain groups or dedicate[s it] solely to the discussion of certain subjects." Id.

In traditional public forums and designated public forums, the government may impose time, place, and manner restrictions that are "content neutral, narrowly tailored to achieve a significant government interest and 'leave open ample alternative channels of communication.'" Id. at 1231 (quoting Perry Educ. Ass'n, 460 U.S. at 45-46). In contrast, in limited public forums, restrictions on expression must merely be "reasonable and viewpoint neutral." Id. "Reasonableness in this context 'must be assessed in the light of the purpose of the forum and all the surrounding circumstances.'" Id.; see also Rosenberger v. Rector & Visitors of the Univ. of VA, 515 U.S. 819, 829 (1995).

Based on the foregoing principles, the constitutionality of the challenged restrictions in the former Speech Policy depends on: (1) the type of forum at issue, and (2) the nature of the government interests that support the restrictions. As explained in more detail below, GGC's Speech Zones should be classified as designated public fora, and its remaining outside property should be classified as non-public fora. The type of designation is not, however, crucial in this case

because the time, place, and manner restrictions in the former Speech Policy pass

constitutional scrutiny under both standards.

> ### a.  GGC's Speech Zones are Designated Public Fora, and its Remaining Outside Property is Non-Public Fora

Defendants concede that GGC's two Speech Zones are designated public

fora, as GGC has intentionally reserved those areas of the campus for "speeches,

gatherings, distribution of written materials, and marches" (Doc. 13-3 at 1), for

both students and non-students alike.  See, e.g., Bannon v. Sch. Dist. of Palm

Beach Cnty., 387 F.3d 1208, 1213 (11th Cir. 2004) (explaining that a school

creates a designated public forum only when authorities have "by policy or

practice opened those facilities for indiscriminate use by the general public, or by

some segment of the public").

With respect to the other outdoor areas on campus where Plaintiffs wish to

speak (such as GGC's streets, sidewalks, quadrangles, plazas, and park-like lawns),

these areas are non-public fora.  The prior Speech Policy made it clear that GGC

did *not* intend to open its campus to widespread, unrestrained public discourse.  To

the contrary, GGC intentionally chose to close expressive public discourse on its

campus in all areas except for the two Speech Zones.  (Doc. 13-3); Bloedorn, 631

F.3d at 1232 ("[o]ur focus remains on [the college's] intentions in establishing and

maintaining its property").  Thus, the two Speech Zones have been specifically set

aside for public "speeches, gatherings, distribution of written materials, and

marches." (Doc. 13-3 at 1). Individuals may still, however, have private conversations with each other, both planned and spontaneous, anywhere on campus.

While Plaintiffs may argue that the outdoor areas physically resemble public sidewalks and public parks (i.e., traditional public fora), the Supreme Court is clear that "[t]he physical characteristics of the property alone cannot dictate forum analysis." United States v. Kokinda, 497 U.S. 720, 727 (1990) (explaining that just because the sidewalk in front of the post office was indistinguishable from the public sidewalk on the other side of the parking lot did not make it a public forum); see also Greer v. Spock, 424 U.S. 828 (1976) (holding that a military base is not a public forum, despite the presence of sidewalks and streets); Sentinel Communications Co. v. Watts, 936 F.2d 1189 (1991) (just because highway rest areas and municipal parks are physically identical does not transform rest areas into a public forum). In fact, the Eleventh Circuit has already rejected the notion that a college campus is a public forum simply because it possesses parks and sidewalks, explaining that:

> Even though [the college's] campus possesses many of the characteristics of a public forum – including open sidewalks, streets, and pedestrian malls – it differs in many important ways from public streets or parts. Perhaps most important, the purpose of a university is strikingly different from that of a public park. *Its essential function is not to provide a forum for general public expression and assembly; rather, the university campus is an enclave created for the pursuit of higher learning.*

Bloedorn, 631 F.3d at 1233-34 (emphasis added).  The other outdoor areas of GGC's campus, therefore, should not be characterized as anything other than non-public fora.

       *b.*      *The Time, Place, and Manner Restrictions in the Prior Speech Policy Pass Constitutional Scrutiny*

However, assuming *arguendo* that the higher standard for a public forum or a designated forum applies, the prior Speech Policy nonetheless passes constitutional scrutiny.  As noted above, restrictions are permissible in such fora as long as they are "content neutral, narrowly tailored to achieve a significant government interest, and 'leave[s] open ample alternative channels of communication." Bloedorn, 631 F.3d at 1238.  To demonstrate the significance of its interest, the government "is not required to present detailed evidence. . .,[but] is entitled to advance its interests by arguments based on appeals to common sense and logic." Coalition for the Abolition of Marijuana Prohibition v. City of Atlanta, 219 F.3d 1301, 1318 (11th Cir. 2000) (citations omitted).  To establish that a restriction is narrowly tailored, the court must determine whether there is a "reasonable fit" between the governmental interests and the restriction.  Cincinnati v. Discovery Network, 507 U.S. 410, 416 (1993).  Narrow tailoring in this context "need not be the least restrictive or least intrusive means of doing so.  Rather, the government need only avoid regulat[ing] expression in such a manner that a

substantial portion of the burden on speech does not serve to advance its goals."
Ward v. Rock Against Racism, 491 U.S. 781, 798-9 (1989).

Regarding the first requirement, the prior Speech Policy was content neutral. Under the policy, *all individuals* were required to submit a request and obtain permission before they engage in expressive activity. *All individuals* were subject to the same criteria, and the policy did not refer to specific viewpoints or content. Instead, the Speech Policy set forth fifteen criteria for determining whether to grant a request, and mandated that "[a]uthorization will be granted in accordance with the principle of *content neutrality*" so that a "diversity of viewpoints" may be expressed.[3]  (Doc. 13-3 at 1, 2) (emphasis added).  Thus, Plaintiffs' assertion that the policy provided officials with the "unchecked right to restrict the content and viewpoint of what students say on campus" or with "unbridled discretion" to determine who may engage in expression outside of the zones or when the zones are closed is without merit.  (Doc. 13 at ¶ 3).  While Plaintiffs may wish that the prior Speech Policy had been more precise, the constitution does not require exact precision for a policy to survive scrutiny:

> Granting waivers to favored speakers (or, more precisely, denying them to disfavored speakers) would of course be unconstitutional, but we think that this abuse must be dealt with if and when a pattern of unlawful favoritism appears, rather than by insisting upon a degree of rigidity that is found in few legal arrangements.

---

[3] While two of the criteria prohibit intimidation, harassment, and disorderly conduct, these criteria should be construed to prohibit true threats and other unprotected speech.  See Section IV.B.3.a.

Thomas, 534 U.S. at 325.

As for the second requirement (narrow tailoring), Plaintiffs challenge multiple provisions of the former Speech Policy. Those provisions—and the reasons they are narrowly tailored to promote GGC's interests—are set forth below, in turn:

### (1) Individuals must request to engage in expressive activity

The law is well-settled that the State may regulate competing uses of a forum through the imposition of permit requirements. Cox v. New Hampshire, 312 U.S. 569, 574-76 (1941). Here, as expressly stated in its Speech Policy, GGC undoubtedly has a significant interest in "providing a forum for free and open expression," while simultaneously "serv[ing] the interests of others, prevent[ing] the disruption of the educational process, and protect[ing] against the invasion of the rights of others." (Doc. 13-3 at 1). GGC has chosen to advance these competing interests through a permit system. Both the Eleventh Circuit and its sister circuits have held that such a system is, when regulating speech on college

campuses, constitutional.[4]   See, e.g., Bloedorn v. Grube, 631 F.3d 1218 (11th Cir.

2011); Bowman v. White, 444 F.3d 967 (8th Cir. 2006) (holding that a permit

requirement is justified to "coordinate multiple uses of limited space, assure

preservation of the [campus], prevent uses that are dangerous to students or other

people").

Notably, Plaintiffs do not identify a *single instance* where a person or group

requested permission to engage in expressive activity (either inside or outside the

Speech Zones) but was turned down.[5]   Indeed, with respect to Plaintiff

Uzuegbunam's speech in particular, the allegations in the Amended Complaint

show that GGC granted all of the free speech requests he submitted.

### (2) Requests must be submitted three days in advance

The three-day advance notice period is constitutional pursuant to the

Eleventh Circuit's decision in Bloedorn v. Grube, 631 F.3d 1218 (11th Cir. 2011).

In that case, the Eleventh Circuit found that a two-day notice period passed

---

[4] Defendants recognize that a permitting scheme would "amount to an
unconstitutional prior restraint on speech, if the government exercised unbridled
discretion to limit access to a particular public forum." Bloedorn, 631 F.3d at
1236.However, as discussed earlier in this brief, the allegations in the Amended
Complaint, and the plain language of the prior Speech Policy, do not support a
finding of unbridled discretion because the policy sets forth "narrowly drawn,
reasonable, and definite standards to guide the official's decision." Id.

[5] To the extent Plaintiffs argue that the permitting system gives GGC a means to
engage in content or viewpoint discrimination, this is contradicted by the explicit
language of the former Speech Policy that "[a]uthorization will be granted in
accordance with the principle of content neutrality." (Doc. 13-3 at 2).

constitutional muster because colleges have a significant safety interest in scheduling and preparing its public safety department for events.  As the <u>Bloedorn</u> Court explained:

> [The college's] safety concern is not only with protecting its more than 18,000 and countless other community members, but also with protecting the speaker from the thousands of individuals passing by the area every day. Crowds, and potentially unruly ones, are inevitable in a highly trafficked area of a large university campus.  In fact, because of the location of the Free Speech Area, it is unlikely that any speaker using the area would fail to attract attention.

631 F.3d at 1240.  The same safety interests exist in the case at bar, as GGC's campus consists of 260 acres, GGC enrolls thousands of students (Doc. 13-15 at 12), GGC necessarily has limited public safety personnel and resources, and the Speech Zones are in areas where students "routinely congregate." (Doc. 13, ¶ 243).[6]

In fact, as the Eleventh Circuit recognized in <u>Bloedorn</u>, other circuits have upheld university permitting schemes that required the same, or significantly more, advance notice.  <u>See</u>, <u>e.g.</u>, <u>Bowman v. White</u>, 444 F.3d 967, 982 (8th Cir. 2006) (finding that a 3-day notice requirement was narrowly tailored to serve a significant interest in campus safety, because "a university is less able than a city or other entity with police powers to deal with a significant disruption on short

---

[6] Plaintiffs' allegation that the notice requirement prohibits spontaneous speech is misguided.  Spontaneous person-to-person speech is permitted by individuals throughout the campus.  An authorization must be obtained only for "speeches, gatherings, distribution of written materials, and marches." (Doc. 13-3 at 1).

notice"); <u>Sonnier v. Crain</u>, 613 F.3d 436, 445 (5th Cir. 2010) (upholding a 7-day notice requirement because "[u]niversities are less equipped than cities and other public fora (or designated public fora) to respond to disruptions on short notice. Providing a university with advance notice allows the university to adequately take care of any issues associated with the public speech or demonstration that might hamper the university's ability to meet its primary goal -- the education of students.").

### (3) Expressive activity is limited to specific days and times for once every thirty days

In assessing the constitutionality of GGC's policy of restricting the Speech Zones to four hours on Monday through Thursday and two hours on Friday, for no more than once a month, <u>Bloedorn</u> is again instructive.  In that case, the plaintiff challenged a speech restriction that limited use of a free speech zone to one and a half hours no more than once a month. 631 F.3d at 1240.  The Eleventh Circuit readily rejected the plaintiff's challenge, explaining that the time restriction was "not draconian." <u>Id.</u>  In support of this finding, the Court noted that:

> [The plaintiff] can speak for an extended time period.  One-and-one-half hours is longer than most college lectures, than most television shows, and than many movies; it is no less time than is generally allocated for a presidential debate, and it is substantially more time than this Court affords for oral argument.

Id. at 1240-41.  The Court also found it significant that the restriction furthered the college's express interest in promoting the propagation of different viewpoints.  Id. at 1241.

The same can be said in this case: under the former Speech Policy, individuals were given an extended amount of time to engage in expressive activity each month, and the Speech Zones were located in busy areas of the campus (i.e., outside of the food court and in between Student Housing and the Student Center). (Doc. 13-3 at 2).  Additionally, GGC has a strong interest in "accommodat[ing] all interested users," providing for "divergent points of view," and avoiding the monopolization of space.[7]  (Id. at 1-2).  Finally, it is undisputed that individuals could request time periods outside of the ones that were specifically set forth in the policy, thus making the time restrictions even less restrictive than they may appear at first blush.  (Id. at 2) ("[o]n occasion upon written request . . . other times may be authorized").

In fact, Plaintiff Uzuegbunam's own "Free Speech Area Request Form" shows that he was granted permission to utilize a Speech Zone for six hours on

---

[7] Plaintiffs have not sufficiently pled that this aspect of the former policy is invalid in all circumstances, as there are situations in which "limiting the number of times an individual speaks on campus and the length of time an individual speaks on campus are valid means for [a college] to protect its legitimate interests. If a large number of individuals or organizations wish to speak on campus during the same week, the University must have a non-discriminatory manner of granting permission to as many diverse speakers as possible." Sonnier v. Crain, 613 F.3d 436 (5th Cir. 2010).

August 25th, six hours on September 8th, and six hours on September 22nd. (Doc. 13-17 at 1). This is a significant amount of time *outside of* the specific hours of operation and considerably more than once every 30 days.[8] As a result, Plaintiff Uzuegbunam's argument that the time restrictions violated his free speech is without merit.

### (4) Copies of publicity materials must be submitted with the request

Plaintiffs also challenge the requirement that publicity materials be attached to the authorization form and that, upon authorization, such materials be distributed to the campus Senior Associate Provost for Student Affairs, the Director of Public Services/Campus Police, the Office of Public Relations, the Dean of Students, and the applicant. (Doc. 13-3 at 2). Contrary to Plaintiffs' belief, this is simply a notice provision that gives GGC notice of the literature that will be distributed during a speech event. Nothing in this provision allows the named individuals to exclude the publicity materials, rescind an already-granted request, or deny the individual's application based on the content of the materials.

Instead, this provision promotes GGC's significant interests in security, safety, and the controlled use of its name. More specifically, GGC has an interest in ensuring that individuals are not engaging in unauthorized uses of the college's

---

[8] Plaintiffs also do not allege that GGC has ever denied another individual's request to utilize a Free Speech Zone at other times, or that GGC has ever actually enforced its once-a-month rule.

name, copyright violations, criminal conduct, or commercial solicitations.  It also has an interest in knowing in advance the type of literature that will be distributed during a free speech event—the more polarizing or controversial the literature, the more security the campus may need to provide.

### (5) Expressive activity may be conducted only in the two Free Speech zones

Courts have uniformly rejected "the proposition that . . . a university must grant free access to all of its grounds or buildings." Gilles v. Blanchard, 477 F.3d 466, 470 (citing Widmar v. Vincent, 454 U.S. 263, 268 n.5 (1981)); Sonnier v. Crain, 613 F.3d 436 (5th Cir. 2010).   As explained above, during the forum analysis, GGC is "government property dedicated to education and learning by its accepted and registered students, as well as by its faculty and staff." Bloedorn, 631 F.3d at 1235.   GGC has "the right to preserve its campus for its intended purpose"—i.e., education—and limiting expressive activities to two places on campus is narrowly tailored to that purpose. Id.; see also Sonnier, 613 F.3d at 448.

Importantly, the Eleventh Circuit has noted that, when analyzing the constitutional validity of a school's restrictions on speech, courts should be mindful of the Supreme Court's directive:

> First Amendment rights, we have observed, must be analyzed in light of the special characteristics of the school environment . . . . Cognizant that judges lack the on-the-ground expertise and experience of school administrators . . . we have cautioned courts in various contexts to resist substituting their own notions of sound educational policy for those of the school authorities which they review.

Christian Legal Soc'y Chapter of the Univ. of Cal. v. Martinez, 561 U.S. 661 (2010). Following this directive, the Court should find that GGC's decision to balance its interests in preserving educational resources and facilities, providing a safe campus, and allowing students to express diverse viewpoints, by delineating two Speech Zones for public speech is constitutional.

Finally, as to the third part of the public forum and designated forum standard, the prior Speech Policy "[left] open ample alternative channels of communication." Bloedorn, 631 F.3d at 1231 (quoting Perry Educ. Ass'n, 460 U.S. at 45-46). First, individuals could speak with each other throughout the university campus, at any time and without having to obtain prior permission. Second, the campus is surrounded on all sides by public roads from which Plaintiffs may preach their message to those who are entering and exiting the campus. (Doc. 13-1). Third, Plaintiffs could form a student organization, which would allow them to post and promote their religious message on bulletin boards across the campus. (Doc. 13-15 at 132).

### c. The Prior Speech Policy is Not Facially Overbroad

Plaintiffs also appear to bring a facial overbreadth challenge to the prior Speech Policy. "[A] facial challenge, as distinguished from an as-applied challenge, seeks to invalidate a state regulation itself." DA Mortg., Inc. v. City of Miami Beach, 486 F.3d 1254, 1262 (11th Cir. 2007). Facial challenges are

generally disfavored as a matter of law.  Washington State Grange v. Washington State Republican Party, 552 U.S. 442, 450 (2008).  Where, as here, there is a facial challenge to overbreadth on First Amendment free speech grounds, the court must determine whether the statute reaches a substantial amount of constitutionally protected conduct.  Hoffman Estates v. Flipside, Hoffman Estates, 455 U.S. 489, 494 (1982).  Even then, the scope of the statute does not render it unconstitutional unless its overbreadth is real and substantial.  Osborne v. Ohio, 495 U.S. 103, 112 (1990).

A facial overbreadth challenge is the most difficult type of First Amendment challenge to sustain because a plaintiff must establish that a "'substantial number of its applications are unconstitutional, 'judged in relation to the statute's plainly legitimate sweep."  Washington State Grange, 552 U.S. at 449 n. 6 (quoting New York v. Ferber, 458 U.S. 747, 769-71 (1982)).  The "mere fact that one can conceive of some impermissible applications of a statute is not sufficient to render it susceptible to an overbreadth challenge."  City Council of Los Angeles v. Taxpayers for Vincent, 466 U.S. 789, 800 (1984).  Moreover, even if a statute is determined to be overbroad, the overbreadth doctrine may be applied to strike it down only when a limiting construction is not possible.  Broadrick v. Oklahoma, 413 U.S. 601, 613 (1973); Hoffman Estates, 455 U.S. at 494 n.4.  Striking a statute under the overbreadth doctrine should be a last resort.  Broadrick, 413 U.S. at 613.

The sweep of the prior Speech Policy in the instant case was legitimate.  As noted above, GGC has significant interests in maintaining security on campus and fostering a safe learning environment.  Requiring individuals to apply for a permit before engaging in expressive activity and imposing reasonable time, place, and manner restrictions furthers those interests and, hence, is not an overly broad regulation of speech.

**3.  The Prior Disorderly Conduct Policy Does Not Violate the First Amendment Right to Freedom of Speech**

Plaintiffs also challenge, both facially and as-applied to their speech, the prior Disorderly Conduct Policy, to the extent that it prohibited expression that "disturbs the peace and/or comfort of person(s)."  (Doc. 1 at ¶ 3).  This Court should dismiss both challenges.

*a.  The Prior Disorderly Conduct Policy is Not Facially Invalid*

In considering a constitutional challenge, the court must bear in mind that "[e]very statute is presumed to be constitutional."  United States v. Bollinger, 798 F.3d 201, 207 (4th Cir. 2015) (quoting Munn v. Illinois, 94 U.S. 113, 123 (1876)). On a facial challenge to a state law provision, the court "must take the statute as though it read precisely as the highest court of the State has interpreted it." Kolender v. Lawson, 461 U.S. 352, 355 n.4 (1983) (quoting Wainwright v. Stone, 414 U.S. 21, 22-23 (1973)) (internal quotation mark omitted). If there is no authoritative precedent from the state supreme court, this court may look to an

intermediate appellate court's construction of the statute.  Gooding v. Wilson, 405 U.S. 518, 525 n.3 (1972); see also Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489, 494 n.5 (1982) ("In evaluating a facial challenge to a state law, a federal court must, of course, consider any limiting construction that a state court or enforcement agency has proffered.").

Most importantly, in determining the constitutionality of a statute, courts must construe the statute "so as to avoid all constitutional difficulties." Gooding v. Wilson, 405 U.S. 518, 520 (1972).  The same principle applies when a policy rather than a statute, ordinance, or other law is involved.  See, e.g., DeJohn v. Temple Univ., 537 F.3d 301 (3rd Cir. 2008); Saxe v. State College Area Sch. Dist., 240 F.3d 200 (3rd Cir. 2001); Dambrot v. Central Mich. Univ., 55 F.3d 1177 (6th Cir. 1995).  Thus, federal and state courts have consistently interpreted disorderly conduct laws as prohibiting only "fighting words."[9]  State v. Saunders, 339 So. 2d 641 (Fla. Sup. Ct. 1976) (narrowing Florida's disorderly conduct statute "so that it shall hereafter only apply either to words which by their very utterance . . . inflict injury or tend to incite an immediate breach of the peace"); City of Landrum v. Sarratt, 572 S.E.2d 476 (S.C. Ct. App. 2002); Robinson v. State, 615 So.2d 112, 113 (Ala. Crim. App. 1992); In re Welfare of S.L.J., 263 N.W.2d 412 (Minn. 1978)

---

[9] "Fighting words" are "those which by their very utterance inflict injury or tend to incite an immediate breach of the peace," the prevention and punishment of which "has never been thought to raise any Constitutional problem." Chaplinsky v. New Hampshire, 315 U.S. 568, 572 (1942).

(construing a prohibition on "offensive, abusive, or obscene language" to extend only to "fighting words").

Likewise, in the State of Georgia and the Eleventh Circuit, courts have consistently construed disorderly conduct laws to prohibit only "fighting words." See, e.g., Merenda v. Tabor (11th Cir., 2013); Lamar v. Banks, 684 F.2d 714 (11th Cir. 1982) (explaining that subsection (a) of Georgia's disorderly conduct statute has been "specifically limited to fighting words"); Turner v. State, 274 Ga. App. 731 (2006); Woodward v. Gray, 241 Ga. App. 847 (2000); City of Macon v. Smith, 244 Ga. 157 (1979). This Court should, therefore, limit the scope of the prior Disorderly Conduct Policy to apply only to "fighting words" (or other categories of unprotected speech, such as true threats). Such a narrow interpretation of the policy is further supported by the fact that GGC officials, in determining whether disorderly conduct has occurred, are mandated to comply with the First Amendment:

> In recognition and support of the First Amendment of the United States Constitution, freedom of expression and academic freedom *shall* be considered in investigating and reviewing these types of alleged conduct violations.

(Doc. 13-15 at 27) (emphasis added). This Court should, therefore, find as a matter of law that the challenged provision of the former Disorderly Conduct Policy applies only to fighting words and, hence, is constitutional.

### b. *Application of the Prior Disorderly Conduct Policy to Plaintiff Uzuegbunam's Speech Did Not Violate the First Amendment*

Additionally, GGC's application of the prior Disorderly Conduct Policy to Plaintiff Uzuegbunam's open-air speaking outside of the food court on August 25, 2016, did not violate the First Amendment. As Plaintiff Uzuegbunam admits in the Amended Complaint, he was able to speak about his religious beliefs for approximately twenty minutes. (Doc. 13 at ¶ 259). He did so by standing on top of a stool and exclaiming his beliefs in a manner "loud enough to be heard" by "many" students who were eating, studying, and socializing. (Id. at ¶¶ 251, 255-256). GGC's Safety Department received multiple calls and complaints about Plaintiff Uzuegbunam's open-air speaking. (Id. at ¶¶ 261, 271). GGC informed him that he was engaging in disorderly conduct and needed to stop. (Id. at ¶ 277). As Plaintiff Uzuegbunam admits, GGC interrupted his open-air speaking only because people were calling and "complaining about his expression." (Id. at ¶ 271).

Thus, the allegations in the Amended Complaint demonstrate that GGC stopped Plaintiff Uzuegbunam—not because of the content of his speech—but because he was engaging in impermissible open-air speaking that was actually disturbing the students. There is a distinction between "mere words, used as a tool of communication," which are protected, and the use of words to "invade the rights of others to pursue their lawful activities," which are not protected. <u>Gold v. City of</u>

<u>Miami</u>, 138 F.3d 886 (11th Cir. 1998).  For example, in <u>White v. State</u>, 330 So. 2d 3 (Fla. 1976),  an individual was convicted for "screaming at the top of his lungs for several minutes at a police station, disturbing the other people at the station and impeding their work."  The court found that the individual's words "were not punished because they were offensive, but because by their very decibel count, [those words] did invade the right of others to pursue their lawful activities." <u>Id.</u> at 6.  As the court further explained, the individual's conduct "would have been equally disorderly had he merely recited 'Mary Had a Little Lamb' in the same tone and under similar circumstances." <u>Id.</u> at 7.

The same conclusion should be reached here, as Plaintiff Uzuegbunam's open-air speaking on top of a stool—which bothered the "many" students who were trying to study, socialize, and eat—was disruptive. In short, Plaintiff Uzuegbunam was asked to stop his open-air speaking because the mode of delivery of his message was actually causing a disturbance, and not because Defendants wanted to silence his religious beliefs.  Indeed, the fact that Plaintiff Uzuegbunam was informed that he could *continue* to express his beliefs by one-on-one speaking and the distribution of literature further supports the notion that he was asked to stop because he was disturbing students and not because of the substance of his speech.  This is further supported by the fact that Defendants never actually charged Plaintiff Uzuegbunam with engaging in disorderly conduct. <u>Mikhail v. City of Lake Worth</u>, 2009 U.S. Dist. LEXIS 59919 (S.D. Fla. 2009) (explaining

that the fact that the officer did not actually charge the plaintiff with disorderly conduct for calling a group of people "sinners" and "whores" "demonstrate[ed] that his goal was not to silence [the plaintiff's] purported religious message, but to control a disorderly situation"); Gilles v. State, 531 N.E.2d 220, 221-222 (Ind. Ct. App. 1988).

### 4.   The Former Policies Do Not Violate the First Amendment's Right to the Free Exercise of Religion

The Free Exercise Clause of the First Amendment provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." The purpose of the Free Exercise Clause is to "protect religious observers against unequal treatment." Hobbie v. Unemployment Appeals Comm'n of Fla., 480 U.S. 136, 148 (1987).

The Supreme Court has made it clear that a "neutral law of general application" can prohibit conduct that is prescribed by an individual's religion without having to be supported by a compelling interest. Employment Division, Oregon Department of Human Resources v. Smith, 494 U.S. 87, 885 (1990); see also Church of Lukumi Babalu Aye, Inc. v. City of Hialeah, 508 U.S. 520, 531 (1993) ("A law that is neutral and of general applicability need not be justified by a compelling government interest, even if the law has the incidental effect of burdening a particular religious practice."). This is true even if the resulting burden on religion is substantial. Smith, 494 U.S. at 883-84. A neutral and generally

applicable law must merely be rationally related to a legitimate government interest, and it is presumed to be constitutional. Keeton v. Anderson-Wiley, 664 F.3d 865, 879-80 (11th Cir. 2011).

A law is not neutral if "the object of [the] law is to infringe upon or restrict practices because of their religious motivation." Id. (quoting Church of the Lukumi Babalu Aye, Inc., 508 U.S. at 520). Additionally, a facially neutral law constitutes a religious "gerrymander" if religious practice is singled out for discriminatory treatment, and the object of the law is "the suppression of religion." Primera Iglesia Bautista Hispana of Boca Raton, Inc. v. Broward Cnty., 450 F.3d 1295, 1309 (11th Cir. 2006). A law is not generally applicable if the government selectively imposes burdens "only on conduct motivated by religious belief." Id. (quoting Church of the Lukumi Babalu Aye, Inc., 508 U.S. at 544-45).

Here, the former Speech Policy and Disorderly Conduct Policy were neutral on their face—they did not refer to religion, nor did they single out a particular religious practice or belief. In fact, the policies did not even single out religious expression in general, as both policies applied to *all speech*, regardless of whether it is religious or secular in nature. There is also no indication that the policies were crafted to suppress religious expression.[10] To the contrary, as discussed above, the object of both policies was to advance GGC's legitimate interests in preserving its

---

[10] Not only was Plaintiff Uzuegbunam encouraged to continue his expression, he acknowledges that others with similar religious messages were permitted to do the same. (Doc. 13 at ¶¶ 293-296).

facilities, creating a safe learning environment, and minimalizing disruptions, while still giving individuals opportunities to express their personal beliefs and viewpoints.

In short, the Free Exercise Clause does not "divest the Government of its right to use what is, after all, its land":

> The Free Exercise Clause cannot be understood to require the Government to conduct its own internal affairs in ways that comport with the religious beliefs of particular citizens . . . The Free Exercise Clause affords an individual protection from certain forms of government compulsion; it does not afford an individual a right to dictate the conduct of the Government's internal procedures.

Lyng v. Northwest Indian Cemetery Protective Ass'n, 485 U.S. 439, 448 (1988). See, e.g., Alabama Student Party v. Student Government Asso. of University of Alabama, 867 F.2d 1344, 1347 (11th Cir. 1989) (noting that courts must give "deference to school officials who seek to reasonably regulate speech and campus activities in furtherance of the school's educational mission"). Plaintiffs' Free Exercise claim therefore fails as a matter of law because GGC's former policies were neutral, generally applicable restrictions that promoted GGC's legitimate interests and advanced its educational mission.

**5.     The Prior Policies Do Not Violate the Due Process Clause**

Plaintiffs also assert that the former policies are unconstitutionally vague and overbroad, in violation of the Fourteenth Amendment's Due Process Clause. In particular, Plaintiffs claim that there are no criteria to guide officials when

deciding whether to: (1) grant or deny student speech requests, (2) modify the speech zones, (3) schedule the speech zones to "accommodate all interested users," (4) review proposed publicity materials, and (5) determine when a student's expression has "disturbed the peace and/or comfort of person(s)." (Doc. 13 at ¶¶ 129-132, 142-145, 171). Plaintiffs' assertion is patently incorrect. Defendants have already explained why there is no overbreadth issue in this case. See Section VI.B, supra. Thus, this section focuses on whether GGC's former policies are unconstitutionally vague.

The vagueness doctrine focuses on two issues: (1) whether a statute defines the offense with sufficient definiteness such that ordinary people can understand what conduct is prohibited; and (2) whether the statute encourages arbitrary and discriminatory enforcement. Kolender v. Lawson, 461 U.S. 352, 357 (1983). The standard by which a regulation is measured for vagueness is whether "persons of common intelligence must necessarily guess at its meaning and differ as to its application." DA Mortg., Inc., 486 F.3d at 1271. "[M]athematical certainty" however, is not required. "Perfect clarity and precise guidance have never been required." Ward, 491 U.S. at 794. "[T]he complainant must prove that the enactment is vague 'not in the sense that it requires a person to conform his conduct to an imprecise but comprehensible normative standard, but rather in the sense that no standard of conduct is specified at all.'" Hoffman Estates, 455 U.S. at 495 n. 7 (quoting Coates v. City of Cincinnati, 402 U.S. 611, 614 (1971)).

34

When a constitutional challenge is based on vagueness, a plaintiff must show that the legislation is "impermissibly vague in *all of its applications*." Hoffman Estates, 455 U.S. at 495 (emphasis added).  For this reason:

> A party who engages in some conduct that is *clearly proscribed* cannot complain of the vagueness of the law as applied to the conduct of others.  Accordingly, . . . [i]f Plaintiffs' own conduct is clearly proscribed by the terms of the ordinance, this necessarily precludes a finding of facial vagueness.

Catron v. City of St. Petersburg, 658 F.3d 1260, 1271 (11th Cir. 2011) (emphasis added).  Here, during the first incident, Plaintiff Uzuegbunam distributed literature in an area outside of the Speech Zones without obtaining a permit.  Such conduct was expressly prohibited by the former Speech Policy.  (Doc. 13-3 at 4).  Thus, Plaintiffs cannot challenge the former Speech Policy as unconstitutionally vague based on the first incident.

As for the second incident that occurred on August 25, 2016, it is undisputed that multiple students called and complained about Plaintiff Uzuegbunam's open-air speaking.  Consequently, his open-air speaking was clearly proscribed by the Disorderly Conduct Policy that was in effect at the time, which prohibited conduct that has "disturb[ed] the peace and/or comfort of person(s)." (Doc. 13-15). Calls and complaints *necessarily* indicate that the complainant's peace and/or comfort have been disturbed.  This is, or should be, easily understood by "persons of common intelligence."  Because GGC's former policies conveyed the proscribed

conduct in terms that are understandable to persons of reasonable intelligence, Plaintiffs' due process claim should be dismissed.

### 6.    Defendants Did Not Violate Plaintiffs' Right to the Equal Protection of the Laws

The Equal Protection Clause requires that "all persons similarly circumstanced shall be treated alike." Plyer v. Doe, 457 U.S. 202, 216 (1982). To establish an equal protection claim, a plaintiff must show that similarly situated persons have been treated differently and that the defendant's actions were motivated by an unlawful factor. Mickens v. Tenth Judicial Circuit, 181 Fed. Appx. 865, 878 (11th Cir. 2006). In this context, "similarly situated" requires some specificity. Campbell v. Rainbow City, 434 F.3d 1306, 1314 (11th Cir. 2006). The comparator must be similarly situated in all relevant respects. Griffin Indus., Inc. v. Irvin, 496 F.3d 1189, 1202-03 (11th Cir. 2007).

Plaintiffs' Amended Complaint does not meet this standard, as Plaintiffs have failed to identify any similarly situated person who allegedly received preferential treatment. More specifically, they have not identified any person who, unlike Plaintiff Uzuegbunam: (1) was allowed to distribute literature outside of the Speech Zones without completing the application/reservation process, or (2) was allowed to continue engaging in open-air speaking after students had called and lodged complaints. While Plaintiffs point to a "percussion group" that loudly plays drums and instruments outside of the Speech Zones without being told to stop,

there are no plausible allegations that Plaintiffs and the percussion group are similarly situated. (Doc. 13 at ¶ 307). Even assuming that beating on a drum is expressive activity, Plaintiffs do not sufficiently allege that the percussion group was operating without prior authorization or that any students had complained about the percussion group.[11]

Plaintiffs also point to the fact that members of the LDS faith frequently distribute literature and share their religious beliefs "both inside and outside the speech zones" without being asked to stop. (Doc. 13 at ¶ 313). Again, there is no indication that Plaintiffs and the LDS members are similarly situated. Although Plaintiffs and the LDS members may share similar religious beliefs, Plaintiffs do not plausibly allege that the LDS members did not have to submit requests to engage in expressive activity.[12] (Doc. 13 at ¶ 314). Nor is there any allegation that LDS members used open-air speaking or ever received complaints from other

---

[11] Plaintiffs allege "upon information and belief" that the percussion group was wrongfully engaging in expressive activity because it did not obtain a permit beforehand and/or used sound amplification. (Doc. 13 at ¶ 311). However, such allegations based "upon information and belief" do not have to be taken as true for the purposes of a 12(b)(6) motion to dismiss. Mann v. Palmer, 713 F.3d 1306, 1315 (11th Cir. 2013).

[12] Again, Plaintiffs allege that, "upon information and belief," the LDS members "did not obtain a permit before engaging in some or all of" their expressive activities. (Doc. 13 at ¶ 314). Allegations based merely "upon information and belief" do not, however, have to be taken as true for a 12(b)(6) motion, particularly when, as here, there are no additional plausible allegations to support it. Mann v. Palmer, 713 F.3d 1306, 1315 (11th Cir. 2013); Tamanji v. Nationstar Mortg. LLC, 2014 U.S. Dist. LEXIS 188998 (N.D. Ga. 2014).

students.  To the contrary, Defendant Hughes told Plaintiff Uzuegbunam that LDS members regularly get approval to express their religious views through one-on-one conversations and by distributing literature, and GGC does not receive any complaints about them.  (Doc. 13 at ¶¶ 293-298).  Defendant Hughes then suggested that Plaintiff Uzuegbunam use the same methods that the LDS members use.  (Id. at ¶ 295).  The mere fact that Plaintiff Uzuegbunam would have been allowed to continue expressing his religious views through one-on-one conversations and literature distribution demonstrates that Plaintiffs and the LDS members are not being treated unequally. Plaintiffs' Equal Protection claim should, therefore, be dismissed for failure to state a claim.

**B.     Defendants Cannot be Held Liable Under § 1983 on a Theory of Supervisory Liability**

Plaintiffs' § 1983 claims against Defendants Preczewski (GGC President), Richardson (VP of Academic and Student Affairs Williams (the Warden of Smith State Prison), Fatzinger (Senior Associate Provost for Student Affairs), Jiminez (Dean of Students), Ruffin (Dean of Library Services), and Schneider (Associate VP of Public Safety and Emergency Preparedness/Chief of Police) fail to state a plausible claim for relief.  Under Section 1983, supervisory liability may exist either when the supervisor personally participates in the alleged unconstitutional conduct or when there is a causal connection between the actions of the supervisor and the alleged constitutional deprivation. Amnesty Int'l, USA v. Battle, 559 F.3d

1170, 1180 (11th Cir. 2009) (citing Gonzalez v. Reno, 325 F.3d 1228, 1234 (11th Cir. 2003)).  The necessary causal connection can be established "when a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he fails to do so." Cottone v. Jenne, 326 F.3d 1352, 1360 (11th Cir. 2003).  The causal connection may also be established when a supervisor's "custom or policy . . . result[s] in deliberate indifference to constitutional rights." Id. (internal citations omitted).  "The standard by which a supervisor is held liable in [his] individual capacity for the actions of a subordinate is *extremely rigorous*." Id. (emphasis added).

In the case at bar, Plaintiffs are suing these particular Defendants based on their supervisory roles at GGC.  They have not, however, alleged any facts that would plausibly meet the "extremely rigorous" standard above.

**C.    Plaintiffs Cannot Pursue a Claim for Monetary Damages Against Defendants in Their Official Capacities**

**1.    Plaintiffs' Claim for Monetary Damages Against Defendants in Their Official Capacities is Barred by the Eleventh Amendment**

The Eleventh Amendment prohibits suit against a State or one of its agencies, departments, or officials, absent a waiver by the State or a valid congressional override. Kentucky v. Graham, 473 U.S. 159, 169 (1985).  This immunity also extends to state officers such as the State Defendants because "a judgment against a public servant 'in his official capacity' imposes liability on the entity that he represents." Id. at 169.

In order to override the Eleventh Amendment, Congress must do so with "an unequivocal expression of congressional intent to 'overturn the constitutionally guaranteed immunity of the several States.'"  Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 99 (1984).  The United States Supreme Court has repeatedly held that "§1983 does not override a State's Eleventh Amendment immunity." Will v. Michigan Dep't of State Police, 491 U.S. 58, 63 (1989).

Without an express congressional override of Eleventh Amendment immunity, Plaintiff must demonstrate that the State has consented to being sued. Here, the State Defendants have not consented to being sued under § 1983.  To the contrary, the State of Georgia has specifically preserved its sovereign immunity in the state constitution.  See Ga. Const. Art. I, §II, ¶ IX(f) (stating that "[n]o waiver of sovereign immunity . . . shall be construed as a waiver of any immunity provided to the state or its departments, agencies, officers, or employees by the United States Constitution"). Therefore, to the extent Plaintiffs are suing Defendants for monetary damages in their official capacities, such claims are barred by the Eleventh Amendment and fail as a matter of law.

### 2.    Defendants, in Their Official Capacities, are Not "Persons" Amenable to Suit Under § 1983

Plaintiffs' claims against Defendants in their official capacities are barred for the additional reason that Defendants are not "persons" as defined by § 1983.

Plaintiffs' federal claims are brought pursuant to 42 U.S.C. § 1983, which provides a cause of action for violations of federal constitutional or statutory rights by any "person" acting under color of law.   In interpreting this requirement, the Supreme Court has ruled that "a State is not a 'person' within the meaning of § 1983." Will v. Michigan Dept. of State Police, 491 U.S. 58, 65 (1989). Furthermore, the Supreme Court has explained that the definition of a "State" includes state agencies and individual state officers sued in their official capacity. Will, 491 U.S. at 70, 71; Mt. Healthy Bd. Of Educ. v. Doyle, 429 U.S. 276, 280 (1977); see also Arizonans for Official English v. Ariz., 520 U.S. 43, 69 (1997) (rejecting an award of nominal damages against a state officer sued in his official capacity under Section 1983).   Thus, to the extent Plaintiffs are suing Defendants in their official capacities, they are not "person[s]" who can be sued under § 1983. Accordingly, Plaintiffs fail to state any constitutional violations against Defendants in their official capacities.

**D.     Defendants are Entitled to Qualified Immunity**

Qualified immunity protects governmental defendants sued in their individual capacities so long as their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Vinyard v. Wilson, 311 F.3d 1340, 1346 (11th Cir. 2002) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).  The immunity is decided as a matter of law,

and is effectively lost if a case is erroneously permitted to go to trial.  Mitchell v. Forsyth, 472 U.S. 511, 526 (1985).

To avail of the immunity, a defendant must first prove that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred.  Vinyard, 311 F.3d at 1346.  Once this showing is made, the burden shifts to the plaintiff to show that the law was clearly established.  Id.  The plaintiff can meet this burden only by pointing to constitutional provisions, federal statutes, and binding judicial decisions of the United States Supreme Court, the Eleventh Circuit, and the Georgia Supreme Court that clearly establish the law.  Griffin Indus., Inc. v. Irvin, 496 F.3d 1189, 1200 n.6 (11th Cir. 2007); Marsh v. Butler County, 268 F.3d 1014, 1033  n.10 (11th Cir. 2001) (en banc).

When determining whether the defendant was engaged in discretionary acts, the question that must be answered is whether they were pursuing legitimate job-related goals through means that were within their power to utilize.  Holloman v. Harland, 370 F.3d 1252, 1266 (11th Cir. 2004).  The inquiry does not focus on whether it was within the defendant's authority to commit the allegedly illegal act.  Harbert Int'l, Inc. v. James, 157 F.3d 1271, 1282 (11th Cir. 1998).  Rather, the question is "whether the act complained of, if done for a proper purpose, would be within, or reasonably related to, the outer perimeter of an official's discretionary duties."  Id. (quoting In re Allen, 106 F.3d 582, 594 (4th Cir. 1997)).  Courts therefore look to the "general nature of the defendant's action, putting aside the

42

fact that it may have been committed for an unconstitutional purpose, in an unconstitutional manner, to an unconstitutional extent, or under constitutionally inappropriate circumstances." Holloman, 370 F.3d at 1266.

Here, Defendants are being sued because of: (1) their authority to implement the former Speech Policy, or (2) their alleged actions in enforcing the former policy to Plaintiff Uzuegbunam's expressive activity. The burden, accordingly, shifts to Plaintiffs to show a violation of a clearly established constitutional right.

For the reasons stated above, Plaintiffs have not been deprived of any constitutional right.   Yet, even if this Court were to find the allegations in the Amended Complaint sufficient to allege a constitutional violation, Defendants are still entitled to qualified immunity because there is no clearly established law that their actions, in implementing and enforcing the prior Speech Policy and prior Disorderly Conduct Policy would violate the constitution.  See Bloedorn, 631 F.3d at 1240.

## VII.  CONCLUSION

For all of the reasons stated above, Defendants respectfully ask the Court to dismiss Plaintiffs' Amended Complaint (Doc. 13) in its entirety.


[SIGNATURES ON THE FOLLOWING PAGE]


43

Respectfully submitted,

CHRISTOPHER M. CARR     112505
Attorney General

KATHLEEN M. PACIOUS     558555
Deputy Attorney General

*/s/ Devon Orland*
DEVON ORLAND     554301
Senior Asst. Attorney General

*/s/ Ellen Cusimano*
ELLEN CUSIMANO     844964
Assistant Attorney General

Please address all communications to:

Devon Orland
Senior Assistant Attorney General
Department of Law, State of Georgia
40 Capitol Square, S.W.
Atlanta, Georgia  30334-1300
Telephone: (404) 463-8850
Facsimile:  (404) 651-5304
E-mail: dorland@law.ga.gov

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing document has been prepared in Times New Roman (14 point) and fully complies with the font and point selection requirements of LR 5.1(B), N.D. Ga.

*/s/ Ellen Cusimano*
ELLEN CUSIMANO

## CERTIFICATE OF SERVICE

I hereby certify that on this date I have electronically filed the foregoing **MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT** using the CM/ECF system which will automatically send electronic mail notification of such filing to counsel of record as follows:

**David A. Cortman**
**Travis C. Barham**
**Alliance Defending Freedom**
**1000 Hurricane Shoals Rd. NE, Suite D-1100**
**Lawrenceville, GA  30043**

**Casey Mattox**
**Alliance Defending Freedom**
**440 1st Street, NW, Ste. 600**
**Washington, D.C. 20001**

I hereby certify that I have mailed by United States Postal Service the document to the following non-CM/ECF participants:  **NONE.**

This 17th day of March, 2017.

*/s/ Ellen Cusimano*
ELLEN CUSIMANO