IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

CHIKE UZUEGBUNAM, *et al.*,

           *Plaintiffs*,

      v.

STANLEY C. PRECZEWSKI, *et al.*,

           *Defendants*.

Case No. 1:16-cv-04658-ELR

THE HONORABLE ELEANOR L. ROSS

PLAINTIFFS' RESPONSE IN OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT

TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................... v

INTRODUCTION ................................................................................. 1

ARGUMENT ..................................................................................... 3

   I.    Defendants' policies broadly curtail student speech on campus. ......... 4

   II.   All Defendants were personally involved in (and thus can be held liable for) violating Plaintiffs' rights. .................................................... 6

   III.  As Plaintiffs pleaded that Defendants are violating their clearly established rights, nobody merits qualified immunity. ....................... 8

       A. Both of Defendants' policies violate Plaintiffs' clearly established free speech rights. ........................................................... 10

          1. Both of Defendants' policies are viewpoint-based, which is unconstitutional in any forum. .................................................... 11

            a. Both policies grant officials unbridled discretion. ................ 11

              i. Defendants' Speech Zone Policy ...................................... 12

              ii. Defendants' Speech Code .................................................. 14

            b. Both policies do not prevent viewpoint discrimination. ........ 16

              i. Defendants' Speech Zone Policy ...................................... 17

              ii. Defendants' Speech Code .................................................. 18

            c. Defendants' Speech Code is a heckler's veto that restricts any speech someone finds offensive. ..................................... 19

          2. Defendants' Speech Zone Policy is an illegal prior restraint in areas that are at least designated public fora for students. ..... 22

            a. The First Amendment protects Plaintiffs' expression. ........ 23

            b. Defendants' Speech Zone Policy restricts speech in areas that are at least designated public fora for students. .......... 24

i.   Federal courts have held that the open, outdoor, generally accessible areas of campus are designated public fora for students. ..................................................... 25

ii.  *Bloedorn* confirms that the open, outdoor, generally accessible areas of campus are designated public fora for students................................................................ 27

iii. *Bloedorn's* factors confirm that the open, outdoor, generally accessible areas of campus are designated public fora for students. ..................................................... 28

c.   Both policies are content-based. ........................................... 30

d.   Defendants' Speech Zone Policy fails intermediate scrutiny. ............................................................................. 31

i.   Defendants' Speech Zone Policy contains five features that flunk intermediate scrutiny...................................... 32

ii.  Most of Defendants' asserted interests do not satisfy intermediate scrutiny......................................................... 36

e.   Both policies fail strict scrutiny............................................ 37

f.   Defendants' Speech Zone Policy does not provide ample alternative means of communication. ................................... 38

g.   Both policies lack the protections required of content-based prior restraints. ................................................................... 39

h.   Defendants' Speech Zone Policy fails the scrutiny for limited public fora. .............................................................. 39

3.   Both of Defendants' policies are overbroad as they restrict a substantial amount of protected speech...................................... 40

B. Both of Defendants' policies violate Plaintiffs' clearly established free exercise rights. ........................................................................ 41

1.   Both policies are individualized governmental assessments.... 42

2.   Both policies violate the hybrid rights doctrine. ....................... 43

C. Both of Defendants' policies violate Plaintiffs' clearly established Fourteenth Amendment Rights..................................................... 43

1. Both of Defendants' policies are vague. ..................................... 43

2. Both of Defendants' policies violate equal protection. ............. 44

CONCLUSION .......................................................................................... 45

CERTIFICATE OF FORMATTING ............................................................ 47

CERTIFICATE OF SERVICE ..................................................................... 48

# TABLE OF AUTHORITIES

## CASES

*ACLU v. Mote,*
   423 F.3d 438 (4th Cir. 2005) .......................................................... 28

*Am.-Arab Anti-Discrimination Comm. v. City of Dearborn,*
   418 F.3d 600 (6th Cir. 2005)...................................................... 32, 33

*Atl. J. & Const. v. Atl. Dep't of Aviation,*
   322 F.3d 1298 (11th Cir. 2003).......................................................... 12, 24

*Bair v. Shippensburg Univ.,*
   280 F. Supp. 2d 357 (M.D. Pa. 2003) .................................................... 11, 16

*Bantam Books, Inc. v. Sullivan,*
   372 U.S. 58 (1963) .......................................................................... 23

*Bd. of Airport Comm'rs of L.A. v. Jews for Jesus, Inc.,*
   482 U.S. 569 (1987) .................................................................. 1, 2, 40

*Bd. of Regents of Univ. of Wis. Sys. v. Southworth,*
   529 U.S. 217 (2000) .............................................................. 16, 18, 19

*Bell Atl. Corp. v. Twombly,*
   550 U.S. 544 (2007) ...................................................................... 2, 3

*Bell v. City of Winter Park,*
   745 F.3d 1318 (11th Cir. 2014)................................................... 20, 32, 38

*Bloedorn v. Grube,*
   631 F.3d 1218 (11th Cir. 2011).................... 24, 25, 27, 28, 29, 30, 31, 35, 36

*Boateng v. Ret. Corp. of Am. Partners, L.P.,*
   2013 WL 12061901 (N.D. Ga. Mar. 5, 2013) ............................................. 45

*Booher v. Bd. of Regents of N. Ky. Univ.,*
   1998 WL 35867183 (E.D. Ky. July 21, 1998)............................................ 11

*Bowman v. White,*
   444 F.3d 967 (8th Cir. 2006)........................................................... 35

*Brooks v. Blue Cross & Blue Shield of Fla., Inc.,*
   116 F.3d 1364 (11th Cir. 1997)......................................................... 3

*Burbridge v. Sampson,*
   74 F. Supp. 2d 940 (C.D. Cal. 1999) ................................................ 11, 26, 34

*Burk v. Augusta-Richmond Cnty.,*
    365 F.3d 1247 (11th Cir. 2004) ........................... 23, 30, 31, 32, 33, 37, 38, 39

*C.E.F. of Md., Inc. v. Montgomery Cnty. Pub. Schs.,*
    457 F.3d 376 (4th Cir. 2006) ........................................................ 17

*C.E.F. of N.J., Inc. v. Stafford Twp. Sch. Dist.,*
    386 F.3d 514 (3d Cir. 2004) ........................................................ 20

*CAMP Legal Def. Fund, Inc. v. City of Atl.,*
    451 F.3d 1257 (11th Cir. 2006) .......................................... 12, 23, 30

*Cantwell v. Connecticut,*
    310 U.S. 296 (1940) ................................................................... 22

*Capitol Square Review & Advisory Bd. v. Pinette,*
    515 U.S. 753 (1995) ................................................................... 24

*Chaparro v. Carnival Corp.,*
    693 F.3d 1333 (11th Cir. 2012) .................. 3, 4, 6, 7, 8, 13, 15, 21, 22, 38, 45

*Christian Legal Soc'y v. Martinez,*
    561 U.S. 661 (2010) ................................................................... 37

*Church of Lukumi Babalu Aye, Inc. v. City of Hialeah,*
    508 U.S. 520 (1993) ............................................................. 42, 43

*City of Chi. v. Morales,*
    527 U.S. 41 (1999) ..................................................................... 43

*City of Lakewood v. Plain Dealer Publ'g Co.,*
    486 U.S. 750 (1988) ................................................ 12, 15, 17, 18, 21

*City of Okla. City v. Tuttle,*
    471 U.S. 808 (1985) ................................................................. 7, 8

*Coal. for Abolition of Marijuana Prohibition v. City of Atl.,*
    219 F.3d 1301 (11th Cir. 2000) ................................................... 32

*Cohen v. California,*
    403 U.S. 15 (1971) ............................................................... 21, 22

*Cohen v. San Bernardino Valley Coll.,*
    92 F.3d 968 (9th Cir. 1996) ........................................................ 11

*Coll. Republicans at S.F. State Univ. v. Reed,*
    523 F. Supp. 2d 1005 (N.D. Cal. 2007) .................................. 11, 16, 19

*Connally v. Gen. Constr. Co.*,
   269 U.S. 385 (1926).......................................................................... 44

*Cook v. Gwinnett Cnty. Sch. Dist.*,
   414 F.3d 1313 (11th Cir. 2005).................................................... 11

*Cornelius v. NAACP Legal Def. & Educ. Fund*,
   473 U.S. 788 (1985).................................................... 22, 24, 40

*Cottone v. Jenne*,
   326 F. 3d 1352 (11th Cir. 2003)...................................................... 6

*Cross v. Alabama*,
   49 F.3d 1490 (11th Cir. 1995)......................................................... 9

*DA Mortg., Inc. v. City of Miami Beach*,
   486 F.3d 1254 (11th Cir. 2007)............................................. 41, 43

*Dambrot v. Cent. Mich. Univ.*,
   55 F.3d 1177 (6th Cir. 1995)......................... 11, 14, 15, 16, 19, 44

*Dambrot v. Cent. Mich. Univ.*,
   839 F. Supp. 477 (E.D. Mich. 1993) ................................. 11, 16, 19

*DeJohn v. Temple Univ.*,
   537 F.3d 301 (3d Cir. 2008) ............................ 1, 2, 11, 15, 16, 30, 37, 41, 44

*Dodds v. Richardson*,
   614 F.3d 1185 (10th Cir. 2010)....................................................... 7

*Doe v. Univ. of Mich.*,
   721 F. Supp. 852 (E.D. Mich. 1989) ......................... 11, 15, 16, 44

*Emp't Div. v. Smith*,
   494 U.S. 872 (1990)............................................................. 42, 43

*Erznoznik v. City of Jacksonville*,
   422 U.S. 205 (1975)...................................................................... 21

*Exodus Vision, LLC v. Touchmarck Nat'l Bank*,
   2017 WL 951732 (N.D. Ga. Mar. 10, 2017) .................................. 3

*Fla. Dep't of Revenue v. Piccadilly Cafeterias, Inc.*,
   554 U.S. 33 (2008)....................................................................... 21

*Forsyth Cnty. v. Nationalist Movement*,
   505 U.S. 123 (1992)......................... 12, 14, 15, 17, 31, 40

*Freedman v. Maryland,*
   380 U.S. 51 (1965) ................................................................ 39

*Frisby v. Schultz,*
   487 U.S. 474 (1988) .............................................................. 32

*GeorgiaCarry.Org, Inc. v. Georgia,*
   687 F.3d 1244 (11th Cir. 2012) ........................................... 42

*Gilio v. Sch. Bd. of Hillsborough Cnty.,*
   905 F. Supp. 2d 1262 (M.D. Fla. 2012) .............................. 25

*Grace Christian Life v. Woodson,*
   2016 WL 3194365 (E.D.N.C. June 4, 2016) ........................ 10

*Grayned v. City of Rockford,*
   408 U.S. 104 (1972) .............................................................. 43

*Gregoire v. Centennial Sch. Dist.,*
   907 F.2d 1366 (3d Cir. 1990) .............................................. 37

*Gregory v. City of Chi.,*
   394 U.S. 111 (1969) .............................................................. 22

*Grossman v. City of Portland,*
   33 F.3d 1200 (9th Cir. 1994) .............................................. 33

*Hafer v. Melo,*
   502 U.S. 21 (1991) ................................................................ 9

*Hays Cnty. Guardian v. Supple,*
   969 F.2d 111 (5th Cir. 1992) ................................... 10, 26, 29

*Healy v. James,*
   408 U.S. 169 (1972) ..................................................... 2, 10, 23

*Holloman v. Harland,*
   370 F.3d 1252 (11th Cir. 2004) ............................... 9, 20, 37

*Horton v. City of St. Augustine,*
   272 F.3d 1318 (11th Cir. 2001) ................................... 41, 43

*Int'l Soc'y for Krishna Consciousness, Inc. v. Lee,*
   505 U.S. 830 (1992) .............................................................. 40

*Iota Xi Chapter of Sigma Chi Fraternity v. George Mason Univ.,*
   993 F.2d 386 (4th Cir. 1993) .............................................. 11

*Justice for All (JFA) v. Faulkner,*
  410 F.3d 760 (5th Cir. 2005)....................................................... 10, 25, 26, 30

*Keating v. City of Miami,*
  598 F.3d 753 (11th Cir. 2010)........................................................ 9

*Keeton v. Anderson-Wiley,*
  664 F.3d 865 (11th Cir. 2001)....................................................... 22, 31

*Keyishian v. Bd. of Regents of Univ. of N.Y.,*
  385 U.S. 589 (1967) ............................................................... 1

*Khademi v. S. Orange Cnty. Cmty. Coll. Dist.,*
  194 F. Supp. 2d 1011 (C.D. Cal. 2002) ........................................ 11, 26, 34

*Knowles v. City of Waco,*
  462 F.3d 430 (5th Cir. 2006)........................................................ 32

*Kyle K. v. Chapman,*
  208 F.3d 940 (11th Cir. 2000) ..................................................... 9

*Lady J. Lingerie v. City of Jacksonville,*
  176 F.3d 1358 (11th Cir. 1999)................................................ 12, 14, 16, 17

*Lamar v. Banks,*
  684 F.2d 714 (11th Cir. 1982)...................................................... 21

*Lewis v. Wilson,*
  253 F.3d 1077 (8th Cir. 2001)...................................................... 20

*Long Beach Area Peace Network v. City of Long Beach,*
  574 F.3d 1011, 1025 (9th Cir. 2008) ........................................... 38

*McCauley v. Univ. of V.I.,*
  618 F.3d 232 (3d Cir. 2010)..................................................... 4, 11, 15, 41

*McCullen v. Coakley,*
  134 S. Ct. 2518 (2014).............................................................. 32

*McIntyre v. Ohio Elections Comm'n,*
  514 U.S. 334 (1995) ............................................................... 23

*McMahon v. City of Panama City Beach,*
  180 F. Supp. 3d 1076 (N.D. Fla. 2016)......................................... 29

*Merenda v. Tabor,*
  506 Fed. Appx. 862 (11th Cir. 2013) .......................................... 21

*Meyer v. Snyders Lance, Inc.*,
  2012 WL 6913724 (M.D. Ga. Dec. 12, 2012)................................................. 3

*Morse v. Frederick*,
  551 U.S. 393 (2007)......................................................................................... 37

*Murdock v. Pennsylvania*,
  319 U.S. 105 (1943)................................................................................. 18, 23

*Near v. Minnesota*,
  283 U.S. 697 (1931)......................................................................................... 20

*Neb. Press Ass'n v. Stuart*,
  427 U.S. 539 (1976) ........................................................................................ 23

*OSU Student Alliance v. Ray*,
  699 F.3d 1053 (9th Cir. 2012)................................................... 10, 14, 26, 29

*Papish v. Bd. of Curators of Univ. of Mo.*,
  410 U.S. 667 (1973)......................................................................................... 19

*Plyler v. Doe*,
  457 U.S. 202 (1982)......................................................................................... 45

*Pritchard v. Carlton*,
  821 F. Supp. 671 (S.D. Fla. 1993) ................................................................. 27

*Pro-Life Cougars v. Univ. of Hous.*,
  259 F. Supp. 2d 575 (S.D. Tex. 2003)....................................... 11, 14, 18, 26

*R.A.V. v. City of St. Paul*,
  505 U.S. 377 (1992) ........................................................................................ 16

*Redd v. Conway*,
  160 Fed. Appx. 858 (11th Cir. 2005) ............................................................. 7

*Reed v. Town of Gilbert*,
  135 S. Ct. 2218 (2015).............................................................................. 31, 37

*Regan v. Time, Inc.*,
  468 U.S. 641 (1984)......................................................................................... 31

*Roberts v. Haragan*,
  346 F. Supp. 2d 853 (N.D. Tex. 2004) .............................. 11, 26, 34, 35, 36

*Rogers v. City of Atl.*,
  __ F. Supp. 3d __, 2016 WL 6080227 (N.D. Ga. Oct. 17, 2016) .................. 3

*Rosenberger v. Rector & Visitors of Univ. of Va.*,
   515 U.S. 819 (1995) ...................................................................... 30

*Saxe v. State Coll. Area Sch. Dist.*,
   240 F.3d 200 (3d Cir. 2001) ....................................................... 15

*Schneider v. New Jersey*,
   308 U.S. 147 (1939) ............................................................... 23, 39

*Sentinel Commc'ns Co. v. Watts*,
   936 F.2d 1189 (11th Cir. 1991) ................................................. 27

*Shephard v. Davis*,
   300 Fed. Appx. 832 (11th Cir. 2008) .......................................... 9

*Shuttlesworth v. City of Birmingham*,
   394 U.S. 147 (1969) ......................................................... 11, 12, 33

*Skyline Corp. v. N.L.R.B.*,
   613 F.2d 1328 (5th Cir. 1980) .................................................... 13

*Smith v. Tarrant Cnty. Coll. Dist.*,
   670 F. Supp. 2d 534 (N.D. Tex. 2009) ................................... 11, 14

*Smith v. Tarrant Cnty. Coll. Dist.*,
   694 F. Supp. 2d 610 (N.D. Tex. 2010) ................................... 10, 26

*Snyder v. Phelps*,
   562 U.S. 443 (2011) .................................................................... 24

*Solantic LLC v. City of Neptune Beach*,
   410 F.3d 1250 (11th Cir. 2005) ............................................. 37, 38

*Sonnier v. Crain*,
   613 F. 3d 436 (5th Cir. 2010) .................................................... 36

*Sonnier v. Crain*,
   634 F.3d 778 (5th Cir. 2011) ...................................................... 36

*Stewart v. D.C. Armory Bd.*,
   863 F.2d 1013 (D.C. Cir. 1988) ................................................. 29

*Sweezy v. New Hampshire*,
   354 U.S. 234 (1957) ...................................................................... 1

*Terminiello v. City of Chi.*,
   337 U.S. 1 (1949) ................................................................... 10, 21

*Texas v. Johnson*,
    491 U.S. 397 (1989) ..................................................................... 19

*Thomas v. Chi. Park Dist.*,
    534 U.S. 316 (2002) ..................................................................... 39

*Thomas v. Collins*,
    323 U.S. 516 (1945) ..................................................................... 33

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.*,
    393 U.S. 503 (1969) .............................................................. 2, 20

*United States v. Frandsen*,
    212 F.3d 1231 (11th Cir. 2000) ............................................ 22, 39

*United States v. Hutley*,
    2010 WL 4223741 (N.D. Ga. Aug. 27, 2010) ............................. 13

*Univ. of Cincinnati Chapter of Young Ams. for Liberty v. Williams*,
    2012 WL 2160969 (S.D. Ohio June 12, 2012) ......... 10, 26, 30, 33, 34, 35, 44

*UWM Post, Inc. v. Bd. of Regents of Univ. of Wis. Sys.*,
    774 F. Supp. 1163 (E.D. Wis. 1991) ..................................... 11, 16

*Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*,
    455 U.S. 489 (1982) ..................................................................... 43

*Ward v. Rock Against Racism*,
    491 U.S. 781 (1989) ................................................................ 24, 38

*Warren v. Fairfax Cnty.*,
    196 F.3d 186 (4th Cir. 1999) ...................................................... 28

*Watchtower Bible & Tract Soc'y of N.Y., Inc. v. Vill. of Stratton*,
    536 U.S. 150 (2002) ....................................................... 4, 33, 36

*Watson v. City of Memphis*,
    373 U.S. 526 (1963) ..................................................................... 20

*Watts v. Fla. Int'l Univ.*,
    495 F.3d 1289 (11th Cir. 2007) ............................................... 3, 42

*Widmar v. Vincent*,
    454 U.S. 263 (1981) ..................................... 10, 22, 25, 30, 36

*Will v. Mich. Dep't of State Police*,
    491 U.S. 58 (1989) ......................................................................... 8

*Wollschlaeger v. Gov. of Fla.*,
   __ F.3d __, 2017 WL 632740 (11th Cir. Feb. 16, 2017) ........................ 43, 44

STATUTES

42 U.S.C. § 1983 ................................................................................. 7

GA. CODE § 16-11-39(a)(3) .................................................................. 21

GA. CODE § 26-2610(a) ........................................................................ 21

OTHER AUTHORITIES

Univ. Sys. of Ga. Bd. of Regents, *Physical Master Planning Template* at iv,
   *available at* http://www.usg.edu/assets/facilities/documents/
   masterplan_template.pdf (last visited Apr. 7, 2017) ............................ 28, 29

RULES

FED. R. CIV. P. 8 ................................................................................. 2

## INTRODUCTION

"The essentiality of freedom in the community of American universities is almost self-evident." *Sweezy v. New Hampshire*, 354 U.S. 234, 250 (1957). Our "Nation's future depends upon leaders trained through wide exposure to that robust exchange of ideas which discovers truth out of a multitude of tongues, rather than through any kind of authoritative selection." *Keyishian v. Bd. of Regents of Univ. of N.Y.*, 385 U.S. 589, 603 (1967). "[S]tudents must always remain free to inquire, to study and to evaluate, to gain new maturity and understanding; otherwise our civilization will stagnate and die." *Id*. Thus, "free speech is of critical importance because it is the lifeblood of academic freedom." *DeJohn v. Temple Univ.*, 537 F.3d 301, 314 (3d Cir. 2008).

Ignoring this, Defendants enforced two policies that treat students as if they should be seen but not heard. When Mr. Uzuegbunam leafletted in a plaza on Georgia Gwinnett College's ("GGC") campus, Defendants quickly stopped him, enforcing their Speech Zone Policy, because he was outside the two speech zones, had not obtained a permit to use these miniscule areas (which they could deny for any reason), and had not submitted his religious literature for review.

When he then dutifully reserved a "free speech expression area," he learned that free speech was not allowed there either. Under Defendants' Speech Code, once anyone complained about his speech, it magically became "disorderly conduct" simply because it "disturb[ed] the peace and/or comfort of person(s)."

These policies "create a virtual 'First Amendment Free Zone'" on campus, which has been illegal in airports for thirty years, let alone in the "marketplace of ideas." *Bd. of Airport Comm'rs of L.A. v. Jews for Jesus, Inc.*, 482 U.S. 569,

574 (1987). Even in elementary school, "free speech is not a right that is given only to be so circumscribed that it exists in principle but not in fact." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 513 (1969). And Defendants have significantly "*less leeway* in regulating student speech than public elementary or high schools." *DeJohn*, 537 F.3d at 315–16. Over forty years ago, the Supreme Court held that "state colleges and universities are not enclaves immune from the sweep of the First Amendment" and its "precedents . . . leave no room for the view that, because of the acknowledged need for order, First Amendment protections should apply with less force on college campuses than in the community at large." *Healy v. James*, 408 U.S. 169, 180 (1972).

This case and Defendants' motion thus present the Court with two questions:

1. *Speech Zone*: The overwhelming consensus among federal courts is that the open, outdoor, generally accessible areas of campus are designated public fora for students and that efforts to quarantine their speech to small "speech zones" violate the First Amendment, especially when officials can discriminate due to content or viewpoint. Thus, can Defendants close their entire campus to student speech for 90% of the week and open only 0.0015% of it for 10% of the week, subject to their prior restraint?

2. *Speech Code*: For decades, the Supreme Court has ruled that the First Amendment protects speech some find offensive (even on a college campus) and that it prohibits the government from instituting a heckler's veto or vague speech restrictions. Thus, federal courts nationwide have struck down speech codes aimed at speech colleges deem uncivil or offensive. Thus, can Defendants punish students for saying anything that, in their view, "disturbs the peace and/or comfort of person(s)"?

The answer to both is: "No." This is why Plaintiffs easily exceed the minimal standard of FED. R. CIV. P. 8 (*i.e.*, "a short and plain statement . . . showing [they are] entitled to relief"). This is why they plausibly pleaded claims that will ultimately succeed, *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007), just like many other student plaintiffs. And this is why this motion should be denied.

## ARGUMENT

Motions to dismiss are "viewed with disfavor and rarely granted." *Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1369 (11th Cir. 1997). Since *Twombly*, they have become "the most overused tool in the litigator's toolbox." *Meyer v. Snyders Lance, Inc.*, 2012 WL 6913724, at *1 (M.D. Ga. Dec. 12, 2012). To defeat this motion, Plaintiffs must simply provide "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Exodus Vision, LLC v. Touchmarck Nat'l Bank*, 2017 WL 951732, at *3 (N.D. Ga. Mar. 10, 2017) (quoting *Twombly*, 550 U.S. at 570). They just have to "'raise a right to relief above the speculative level.'" *Rogers v. City of Atl.*, __ F. Supp. 3d __, 2016 WL 6080227, at *2 (N.D. Ga. Oct. 17, 2016) (quoting *Twombly*, 550 U.S. at 555); *accord Watts v. Fla. Int'l Univ.*, 495 F.3d 1289, 1296 (11th Cir. 2007) (requiring "enough fact to raise a reasonable expectation that discovery will reveal evidence of the necessary element[s]").

At this stage, "the pleadings are construed broadly." *Watts*, 495 F.3d at 1295. The Court must "accept[] the complaint's allegations as true and constru[e] them in the light most favorable to [Plaintiffs]." *Chaparro v. Carnival Corp.*, 693 F.3d 1333, 1335 (11th Cir. 2012) (quotations omitted). "Rule 12(b)(6) does not permit dismissal of a well-pleaded complaint simply because 'it strikes a savvy judge that actual proof of those facts is improbable.'" *Watts*, 495 F.3d at 1295 (quoting *Twombly*, 550 U.S. at 556).

The Complaint pleads detailed facts about Defendants' policies, Compl. ¶¶ 107–203, ECF No. 13, and their enforcement, *id.* ¶¶ 204–359. It "raise[s] a reasonable expectation that discovery could supply additional proof of [Defendants']

liability." *Chaparro*, 693 F.3d at 1337. Thus, this motion should be denied.

## I.   Defendants' policies broadly curtail student speech on campus.

Defendants insist their policies hardly affect student speech. Defs.' Mot. to Dismiss Br. ("MTD Br.") at 2, 19 n.6, ECF No. 18-1. Their spin contradicts what the policies say and how they were enforced. These facts matter more for students who, like Plaintiffs, Compl. ¶¶ 163–64, 178, "remain subject to university rules at almost all hours of the day." *McCauley v. Univ. of V.I.*, 618 F.3d 232, 247 (3d Cir. 2010); *Watchtower Bible & Tract Soc'y of N.Y., Inc. v. Vill. of Stratton*, 536 U.S. 150, 165 (2002) ("The mere fact that [these policies] cover[] so much speech raises constitutional concerns."). These facts show there is no place for free speech at GGC, and they must be taken as true. *Chaparro*, 693 F.3d at 1335.

Exercising his religious beliefs, Mr. Uzuegbunam began leafleting in a plaza outside GGC's library. Compl. ¶¶ 204–06. He did not disrupt pedestrian traffic or disturb anyone inside. *Id.* ¶¶ 208, 212. He just stood where students freely walk and congregate, and he conversed and shared literature with willing passersby. *Id.* ¶¶ 206–14. But he quickly learned that free speech was not allowed there, as Defendants enforced the Speech Zone Policy. *Id.* ¶¶ 215–37.

Under that policy, students may engage in expressive activities only in two speech zones and only after reserving them. *Id.* ¶¶ 113, 136–40. Open just eighteen hours a week (*i.e.*, 10% of the week), they comprise just 0.0015% of the 260-acre campus. *Id.* ¶¶ 104, 114–24. If students want to speak during the other 90% of the week, they must first get a permit. *Id.* ¶¶ 127–28. If they want to speak along any sidewalks or in any park-like "areas where students

4

naturally and freely congregate" outside those zones, they must get a permit. *Id.* ¶ 125–26, 128. The policy provides no guidance on when these permits must be granted. *Id.* ¶¶ 129–32. Also, Defendants can "modify the free speech areas based on the operational needs of the institution," whatever that means. *Id.* ¶ 133. The policy provides no limits on when or how this happens. *Id.* ¶¶ 134–35.

To use the speech zones, students must submit both a reservation form and any literature to be distributed to GGC officials three business days in advance. *Id.* ¶¶ 136–40. Four officials review the literature, but the policy places no limits on the scope of their review or how it impacts the granting of the permit. *Id.* ¶¶ 149–53. The policy lists fifteen considerations all speakers "must meet." *Id.* ¶ 146. Two (*i.e.*, mandating the literature review, allowing its distribution only in a reserved speech zone) are challenged. *Id.* ¶¶ 146, 149, 154–55. But it says nothing about which requests Defendants must grant. So they are free to deny ones that satisfy all fifteen. *Id.* ¶¶ 146–48. Defendants say this policy does not curtail conversations. Defs.' MTD Br. at 2, 19 n.6. This is news to Mr. Uzuegbunam, who was told that it prohibited him from discussing his faith with willing listeners outside the speech zones. Compl. ¶¶ 230–33.

Mr. Uzuegbunam then reserved a speech zone and submitted his literature. *Id.* ¶¶ 238–47. But when his day to speak came, he discovered free speech was not even allowed in the tiny "free speech expression areas." Defendants ordered him to stop speaking publicly simply because someone complained, *id.* ¶¶ 248–68, explaining the complaints converted his speech into disorderly conduct as it disturbed "the peace and tranquility of individuals." *Id.* ¶¶ 277–83, 287–91, 302.

Threatened with sanctions, Mr. Uzuegbunam stopped speaking. *Id.* ¶¶ 282–83, 298. Since then, he and Mr. Bradford have dramatically curtailed any efforts to communicate with other students on campus. *Id.* ¶¶ 236–37, 316–59.

In so doing, Defendants enforced their Speech Code, *id.* ¶¶ 279, 291, 301–02, which bars students from saying anything that "disturbs the peace and/or comfort of person(s)." *Id.* ¶ 170. It gives officials near-unlimited discretion to prohibit speech, lacking any objective enforcement standards and weakly assuring that "freedom of expression . . . shall be considered." *Id.* ¶¶ 171–75; Compl. Ex. 9 at 27. But Defendants' consideration gives free speech short shrift.

Speech is not free at GGC. For 10% of the week, they can speak only on 0.0015% of campus, but only if they seek a permit three days before, let officials review their literature, and get approval (which can be denied for any reason). For the rest of the week and the rest of campus, they need a permit. Anywhere, they cannot say anything that might disturb anyone's "peace" and "comfort."

## II. All Defendants were personally involved in (and thus can be held liable for) violating Plaintiffs' rights.

Six Defendants seek dismissal, saying they cannot be held liable for others' actions. Defs.' MTD Br. at 38–39. But they ignore controlling law and the facts in the Complaint, which must be taken as true. *Chaparro*, 693 F.3d at 1335.

A supervisor violates § 1983 "either when [he] personally participates in the alleged unconstitutional conduct or when there is a causal connection between [his] actions . . . and the alleged constitutional deprivation." *Cottone v. Jenne*, 326 F. 3d 1352, 1360 (11th Cir. 2003). This "[p]ersonal involvement is not limited solely to situations where a defendant violates a plaintiff's rights by

physically placing hands on him." *Dodds v. Richardson*, 614 F.3d 1185, 1195 (10th Cir. 2010). It includes when "a . . . policy is 'the moving force of the constitutional violation.'" *Redd v. Conway*, 160 Fed. Appx. 858, 861 (11th Cir. 2005) (quoting *City of Okla. City v. Tuttle*, 471 U.S. 808, 820 (1985)). That is:

> § 1983 allows a plaintiff to impose liability upon a defendant-supervisor who creates, promulgates, implements, or in some other way possesses responsibility for the continued operation of a policy the enforcement (by the defendant-supervisor or her subordinates) of which "subjects, or causes to be subjected" that plaintiff "to the deprivation of any rights . . . secured by the Constitution. . . ."

*Dodds*, 614 F. 3d at 1199 (quoting 42 U.S.C. § 1983).

The Complaint pleads that Defendants' policies are the "moving force of the constitutional violation." *Tuttle*, 471 U.S. at 820. It outlines both policies' flaws. Compl. ¶¶ 107–61, 185–96 (Speech Zone); *id.* ¶¶ 162–84 (Speech Code). It states both were enforced. *Id.* ¶¶ 221–22, 226–33 (Speech Zone); *id.* ¶¶ 261, 271, 277–79, 282–83, 287–91, 301 (Speech Code). It details how both inflicted irreparable injury. *Id.* ¶¶ 6, 235–37, 303, 316–59, 364, 368, 417, 434, 450, 469. It gives specific facts about how both were enforced against Mr. Uzuegbunam:

- Enforcing the Speech Zone Policy, *id.* ¶¶ 113–25, 154–55, 192–94, 196, Defendants stopped him from leafletting outside those zones. *Id.* ¶¶ 216, 219–20, 226.
- Enforcing the Speech Zone Policy, *id.* ¶¶ 126, 128–30, they stopped his leafletting as he lacked a permit. *Id.* ¶¶ 228–29.
- Due to the Speech Zone Policy, *id.* ¶¶ 136–39, he had to reserve a speech zone. *Id.* ¶¶ 228–29, 232.
- Due to the Speech Zone Policy, *id.* ¶¶ 149–53, he had to submit his literature for review. *Id.* ¶¶ 246–47.
- Due to the *Student Code of Conduct*, *id.* ¶¶ 189–91, 195–96, he needed permission to leaflet, *id.* ¶¶ 228–29, 232, and then could not speak publicly as he lacked separate permission for that. *Id.* ¶¶ 268–76.
- Enforcing the Speech Code, *id.* ¶¶ 170–72, Defendants stopped his public speaking due to complaints. *Id.* ¶¶ 261, 271, 277–83, 287–91, 301–02.

These facts must be taken as true, *Chaparro*, 693 F.3d at 1335, and amply

show that Defendants' policies are the "moving force" behind the violation. *Tuttle*, 471 U.S. at 820. This alone establishes personal involvement.

Moreover, the Complaint pleads that these six Defendants personally participated in creating, implementing, and enforcing both policies:

- *Defendant Preczewski* is responsible for "authorizing, executing, enforcing, and implementing policies governing students at GGC," *id.* ¶ 28; is the final policymaker at GGC, *id.* ¶¶ 29, 37; "is responsible for the enactment, amendment, execution, and implementation" of these policies, *id.* ¶ 30; and "authorized, approved, or implemented" these policies, *id.* ¶ 36.
- *Defendants Richardson, Fatzinger, and Jiminez* are "responsible for administration and policymaking" at GGC and for "the enactment and enforcement" of these policies. *Id.* ¶¶ 40–41, 48–49, 57–58.
- *Defendants Preczewski, Richardson, Fatzinger, and Jiminez* are responsible for enacting, creating, reviewing, changing, authorizing, and enforcing these policies, *id.* ¶¶ 30, 42, 50–51, 59, 61; have authority to change the policies but did not do so. *Id.* ¶ 31–35, 43–44, 52–54, 62–64.
- *Defendant Jiminez* "created and enforced" these policies and makes the final decision if a request to use the speech zones is denied, *id.* ¶¶ 60, 159.
- *Defendant Ruffin* is "responsible for applying and enforcing" the Speech Zone Policy, *id.* ¶¶ 75–76; and "continues to enforce" it, *id.* ¶ 77.
- *Defendant Schneider* is responsible "for enforcing GGC's policies and practices governing student expression," including those at issue here, *id.* ¶¶ 86–87; oversees all GGC law enforcement, *id.* ¶ 88; and directed Defendants Hughes and Lawler to enforce the Speech Code, *id.* ¶ 182.

Plaintiffs pleaded that these six participated personally in creating, implementing, and enforcing the policies that are "the moving force of the constitutional violation." *Tuttle*, 471 U.S. at 820. As these facts must be accepted, Plaintiffs stated valid claims against each of them.[1] *Chaparro*, 693 F.3d at 1335.

## III. As Plaintiffs pleaded that Defendants are violating their clearly established rights, nobody merits qualified immunity.

No Defendant merits qualified immunity—which affects only the damages

---

[1]  "Of course a state official in his or her official capacity, when sued for injunctive relief, would be a person under § 1983 because official-capacity actions for prospective relief are not treated as actions against the State." *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 n.10 (1989). *But see* Defs.' MTD Br. at 40–41.

claims[2]—as Plaintiffs alleged facts showing Defendants "violated a constitutional right" that "was clearly established at the time of the violation." *Holloman v. Harland*, 370 F.3d 1252, 1264 (11th Cir. 2004); *Kyle K. v. Chapman*, 208 F.3d 940, 942 (11th Cir. 2000) ("Defendants are entitled to qualified immunity in a Rule 12(b)(6) motion to dismiss only if the complaint fails to allege facts that would show a violation of a clearly established constitutional right."). Plaintiffs also pleaded official capacity claims for injunctive and declaratory relief.[3]

To be clearly established, Defendants' acts and policies need not be "materially similar to prior precedent" or already declared unconstitutional, *Holloman*, 370 F.3d at 1277–78, as they erroneously argue. Defs.' MTD Br. at 43. Qualified immunity is improper when a "broader, clearly established principle" governs, *Keating v. City of Miami*, 598 F.3d 753, 766 (11th Cir. 2010), or when "in the light of pre-existing law, the unlawfulness [was] apparent." *Shephard v. Davis*, 300 Fed. Appx. 832, 839 (11th Cir. 2008). It is not "unreasonable to expect [D]efendants—who hold themselves out as educators—to be able to apply . . . a standard, notwithstanding the lack of a case with material factual similarities." *Holloman*, 370 F.3d at 1278. "[P]recedents would be of little value if [Defendants] were free to disregard fairly specific statements of principle they contain and focus their attention solely on the particular factual scenarios in which they arose." *Id.*

---

[2]   Plaintiffs seek damages only "from the Defendants sued in their individual capacities." Compl. at 79 ¶ G. *But see* Defs.' MTD Br. at 39–40. The Eleventh Amendment does not "preclude a damages award against [state officials] in their individual capacities pursuant to section 1983." *Cross v. Alabama*, 49 F.3d 1490, 1503 (11th Cir. 1995); *Hafer v. Melo*, 502 U.S. 21, 30–31 (1991).

[3]   Plaintiffs reserve all discussion of Defendants' new policies for the response to their most recent Rule 12(b)(6) motion. *See* Defs.' MTD Br. at 1 n.1.

### A. Both of Defendants' policies violate Plaintiffs' clearly established free speech rights.

Freedom of expression must be jealously guarded, particularly when it involves potentially controversial messages. *See, e.g.*, *Terminiello v. City of Chi.*, 337 U.S. 1, 4 (1949) (noting free speech "best serve[s] its high purpose when it induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger"). This principle extends with equal force to public colleges. *See, e.g.*, *Widmar v. Vincent*, 454 U.S. 263, 268–69 (1981) ("With respect to persons entitled to be there, our cases leave no doubt that the First Amendment rights of speech and association extend to the campuses of state universities."); *Healy*, 408 U.S. at 180 ("[S]tate colleges . . . are not enclaves immune from the sweep of the First Amendment."). Despite Defendants' claims, Defs.' MTD Br. at 23–24, it has been clearly established for decades that the First Amendment protects students on campus to the same degree it protects citizens off campus. *Healy*, 408 U.S. at 180 ("[T]he precedents of this Court leave no room of the view that . . . First Amendment protections should apply with less force on college campuses than in the community at large.").

Hence, federal courts routinely strike down policies like Defendants'. Numerous colleges have quarantined student speech using speech zones or permit requirements, but these policies violate the First Amendment.[4] Ever since colleges began adopting them in the 1980s, courts have struck down speech

---

[4]  *See, e.g.*, *OSU Student Alliance v. Ray*, 699 F.3d 1053 (9th Cir. 2012); *Justice for All (JFA) v. Faulkner*, 410 F.3d 760 (5th Cir. 2005); *Hays Cnty. Guardian v. Supple*, 969 F.2d 111 (5th Cir. 1992); *Grace Christian Life v. Woodson*, 2016 WL 3194365 (E.D.N.C. June 4, 2016); *Univ. of Cincinnati Chapter of Young Ams. for Liberty v. Williams*, 2012 WL 2160969 (S.D. Ohio June 12, 2012); *Smith v. Tarrant Cnty. Coll. Dist.*, 694 F. Supp. 2d 610 (N.D. Tex. 2010);

codes—policies prohibiting "offensive" speech—for the same reason.[5] So Plaintiffs plausibly pleaded that Defendants' policies do so as well.

> **1. Both of Defendants' policies are viewpoint-based, which is unconstitutional in any forum.**

"[E]ven in a non-public forum, the law is clearly established that the state cannot engage in viewpoint discrimination—that is, the government cannot discriminate in access to the forum on the basis of the government's opposition to the speaker's viewpoint." *Cook v. Gwinnett Cnty. Sch. Dist.*, 414 F.3d 1313, 1321 (11th Cir. 2005). But both policies discriminate due to viewpoint by giving unbridled discretion and lacking any protections against such discrimination. Thus, they are illegal in any forum, and this motion should be denied.

> **a. Both policies grant officials unbridled discretion.**

The Supreme Court "consistently condemn[s]" speech regulations that "vest in an administrative official discretion to grant or withhold a permit upon broad criteria unrelated to proper regulation of public places." *Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 153 (1969). Rules that do so are treated

---

*Smith v. Tarrant Cnty. Coll. Dist.*, 670 F. Supp. 2d 534 (N.D. Tex. 2009); *Roberts v. Haragan*, 346 F. Supp. 2d 853 (N.D. Tex. 2004); *Pro-Life Cougars v. Univ. of Hous.*, 259 F. Supp. 2d 575 (S.D. Tex. 2003); *Khademi v. S. Orange Cnty. Cmty. Coll. Dist.*, 194 F. Supp. 2d 1011 (C.D. Cal. 2002); *Burbridge v. Sampson*, 74 F. Supp. 2d 940 (C.D. Cal. 1999).

[5] *See, e.g., McCauley,* 618 F.3d 232; *DeJohn*, 537 F.3d 301; *Cohen v. San Bernardino Valley Coll.*, 92 F.3d 968 (9th Cir. 1996); *Dambrot v. Cent. Mich. Univ.*, 55 F.3d 1177 (6th Cir. 1995); *Iota Xi Chapter of Sigma Chi Fraternity v. George Mason Univ.*, 993 F.2d 386 (4th Cir. 1993); *Coll. Republicans at S.F. State Univ. v. Reed*, 523 F. Supp. 2d 1005 (N.D. Cal. 2007); *Roberts*, 346 F. Supp. 2d 853; *Bair v. Shippensburg Univ.*, 280 F. Supp. 2d 357 (M.D. Pa. 2003); *Booher v. Bd. of Regents of N. Ky. Univ.*, 1998 WL 35867183 (E.D. Ky. July 21, 1998); *Dambrot v. Cent. Mich. Univ.*, 839 F. Supp. 477 (E.D. Mich. 1993); *UWM Post, Inc. v. Bd. of Regents of Univ. of Wis. Sys.*, 774 F. Supp. 1163 (E.D. Wis. 1991); *Doe v. Univ. of Mich.*, 721 F. Supp. 852 (E.D. Mich. 1989).

as viewpoint-based. *CAMP Legal Def. Fund, Inc. v. City of Atl.*, 451 F.3d 1257, 1279 (11th Cir. 2006) (granting this discretion allowed "officials to discriminate based on the viewpoint of the speaker"); *Atl. J. & Const. v. Atl. Dep't of Aviation*, 322 F.3d 1298, 1311 (11th Cir. 2003). Given vague or non-existent criteria, officials "may decide who may speak and who may not based upon the content of the speech or viewpoint of the speaker." *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 763–64 (1988). Speech restrictions must "contain narrow, objective, and definite standards to guide" officials, *Shuttlesworth*, 394 U.S. at 150–51, and cannot involve the "appraisal of facts, the exercise of judgement, and the formation of an opinion." *Forsyth Cnty. v. Nationalist Movement*, 505 U.S. 123, 131 (1992). So "virtually any amount of discretion beyond the merely ministerial is suspect," and "[s]tandards must be *precise* and *objective*." *Lady J. Lingerie v. City of Jacksonville*, 176 F.3d 1358, 1362 (11th Cir. 1999).

### i. Defendants' Speech Zone Policy

Defendants' Speech Zone Policy grants officials five layers of unbridled discretion. First, it gives them discretion over whether students can speak outside those zones (*i.e.*, 0.0015% of campus). Compl. ¶ 124. The policy says, "On occasion upon written request, other areas . . . may be authorized. . . ." *Id.* ¶ 128. Nothing says which permits to grant or what areas to authorize. *Id.* ¶¶ 129–30.

Second, they have discretion over whether students can speak when the zones are closed (*i.e.*, 90% of the week). *Id.* ¶¶ 114–16, 127. The policy says, "On occasion upon written request, . . . other times may be authorized. . . ." *Id.* ¶ 128. It is silent on what permits to grant or the factors to consider. *Id.* ¶¶ 131–32.

Third, Defendants have unbridled discretion when reviewing students' literature. To reserve a speech zone, "[a]ll publicity materials must be submitted with the application form," *id.* ¶ 150, as Mr. Uzuegbunam did. *Id.* ¶¶ 246–47. The *Student Code of Conduct* bans "[c]irculating any advertising media without approval from proper College officials," *id.* ¶ 189, which includes any flyers students distribute, *id.* ¶ 195, as Mr. Uzuegbunam knows, *id.* ¶¶ 226–29. Four officials review it, *id.* ¶ 151, but nothing outlines the criteria they must use or how the flyer's content will impact the pending request, *id.* ¶¶ 152–53.

Fourth, Defendants have unbridled discretion over who can use the speech zones as they review reservation forms and any literature. Compl. ¶¶ 139–40, 150. Defendants note the fifteen criteria all speakers "must meet." Compl. ¶ 146; *see* Defs.' MTD Br. at 3–4, 16. One of them grants officials unbridled discretion to review students' literature. Compl. ¶¶ 149–53. The others do not limit discretion. The policy just says speakers "must meet" these criteria. Compl. Ex. 3 at 3; *id.* at 5 ("Authorization . . . is contingent upon compliance with the criteria listed above."). It does not say that speakers who meet them will be approved, that these are the only reasons a request can be denied, or that officials cannot deny requests for other, unwritten reasons. Compl. ¶ 147. Defendants could deny requests that meet all of them. *Id.* ¶ 148. Defendants' brief cannot amend their policy, *Skyline Corp. v. N.L.R.B.*, 613 F.2d 1328, 1337 (5th Cir. 1980) ("Statements by counsel in briefs are not evidence."); *United States v. Hutley*, 2010 WL 4223741, *10 n.4 (N.D. Ga. Aug. 27, 2010), especially as the Complaint must be accepted as true. *Chaparro*, 693 F.3d at 1335.

13

Fifth, the policy allows them to change the speech zones. They can "modify the free speech areas based on the operational needs of the institution." *Id*. ¶ 133. Nothing defines "operational needs," says when or how these zones can be modified, or sets forth the criteria they must use to modify them. *Id*. ¶¶ 134–35.

At each of the five layers, Defendants' policy lacks the required "narrow, objective, and definite standards." *Forsyth Cnty*., 505 U.S. at 131. Instead, the policy is far from "*precise* and *objective*," giving officials far more than "merely ministerial" discretion. *Lady J. Lingerie*, 176 F.3d at 1362. It grants unbridled discretion, making it viewpoint-based and unconstitutional in any forum.[6]

### ii. Defendants' Speech Code

Defendants' Speech Code grants unbridled discretion by using the subjective, ephemeral terms: "peace" and "comfort." As "different people find different things offensive," *Dambrot*, 55 F.3d at 1184, they likewise differ on what "disturbs [their] peace and/or comfort." Compl. ¶ 170. There is nothing "narrow, objective, and definite" about this policy. *Forsyth Cnty*., 505 U.S. at 131. Defendants do not even try to define these terms or provide objective enforcement guidelines. *Id*. ¶¶ 171–72. So each enforcement will require the "appraisal of facts, the exercise of judgement, and the formation of an opinion," which raises

---

[6]   Numerous courts have struck down college speech zones for granting unbridled discretion. *See, e.g., OSU Student Alliance*, 699 F.3d at 1063–66 (striking student newspaper bin restriction that "created no standards to cabin discretion" and "set no fixed standard" for applying the policy because it conferred unbridled discretion as "a standardless policy"); *Pro-Life Cougars*, 259 F. Supp. 2d at 577–79, 583–84 (striking policy letting officials to move "potentially disruptive" events as it lacked "any objective guidelines or articulated standards"); *Smith*, 670 F. Supp. 2d at 536, 538 (striking policy requiring students get a permit twenty-four hours before speaking in a speech zone for granting "unfettered discretion in imposing prior restraints on speech in public forums").

14

too great a danger of censorship to be allowed. *Forsyth Cnty.*, 505 U.S. at 131.[7]

Sensing their vulnerability, Defendants ask this Court to limit the Speech Code to restrict only "fighting words," Defs.' MTD Br. at 26–28, a limit missing from the policy. But the "doctrine forbidding unbridled discretion . . . requires that the limits [Defendants] claim[] are implicit in [their policy] be made explicit by textual incorporation, binding judicial or administrative construction, or well-established practice." *Lakewood*, 486 U.S. at 770.[8] This Court cannot "rewrite . . . a [policy] to conform it to constitutional requirements," *DeJohn*, 537 F.3d at 315, or "write nonbinding limits into a silent state [policy]," especially as Defendants provide no authoritative construction or "well-understood and uniformly applied practice" to verify their litigation-motivated spin. *Lakewood*, 486 U.S. at 770 & n.11. After all, they enforced this code against Mr. Uzuegbunam, and there is no evidence in the Complaint (which must be taken as true and interpreted in his favor, *Chaparro*, 693 F.3d at 1335) that he uttered any "fighting words." Compl. ¶¶ 238–315. Notably, they appear to drop

---

[7]  Using these principles, numerous college speech codes have fallen to the First Amendment. *Dambrot*, 55 F.3d at 1182, 1184 (invalidating ban on creating an "intimidating, hostile or offensive . . . environment" because "[d]efining what offensive is, in fact, wholly delegated to university officials"); *Doe*, 721 F. Supp. at 853, 867 (striking ban on "stigmatizing or victimizing" others because "it was simply impossible to discern any limitation on its scope or any conceptual distinction between protected and unprotected conduct"); *McCauley*, 618 F.3d at 250 (invalidating ban on causing "emotional distress" because it "is entirely subjective" as "'[e]motional distress' is a very loose concept").

[8]  Defendants cite cases that considered limiting constructions based on the terms of the policy (not invented in briefs with no supporting policy language), *Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200, 215–16 (3d Cir. 2001); *DeJohn*, 537 F.3d at 318–20, or that assumed "*arguendo*" the limiting construction and still struck down the policy. *Dambrot*, 55 F.3d at 1184–85. Plus, none of these cases involved a motion to dismiss.

here their specious claim that his Gospel presentation "arguably rose to the level of 'fighting words.'" Defs.' MTD Br. 29–30, Feb. 1, 2017, ECF No. 11-1.

Identical bids to limit broad speech code language to fighting words have failed. *DeJohn*, 537 F.3d at 320 (finding speech code restricts "speech that does not rise to the level of 'fighting words'"); *Doe*, 721 F. Supp. 864–66 (rejecting claim speech code did not limit protected speech due to enforcement record); *UWM Post*, 774 F. Supp. at 1165, 1169–78 (banning "intimidating, hostile, or demeaning environment" restrict more than fighting words and rejecting proposed limiting construction); *Bair*, 280 F. Supp. 2d at 370 (prohibiting "acts of intolerance" extends beyond fighting words); *Coll. Republicans*, 523 F. Supp. 2d at 1012 (finding speech codes "reach well beyond" unprotected speech). Defendants' proposal would still give unbridled discretion, and viewpoint-based limits on fighting words are unconstitutional. *R.A.V. v. City of St. Paul*, 505 U.S. 377, 391–92 (1992); *Dambrot*, 839 F. Supp. at 482–84 (limiting speech code to fighting words "would not save [it]"); *Dambrot*, 55 F.3d at 1184–85 (same).

Defendants' Speech Code is the antithesis of "*precise* and *objective*," *Lady J. Lingerie*, 176 F.3d at 1362, is viewpoint-based, and is thus illegal in any forum.

### b. Both policies do not prevent viewpoint discrimination.

Policies cannot be viewpoint neutral without including affirmative "protection . . . for viewpoint neutrality." *Bd. of Regents of Univ. of Wis. Sys. v. Southworth*, 529 U.S. 217, 235 (2000). "[V]iewpoint neutrality requires not just that a government refrain from explicit viewpoint discrimination, but also that it provide adequate safeguards to *protect* against the improper exclusion of viewpoints." *C.E.F.*

16

*of Md., Inc. v. Montgomery Cnty. Pub. Schs.*, 457 F.3d 376, 384 (4th Cir. 2006).

### i. **Defendants' Speech Zone Policy**

Defendants' Speech Zone Policy lacks any such protections. Nothing prevents officials from:

- allowing certain students to speak outside the zones while denying other viewpoints access to those same venues, Compl. ¶¶ 126, 128–30;
- selectively allowing students to speak during the 90% of the week the speech zones are closed, *id.* ¶¶ 127–28, 131–32;
- considering the viewpoints in the to-be-distributed literature when deciding whether to grant a reservation, *id.* ¶¶ 149–53;
- denying requests that meet all fifteen considerations due to other factors, *id.* ¶¶ 146–48, including "the whim of the administrator," *Forsyth Cnty.*, 505 U.S. at 133; or
- modifying the zones to benefit favored speakers, *id.* ¶¶ 133–35

Defendants say no one abused this discretion. Defs.' MTD Br. at 18. But "the success of a facial challenge on the grounds that [a policy] delegates overly broad discretion to the decisionmaker rests not on whether the administrator has exercised his discretion in a content- [or viewpoint-] based manner, but whether there is anything in the [policy] preventing him from doing so." *Forsyth Cnty.*, 505 U.S. at 133 n.10; *accord Lakewood*, 486 U.S. at 770 n.11 ("Facial attacks . . . are not dependent on the facts surrounding any particular permit denial.").

Defendants say GGC will follow "the principle of content neutrality" so "'a diversity of viewpoints' may be expressed." Defs.' MTD Br. at 16. This is just a promise to obey the law. It does nothing to limit discretion or to provide the required "*precise* and *objective*" criteria. *Lady J. Lingerie*, 176 F.3d at 1362. The University of Houston similarly said it "considers only content-neutral factors when applying [the challenged policy]," but the court rejected this as it "presumes [officials] will act in good faith and adhere to standards absent from

17

the [policy]'s face," which "'is the very presumption that the doctrine forbidding unbridled discretion disallows.'" *Pro-Life Cougars*, 259 F. Supp. 2d at 584 (quoting *Lakewood*, 486 U.S. at 770). Defendants' argument deserves a similar fate.

### ii. Defendants' Speech Code

Defendants' Speech Code also contains no affirmative "protection . . . for viewpoint neutrality." *Southworth*, 529 U.S. at 235. Nothing prevents officials from using it to silence speech that sparks complaints (as Mr. Uzuegbunam learned, Compl. ¶¶ 261, 271, 277–79, 287–91) or that they find distasteful because there are *no* guidelines for enforcing it. *Id.* ¶¶ 171–72; *id.* ¶¶ 305–06 (banning "fire and brimstone" messages, even in conversations).

Defendants point to one sentence saying: "freedom of expression and academic freedom shall be considered in investigating and reviewing these types of alleged violations." Defs.' MTD Br. at 28. But this is no safe harbor for protected speech. It is simply an assurance that the First Amendment "shall be *considered*." Mr. Uzuegbunam vividly illustrates how hollow it is. For he stood in what they dubbed a "free speech expression area" and preached, Compl. ¶¶ 248–58, a form of speech the Supreme Court has extolled as protected since at least 1943. *See Murdock v. Pennsylvania*, 319 U.S. 105, 108–09 (1943). Yet they stopped him just because someone complained. Compl. ¶¶ 261, 271, 277–79, 287–91. This "we'll consider it" provision is as meaningless as it is standardless.

Courts reject these First Amendment disclaimers. Central Michigan's letter saying it would enforce its speech code constitutionally got this response:

> The university defendant, with that, says in essence "trust us; we may interfere, but not *impermissibly*." The Court is not willing to entrust the guardianship of the First Amendment to the tender mercies of this

18

institution's discriminatory harassment/affirmative action enforcer. *Dambrot*, 839 F. Supp. at 482 n.7. The Sixth Circuit affirmed as there "is nothing to ensure that the University will not violate First Amendment rights even if that is not their intention." *Dambrot*, 55 F.3d at 1183. Nor was San Francisco State's speech code saved by a sentence exempting protected speech. *Coll. Republicans*, 523 F. Supp. 2d at 1020. Like that court, "We must assess regulatory language in the real world context in which the persons being regulated will encounter that language. The persons being regulated here are college students, not scholars of First Amendment law." *Id.* at 1021. A student will read the specific language—banning speech that "disturbs [anyone's] peace and/or comfort"—and avoid anything that might have this effect, rather than speaking his mind and hoping that "the powers-that-be will agree, after the fact, that the course of action []he chose was protected by the First Amendment." *Id.*

In sum, both of Defendants' policies lack any affirmative "protection . . . for viewpoint neutrality," and thus are viewpoint-based, making them illegal in any forum, including college speech fora. *Southworth*, 529 U.S. at 235.

### c. Defendants' Speech Code is a heckler's veto that restricts any speech someone finds offensive.

Few things are more clearly established than the "bedrock principle" of the First Amendment: "the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." *Texas v. Johnson*, 491 U.S. 397, 414 (1989). It extends to colleges, *Papish v. Bd. of Curators of Univ. of Mo.*, 410 U.S. 667, 670 (1973) ("[M]ere dissemination of ideas—no matter how offensive to good taste—on a state university campus

may not be shut off in the name alone of 'conventions of decency.'"), and to high schools, *Holloman*, 370 F.3d at 1274–75 (refusing to curtail speech with which "other students may have disagreed," even if they "cloaked their disagreement in the guise of offense or disgust"); *Tinker*, 393 U.S. at 508 ("Any word spoken . . . that deviates from the views of another person may start an argument or cause a disturbance. But our Constitution says we must take this risk.").

Thus, the Supreme Court has long and often ruled that the First Amendment "knows no heckler's veto." *Lewis v. Wilson*, 253 F.3d 1077, 1082 (8th Cir. 2001); *Near v. Minnesota*, 283 U.S. 697, 722 (1931). It has repeatedly reaffirmed that "constitutional rights may not be denied simply because of [public] hostility to their assertion or exercise." *Watson v. City of Memphis*, 373 U.S. 526, 535 (1963). Heckler's vetoes are viewpoint-based. *Bell v. City of Winter Park*, 745 F.3d 1318, 1324–25 (11th Cir. 2014); *C.E.F. of N.J., Inc. v. Stafford Twp. Sch. Dist.*, 386 F.3d 514, 527 (3d Cir. 2004) (Alito, J.) ("To exclude a group simply because it is controversial or divisive is viewpoint discrimination. A group is controversial or divisive because some take issue with its viewpoint.").

It is difficult to imagine a more flagrant heckler's veto than banning speech that "disturbs the peace and/or comfort of person(s)." Compl. ¶ 170. This allows anyone to silence a speaker for any reason. As these citizen-censors need not justify their complaints, Defendants can enforce the veto and later insist it is unrelated to the message, which is illegal. *Bell*, 745 F.3d at 1324–25 (striking policy that "grant[ed] unrestrained discretion to private citizens to summon the police to prohibit First Amendment activities in public fora"). They try to

do so here, absurdly blaming Mr. Uzuegbunam for speaking where they forced him to speak, Defs.' MTD Br. at 29–31; Compl. ¶ 254, which is improper when the Complaint must be construed in Plaintiffs' favor. *Chaparro*, 693 F.3d at 1335. And it wrongly presumes that GGC can "shut off discourse solely to protect others from hearing it." *Cohen v. California*, 403 U.S. 15, 21 (1971).[9]

Defendants note the "disorderly conduct" heading, Defs.' MTD Br. at 27–28, but speaking in a reserved area is hardly disorderly. Such headings "cannot substitute for the operative text of the [policy]." *Fla. Dep't of Revenue v. Piccadilly Cafeterias, Inc.*, 554 U.S. 33, 47 (2008). No case they cite challenged laws with remotely similar language.[10] The text of Georgia's statute expressly extends only to fighting words. *Merenda v. Tabor*, 506 Fed. Appx. 862, 865 (11th Cir. 2013) ("'. . . that is, words commonly called "fighting words"'" (quoting GA. CODE § 16-11-39(a)(3))); *Lamar v. Banks*, 684 F.2d 714, 715 n.3 (11th Cir. 1982) (same for GA. CODE § 26-2610(a)). Even so, "disorderly conduct" is not a magic "Get Out of the First Amendment Free" card as such convictions are often reversed. *See, e.g.*, *Terminiello*, 337 U.S. at 4–5 (reversing "disorderly conduct"

---

[9]   *Accord Erznoznik v. City of Jacksonville*, 422 U.S. 205, 210 (1975) ("[T]he Constitution does not permit government to decide which types of otherwise protected speech are sufficiently offensive to require protection for the unwilling listener or viewer."). If other students did not want to hear Mr. Uzuegbunam's message, they "could effectively avoid further bombardment of their sensibilities" by leaving, *Cohen*, 403 U.S. at 21, but he cannot go elsewhere and still speak. Defendants cannot blame him for problems their policies created.

[10]   Two of the state cases they cite pre-date the Supreme Court's directive that "the limits [Defendants] claim[] are implicit in its [policy] be made explicit by textual incorporation, binding judicial or administrative construction, or well-established practice." *Lakewood*, 486 U.S. at 770. Two others are criminal cases where the statutory language was not challenged.

conviction for "provocative and challenging" speech); *Gregory v. City of Chi.*, 394 U.S. 111, 113 (1969) (same for attacked civil rights activists); *Cohen*, 403 U.S. at 16, 26 (same for "disturbing the peace" for "offensive conduct"); *Cantwell v. Connecticut*, 310 U.S. 296, 300, 311 (1940) (same for "breach of the peace").

Defendants cannot change the text of the Speech Code or how it was applied as the Complaint must be taken as true. *Chaparro*, 693 F.3d at 1335. Plaintiffs plausibly pleaded it is a viewpoint-based heckler's veto, illegal in any forum.

### 2. Defendants' Speech Zone Policy is an illegal prior restraint in areas that are at least designated public fora for students.

In evaluating Defendants' Speech Zone Policy, the Court must (1) determine if Plaintiffs' speech is protected, (2) "identify the nature of the forum," and (3) assess whether the restrictions "satisfy the requisite standard." *Cornelius v. NAACP Legal Def. & Educ. Fund*, 473 U.S. 788, 797 (1985). Plaintiffs pleaded clearly established First Amendment violations under this analysis.

As "students enjoy First Amendment rights of speech and association on the [college] campus, . . . the denial . . . of use of campus facilities for meetings and other appropriate purposes must be subjected to the level of scrutiny appropriate to any form of prior restraint." *Widmar*, 454 U.S. at 267 n.5. "A prior restraint . . . exists when the government can deny access to a forum for expression before the expression occurs," *United States v. Frandsen*, 212 F.3d 1231, 1236–37 (11th Cir. 2000), or when college officials "attempt to predict in advance the content and consequences of [student] expression." *Keeton v. Anderson-Wiley*, 664 F.3d 865, 882 (11th Cir. 2001) (Pryor, J. concurring). Under the Speech Zone Policy, students need a permit to speak outside the two zones (*i.e.*,

99.985% of campus), Compl. ¶ 124, 126, 128; during the 90% of week they are closed, *id.* ¶¶ 127–28; or inside those zones, *id.* ¶¶ 139–41. To get that permit, Defendants must review any literature to be distributed. *Id.* ¶¶ 139, 149–53. This is a prototypical prior restraint.

As prior restraints censor speech before it occurs, there is a "heavy presumption" against their constitutionality. *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70 (1963); *Burk v. Augusta-Richmond Cnty.*, 365 F.3d 1247, 1251 (11th Cir. 2004). They "are the most serious and least tolerable infringement on First Amendment rights." *Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976). To carry their "heavy burden," *Healy*, 408 U.S. at 184, Defendants must show their policy is a reasonable time, place, and manner regulation (*i.e.*, is content-neutral, is "narrowly tailored to serve a significant government interest," and "leaves open ample alternative channels for communication"). *CAMP*, 451 F.3d at 1280. It need fail only one of these to be unconstitutional; it fails them all.

### a. The First Amendment protects Plaintiffs' expression.

Plaintiffs desire to engage in time-honored forms of expression that the First Amendment clearly protects: "personal conversations, the distribution of religious tracts, and open-air speaking." Compl. ¶¶ 22–23. These classic forms of speech lie at the very "foundation of free government by free men." *Schneider v. New Jersey*, 308 U.S. 147, 161 (1939); *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 347 (1995) (discussing protections for handbilling); *Murdock*, 319 U.S. at 108–09 (same for distributing religious literature and preaching).

Plaintiffs seek to express their religious beliefs and how those beliefs impact

topics like "marriage, morality, politics and social issues." Compl. ¶¶ 19–23. This "private religious speech, far from being a First Amendment orphan, is as fully protected . . . as secular private expression." *Capitol Square Review & Advisory Bd. v. Pinette*, 515 U.S. 753, 760 (1995). Such "speech on public issues occupies the highest rung on the hierarchy of First Amendment values, and is entitled to special protection." *Snyder v. Phelps*, 562 U.S. 443, 452 (2011).

### b. Defendants' Speech Zone Policy restricts speech in areas that are at least designated public fora for students.

"[T]he extent to which [Defendants] may limit access depends on whether the forum is public or nonpublic." *Cornelius*, 473 U.S. at 797. The Eleventh Circuit recognizes traditional, designated, limited, and nonpublic fora. *Bloedorn v. Grube*, 631 F.3d 1218, 1230 (11th Cir. 2011) (discussing traditional, designated, and limited public fora); *Atl. J. & Const.*, 322 F.3d at 1306 n.9 (discussing, *inter alia*, nonpublic fora).[11] Defendants' Speech Zone Policy restricts speech in areas that are designated public fora for students.

Defendants claim the open, outdoor, generally accessible areas of campus—except the two tiny speech zones during 10% of the week, Compl. ¶¶ 113–25—represent nonpublic fora for GGC students. Defs.' MTD Br. at 13–15. They point to cases involving street preachers, military bases, and rest stops. *Id.* But they cite none holding that these areas of a college campus represent nonpublic

---

[11]  In traditional and designated public fora, content-based rules must "be narrowly drawn to serve a compelling state interest," *Atl. J. & Const.*, 322 F.3d at 1306; content-neutral ones must be "narrowly tailored to serve a significant governmental interest, and . . . leave open ample alternative channels of communication." *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989). Elsewhere, restrictions must be "reasonable and viewpoint neutral." *Bloedorn*, 631 F.3d at 1231.

fora for students. They cannot—because there are none.

A "university campus will surely contain a wide variety of fora." *Bloedorn*, 631 F.3d at 1232. But this Court "'does not [have] to choose between the polar extremes of treating an entire university campus as a forum designated for *all* types of speech by *all* speakers, or, alternatively, as a limited public forum where any reasonable restriction on speech must be upheld.'" *Id.* (quoting *JFA*, 410 F.3d at 766). It must "simply . . . determine whether the outdoor areas of [GGC's] campus, accessible to students generally, have been designated as a forum for *student* expression." *JFA*, 410 F.3d at 767. The answer is: "Yes."

### i. Federal courts have held that the open, outdoor, generally accessible areas of campus are designated public fora for students.

"[T]he campus of a public university, *at least for its students*, possesses many of the characteristics of a public forum." *Widmar*, 454 U.S. at 267 n.5 (emphasis added). It need not "make all of its facilities equally available to students and nonstudents alike." *Id.* Thus, street preachers do not set students' rights. Indeed, elementary schools are generally nonpublic fora, unless "the speaker is a student who is entitled to be on school property." *Gilio v. Sch. Bd. of Hillsborough Cnty.*, 905 F. Supp. 2d 1262, 1271 (M.D. Fla. 2012). Student status matters for elementary school fora; it matters more for adults at college.

Following *Widmar*, federal courts consistently found the open, outdoor, generally accessible areas of campus are designated public fora for students. After a district court ruled otherwise, the Fifth Circuit reversed, finding "the sidewalks and plazas are designated public fora for the speech of university

students." *Hays Cnty.*, 969 F.2d at 116. "The campus's function as the site of a community of full-time residents makes it a place where people may enjoy the open air or the company of friends and neighbors in a relaxed environment . . . and suggests an intended role more akin to a public street or park than a non-public forum." *Id.* When the University of Texas limited anonymous leafletting for students, the Fifth Circuit again held the "outdoor open areas of its campus accessible to students—such as plazas and sidewalks—[are designated] public forums for student speech." *JFA*, 410 F.3d at 769. When Oregon State restricted student newspaper bins, the Ninth Circuit ruled its "campus is at least a designated public forum." *OSU Student Alliance*, 699 F.3d at 1062.

District courts followed suit. When Texas Tech dubbed a gazebo its "free speech area," the court ruled: "to the extent the campus has park areas, sidewalks, streets, or other similar common areas, these areas are public forums, at least for the University's students, irrespective of whether the University has so designated them or not." *Roberts*, 346 F. Supp. 2d at 861.[12] Another declared it was not "aware of any other precedent establishing, that a public university may constitutionally designate its entire campus as a limited public forum *as applied to students.*" *Williams*, 2012 WL 2160969, at *5. Thus, Defendants have no

---

[12] *Accord Pro-Life Cougars*, 259 F. Supp. 2d at 582 (finding campus grounds, beyond those expressly opened for student speech, "are public fora designated for student speech"); *Smith*, 694 F. Supp. 2d at 625 ("Typically, at least for the students of a college or university, the school's campus is a designated public forum."); *Khademi*, 194 F. Supp. 2d at 1024 (finding "no doubt" that the "generally available" areas of a community college campus are designated public fora as they are open to the public); *Burbridge*, 74 F. Supp. 2d at 947–48 (same); *Williams*, 2012 WL 2160969, at *5 ("[W]hile the University may exclude those without a legitimate purpose from interior sidewalks and public exterior areas, *such locations remain designated public fora as to students.*").

precedent for declaring the outdoor areas of campus anything less than designated public fora for students (and certainly not nonpublic fora).

> ### ii. *Bloedorn* confirms that the open, outdoor, generally accessible areas of campus are designated public fora for students.

Defendants rest their nonpublic forum claim on *Bloedorn*, Defs.' MTD Br. at 13–15, ignoring its most critical fact (*i.e.*, the speaker was a street-preacher, not a student) and its holding (*i.e.*, for him, the campus was a limited public forum, not a nonpublic one). *Bloedorn*, 631 F.3d at 1227, 1232. Cases that account for these factors deem the campus a designated public forum for students. *Sentinel Commc'ns Co. v. Watts*, 936 F.2d 1189, 1202 (11th Cir. 1991) (noting "state university meeting facilities" exemplify designated public fora)[13]; *Pritchard v. Carlton*, 821 F. Supp. 671, 675 (S.D. Fla. 1993) ("Designated public fora include the student center of a state university."). *Bloedorn* confirms this.

The *Bloedorn* court held that campus sidewalks and other public areas are limited public fora for "outside, non-sponsored speakers" because the "University has limited these areas only for use by a discrete group of people—the GSU community; its students, faculty, and employees; and their sponsored guests." *Bloedorn*, 631 F.3d at 1227, 1232. As *Widmar* noted, "the University is under no obligation to open its campus" to outside speakers. *Id.* at 1233. But here, the speakers are two students, the very people for whose benefit the use of campus is limited. The same places cannot both be limited public fora for outsiders

---

[13] *Sentinel* conflated the terms "designated' and "limited," but the discussion and the level of scrutiny utilized indicate that it was discussing what is now termed a designated public forum.

*because* they are reserved for students' use and also be limited public fora (let alone nonpublic fora) *for* those students, limiting *their* use of those areas.

The Fourth Circuit precedent *Bloedorn* cites confirms this reasoning. In that circuit, a limited public forum has an internal and external standard. *ACLU v. Mote*, 423 F.3d 438, 444 (4th Cir. 2005) (citing *Warren v. Fairfax Cnty.*, 196 F.3d 186, 193–94 (4th Cir. 1999)). The internal one—the same one the Eleventh Circuit applies in a designated public forum—applies "'if the government excludes a speaker who falls within the class to which a designated [limited] public forum is made generally available,'" *id.* (quoting *Warren*, 196 F.3d at 193), such as a "student speaker" denied access to campus resources. *Warren*, 196 F.3d at 193–94. Thus, the open, outdoor areas of campus are—in the Eleventh Circuit's forum taxonomy—at least designated public fora for students.

### iii. *Bloedorn's* factors confirm that the open, outdoor, generally accessible areas of campus are designated public fora for students.

The "policy and practice of the University," the "nature of the property," and "its compatibility with expressive activity" confirm that the open areas of campus are at least designated public fora for students. *Bloedorn*, 631 F.3d at 1232.

The Board of Regents "provide[s] detailed guidelines for the physical development of campuses." Univ. Sys. of Ga. Bd. of Regents, *Physical Master Planning Template* at iv, *available at* http://www.usg.edu/assets/facilities/documents/masterplan_template.pdf (last visited Apr. 7, 2017). One of its two objectives for campuses is "to create a physical environment that . . . encourages social and intellectual interchange among students, faculty and staff," using the "'yard' at

Harvard College and Jefferson's 'academical village' at the University of Virginia" as models. *Id.* The Board (which governs GGC, Compl. Ex. 9 at 12) intends for students to enjoy broad free speech rights on campus, which they cannot when quarantined to 0.0015% of it for 10% of the week. Compl. ¶¶ 113–25.

Defendants insist the Speech Zone Policy shows a contrary intent. Defs.' MTD Br. at 13. But "the very fact that the government *has* restricted speech in the manner challenged in a forum case does *not* of its own weight demonstrate that the government did not intend to designate [or limit] a public forum." *Stewart v. D.C. Armory Bd.*, 863 F.2d 1013, 1017 (D.C. Cir. 1988). If it did, "the restriction on speech . . . would be self-justifying. The restriction would disprove any intention to create a designated public forum, and the failure to create a public forum would justify the restriction on speech." *Hays Cnty.*, 969 F.2d at 117. "The Supreme Court has not adopted such circular reasoning." *Id.* Nor have other circuits. *See, e.g.*, *OSU Student Alliance*, 699 F.3d at 1063.[14]

As to the "nature of the property," *Bloedorn*, 631 F.3d at 1232, the Complaint pleads and pictures show that the campus includes many lawns, plazas, and other park-like outdoor areas that are generally accessible to anyone and where "students naturally and freely congregate." Compl. ¶¶ 103, 105, 125; Compl. Ex. 7 (picturing some of these areas). Indeed, the campus represents students' "town square," especially for those who live there. Compl. ¶ 106.

The Court must "look to . . . the presence of any special characteristics," one of which is that the campus is "an enclave created for the pursuit of higher

---

[14]   *Accord McMahon v. City of Panama City Beach*, 180 F. Supp. 3d 1076, 1096 (N.D. Fla. 2016) (finding government's intent "is not dispositive").

learning by its . . . students." *Bloedorn*, 631 F.3d at 1233–34. There, "free speech is of critical importance because it is the lifeblood of academic freedom." *DeJohn*, 537 F.3d at 314. It extends to students as "universities began as voluntary and spontaneous assemblages or concourses for students to speak and to write and to learn" and the "quality and creative power of student intellectual life to this day remains a vital measure of a school's influence and attainment." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 836 (1995). Declaring the entire campus a nonpublic forum for students would be "anathema to the nature of a [college]." *Williams*, 2012 WL 2160969, at *5.

As to "compatibility with expressive activity," *Bloedorn*, 631 F.3d at 1232, "a university campus is clearly an appropriate place for communication of views on issues of political and social significance," *JFA*, 410 F.3d at 769, especially for students, the very "persons entitled to be there." *Widmar*, 454 U.S. at 268.

In sum, *Bloedorn's* three factors confirm what *Bloedorn's* logic and the consensus of federal courts declared:  the open, outdoor, generally accessible areas of a public college campus are designated public fora for students.

### c.  Both policies are content-based.

To be a reasonable time, place, and manner restriction, Defendants' policies must be content neutral. *CAMP*, 451 F.3d at 1280. The flaws that render them viewpoint-based make them content-based because viewpoint discrimination is "an egregious form of content discrimination." *Rosenberger*, 515 U.S. at 829.

"Even a facially content-neutral . . . regulation may not vest public officials with unbridled discretion over permitting decisions." *Burk*, 365 F.3d at 1256.

As Defendants admit, Defs.' MTD Br. at 18 n.4, the Eleventh Circuit "has long established that a permitting scheme would be content discriminatory, and thus amount to an unconstitutional prior restraint on speech, if the government exercised unbridled discretion to limit access to a particular forum." *Bloedorn*, 631 F.3d at 1236. Both policies give this discretion. *Supra* Part III.A.1.a.

Also, it is clearly established that colleges cannot try "to predict in advance the content and consequences of [student] expression," *Keeton*, 664 F.3d at 882 (Pryor, J. concurring), and that "[l]isteners' reaction to speech is not a content-neutral basis for regulation." *Forsyth Cnty.*, 505 U.S. at 134. Defendants punish students if they "disturb [anyone's] peace and/or comfort." Compl. ¶ 170. They require students to submit any literature to officials, *id.* ¶¶ 139, 149–53, because "the more polarizing or controversial the literature, the more security the campus may need to provide." Defs.' MTD Br. at 23. Thus, they admit they consider audience reaction. *See Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2228 (2015) (finding content discrimination despite "an innocuous justification").

"Regulations which permit the Government to discriminate on the basis of the content of the message cannot be tolerated under the First Amendment." *Regan v. Time, Inc.*, 468 U.S. 641, 648–49 (1984). Policies that lack protections against viewpoint discrimination lack any against content discrimination. *See supra* Part III.A.1.b. Thus, they are content-based and "face strict scrutiny," scrutiny "[f]ew laws survive." *Burk*, 365 F.3d at 1251, 1255.

> **d. Defendants' Speech Zone Policy fails intermediate scrutiny.**

Defendants' Speech Zone Policy fails even the intermediate scrutiny for

content-neutral rules, where Defendants must show that it is "narrowly tailored." *Bell*, 745 F.3d at 1322. That is, it must "target[] and eliminate[] no more than the exact source of the 'evil' it seeks to remedy." *Frisby v. Schultz*, 487 U.S. 474, 485 (1988).

Narrow tailoring requires a "reasonable fit" between Defendants' means and ends. *Coal. for Abolition of Marijuana Prohibition v. City of Atl.*, 219 F.3d 1301, 1318 (11th Cir. 2000). Too often "silencing speech is . . . the path of least resistance. But by demanding a close fit between ends and means, the tailoring requirement prevents the government from too readily 'sacific[ing]' speech for efficiency.'" *McCullen v. Coakley*, 134 S. Ct. 2518, 2534 (2014) (citation omitted). Defendants' Speech Zone Policy flunks this test.

### i. Defendants' Speech Zone Policy contains five features that flunk intermediate scrutiny.

Courts have found five aspects of Defendants' Speech Zone Policy to be not narrowly tailored, often dismissing Defendants' interests. First, as Mr. Uzueg-bunam knows, this policy prevents even a single student from leafleting or discussing his religious beliefs outside the speech zones. Compl. ¶¶ 116, 126–28, 215–34. To use them, he must seek a permit three days before. *Id.* ¶¶ 136–39. As the Eleventh Circuit noted, many courts invalidated "permitting require-ments because their application to small groups rendered them insufficiently tailored." *Burk*, 365 F.3d at 1255 n.13; *see, e.g.*, *Knowles v. City of Waco*, 462 F.3d 430, 436 (5th Cir. 2006) ("[O]rdinances requiring a permit for demonstra-tions by a handful of people are not narrowly tailored to serve a significant government interest."); *Am.-Arab Anti-Discrimination Comm. v. City of*

*Dearborn*, 418 F.3d 600, 608 (6th Cir. 2005) ("Permit schemes and advance notice requirements that potentially apply to small groups are nearly always overly broad and lack narrow tailoring."). As this policy "applies to small intimate groups" and "requires a permit in virtually all public places" on campus, it is not narrowly tailored. *Burk*, 365 F.3d at 1259 (Barkett, J. concurring).

Second, this policy "effectively ban[s]" "a significant amount of spontaneous speech," violating the First Amendment. *Watchtower*, 536 U.S. at 167–68. This is often "the most effective kind of expression," but permit procedures prevent "immediate speech" from responding to "immediate issues." *Grossman v. City of Portland*, 33 F.3d 1200, 1206 (9th Cir. 1994). Often, timing is of the essence. *Shuttlesworth*, 394 U.S. at 163 (Harlan, J. concurring) ("[W]hen an event occurs, it is often necessary to have one's voice heard promptly, if it is to be considered at all."). But at GGC, there is no place for spontaneous speech.[15] Students must get a permit to speak anywhere, anytime on campus—whether outside the zones (*i.e.*, 99.9985% of campus) or when they are closed (*i.e.*, 90% of the week), Compl. ¶¶ 114–16, 124–28, or inside them. *Id.* ¶¶ 136–39. They cannot address time-sensitive matters spontaneously. *Id.* ¶¶ 327–28, 335–36, 339–45; *Williams*, 2012 WL 2160969, at *6 (noting "expansive permitting schemes place an objective burden" on free speech and "essentially ban spontaneous speech").

---

[15] *Watchtower*, 536 U.S. at 165–66 ("It is offensive—not only to the values protected by the First Amendment, but to the very notion of a free society—that in the context of everyday public discourse a citizen must first inform the government of her desire to speak to her neighbors and then obtain a permit to do so."); *Thomas v. Collins*, 323 U.S. 516, 539 (1945) ("As a matter of principle a requirement of registration in order to make a public speech would seem generally incompatible with an exercise of the rights of free speech and free assembly.").

Third, Defendants limit almost all student speech to two tiny zones (*i.e.*, 0.0015% of campus). Compl. ¶¶ 113–25. Courts considering whether Defendants' asserted interests justify such limits, Defs.' MTD Br. at 17–24, have found similar policies are not narrowly tailored. *Roberts*, 346 F. Supp. 2d at 863 (declaring a "free speech gazebo" unconstitutional because the "University's interest in an orderly administration of its campus and facilities . . . does not trump the interest of its students . . . in having adequate opportunities and venues available for free expression"); *Khademi*, 194 F. Supp. 2d at 1034–35 (striking leafleting ban inside and outside college buildings as "not narrowly tailored" to preventing litter and protecting students from solicitors); *Burbridge*, 74 F. Supp. 2d at 950–51 (restricting certain student events to three "preferred areas" does not advance "a single interest, much less a significant one"); *Williams*, 2012 WL 2160969, at *7 (same for limiting student speech to one area).

Fourth, Defendants require students to seek a permit three days before using the speech zones, Compl. ¶¶ 136–39, going beyond the policy struck down at Texas Tech. *Roberts*, 346 F. Supp. 2d at 869 (requiring "students to acquire a permit at least two business days before" speaking "outside the designated free-speech zones but in areas of the campus that are public forums nonetheless"). Like Defendants, Defs.' MTD Br. at 17, Texas Tech said this was needed to "preserv[e] an environment suitable for classroom instruction and library study," coordinate events, and address "noise and safety" concerns. *Roberts*, 346 F. Supp. 2d at 869. But it was not narrowly tailored "because it sweeps too broadly in imposing a burden on a substantial amount of expression that does

34

not interfere with any significant interests of the University." *Id.* at 870; *Williams*, 2012 WL 2160969, at *6–7 (finding three-day notice period not narrowly tailored to having a "peaceful and safe" campus). It "is simply unfathomable that a [GGC] student needs to give the [College] advance notice of an intent to [leaflet]. *There is no danger to public order arising out of students walking around campus [leafleting].*" *Williams*, 2012 WL 2160969 at *7 n.5.

Fifth, Defendants bar students from the speech zones for thirty days after each use, Compl. ¶160–61, to promote different viewpoints. Defs.' MTD Br. at 20–22. But a similar cap imposed for the same reason on non-students was not narrowly tailored. *Bowman v. White*, 444 F.3d 967, 981–82 (8th Cir. 2006). That policy, like this one, "does not by itself foster more viewpoints." *Id.* at 982. "If no one else wants to use the space [during the next thirty days], the space will go unused even if [a student] still wants to use the space." *Id.* "A more narrowly tailored policy might [let students to speak again] if the space is not being used, but give preference to other speakers [for the next thirty days]." *Id.* As this is not narrowly tailored for non-students, it certainly is not for students.

Defendants vainly defend their policy with *Bloedorn*. Defs.' MTD Br. at 20. The *Bloedorn* policy required two days notice. *Bloedorn*, 631 F.3d at 1240. Defendants require three. Compl. ¶ 139. *Bloedorn* involved only non-students, for whom the outdoor areas of campus are limited public fora. *Bloedorn*, 631 F.3d at 1232. Defendants restrict students, for whom those areas are designated public fora. *See supra* Part III.A.2.b. Thus, their policy must not just be "reasonable"; it must be "narrowly tailored," which it is not. *See Roberts*, 346 F.

35

Supp. 2d at 869 (rejecting two-day notice requirement on student speech that was "not unreasonably burdensome" because the "standard for regulations on expression in public forums is not that they be reasonable, but that they are narrowly tailored to promote a significant governmental interest"). Plus, student speech poses no extra burden to GGC security, whose job is to ensure that students' freedoms are respected on campus. *Bloedorn*, 631 F.3d at 1240 (noting school assigned "two campus security personnel" to outside speakers).[16]

### ii. Most of Defendants' asserted interests do not satisfy intermediate scrutiny.

Defendants allegedly require students to submit literature for review to prevent "unauthorized uses of the college's name" and "copyright violations." Defs.' MTD Br. at 22–23. Notably, they cite no court holding that this interest justifies curtailing all literature distribution.

Defendants insist they must protect students from "criminal conduct" and "commercial solicitations." Defs.' MTD Br. at 23. Requiring a permit for it is not narrowly tailored to fraud or crime prevention. *Watchtower*, 536 U.S. 165–69.

Next, Defendants cite their educational mission, Defs. MTD Br. at 23–24, as if this did not include fostering a robust marketplace of ideas where students engage one another. Even so, a college's "institutional mission . . . does not exempt its actions from constitutional scrutiny." *Widmar*, 454 U.S. at 268. "[T]he broad argument . . . that . . . public [high] school officials [may] censor

---

[16] Defendants also quote *Sonnier v. Crain*, 613 F. 3d 436 (5th Cir. 2010), Defs.' MTD Br. at 20, but fail to note that the Fifth Circuit withdrew the portions they quote. *Sonnier v. Crain*, 634 F.3d 778, 778–79 (5th Cir. 2011) (withdrawing "Section IV of the opinion . . . with the exception of Section IV(D)," which struck down a security fee policy unrelated to notice requirement).

any student speech that interferes with a school's 'educational mission' . . . strikes at the very heart of the First Amendment." *Morse v. Frederick*, 551 U.S. 393, 423 (2007) (Alito, J. concurring); *Gregoire v. Centennial Sch. Dist.*, 907 F.2d 1366, 1374 (3d Cir. 1990) (finding "educational mission" is "so vague" as to give "virtually unbridled discretion"). Even at high school, "[w]here students' expressive activity does not materially interfere with a school's vital educational mission, and does not raise a realistic chance of doing so, it may not be prohibited simply because it conceivably *might* have such an effect." *Holloman*, 370 F.3d at 1274. Defendants' policy addresses this same contingency, and they have "*less leeway* in regulating student speech." *DeJohn*, 537 F.3d at 316.

Last, Defendants seek deference. Defs.' MTD Br. at 23–24. But this case is about constitutional rights, not a pedagogical policy. Federal courts are "the final arbiter of . . . whether a public university has exceeded constitutional constraints, and [they] owe no deference to universities when [they] consider that question." *Christian Legal Soc'y v. Martinez*, 561 U.S. 661, 686 (2010).

In short, Defendants' Speech Zone Policy is a restriction on First Amendment rights of breathtaking scope and cannot be justified by a significant government interest. It is not narrowly tailored; it is an illegal prior restraint.

### e. Both policies fail strict scrutiny.

Being content-based, *supra* Part III.A.2.c, both policies must satisfy "strict scrutiny," *Burk*, 365 F.3d at 1251, (*i.e.*, "further[] a compelling interest and [be] narrowly tailored to [it]," *Reed*, 135 S. Ct. at 2231). Safety will "not . . . sustain content-based restrictions." *Solantic LLC v. City of Neptune Beach*, 410 F.3d

1250, 1268 (11th Cir. 2005). Here, Defendants must use "the least restrictive means." *Burk*, 365 F.3d at 1255. As the Speech Zone Policy lacks a "reasonable fit" with their interests, *supra* Part III.A.2.d, they did not do so. They do not try to justify the Speech Code. Defs.' MTD Br. at 26–31. "Few laws survive such scrutiny, and [these policies are] no exception." *Burk*, 365 F.3d at 1255.

### f. Defendants' Speech Zone Policy does not provide ample alternative means of communication.

To pass intermediate scrutiny, Defendants' Speech Zone Policy must also "leave open ample alternative channels of communication." *Ward*, 491 U.S. at 802; *Bell*, 745 F.3d at 1322 (same). Relevant factors include whether the speaker can "reach the intended audience," the location is "part of the expressive message," there is "opportunity for spontaneity" in the alternative location, and the alternatives are more costly or less convenient. *Long Beach Area Peace Network v. City of Long Beach*, 574 F.3d 1011, 1025 (9th Cir. 2008).

Defendants claim students can converse without "prior permission." Defs.' MTD Br. at 24. But they do not explain how officials (or students) are to distinguish permissible conversing from impermissible public speaking, and the Complaint pleads they enforced this policy to bar Mr. Uzuegbunam from conversing outside the speech zones. Compl. ¶¶ 230–33. These facts—which must be accepted, *Chaparro*, 693 F.3d at 1335—show this alternative does not exist.

Next, Defendants say Plaintiffs could leave GGC and speak to people driving by or use bulletin boards. Defs.' MTD Br. at 24. The former is impractical, preventing them from reaching their intended audience. The latter is far more costly time-wise and less convenient as they would have to comply with the

38

rules for creating a student group to have one-sided interaction with a fraction of the students they could reach otherwise. Besides, "one is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place." *Schneider*, 308 U.S. at 163.

Even if Defendants' Speech Zone Policy were content-neutral, it would have to satisfy all three criteria for time, place, and manner restrictions to be valid. As it fails all three, Plaintiffs pleaded plausible free speech claims.

### g. Both policies lack the protections required of content-based prior restraints.

As "content-based prior restraint[s]," Defendants' policies "must also satisfy the procedural requirements of *Freedman v. Maryland*, 380 U.S. 51 [(1965)]." *Burk*, 365 F.3d at 1255 n.12. They "can be imposed only for a specified brief period" of time, "expeditious judicial review . . . must be available," and "the censor must bear the burden of going to court to suppress the speech and must bear the burden of proof." *Thomas v. Chi. Park Dist.*, 534 U.S. 316, 321 (2002); *Frandsen*, 212 F.3d at 1238 (citing *Freedman*, 380 U.S. at 59).

The Speech Code limits all student speech, even off campus. Compl. ¶¶ 163–64, 178. The Speech Zone Policy applies all the time, even to conversations. *Id.* ¶¶ 230–33. It has no time limits for granting permits and gives Defendant Jiminez the final word, without requiring an explanation. *Id.* ¶¶ 157–59.

### h. Defendants' Speech Zone Policy fails the scrutiny for limited public fora.

Defendants rightly note that the type of forum here is of secondary importance, Defs.' MTD Br. at 12–13, because the Speech Zone Policy has been unconstitutional, even in nonpublic fora, for at least thirty years. In the 1980s,

Los Angeles International Airport banned expressive activities in its terminals. *Jews for Jesus*, 482 U.S. at 570–71. Defendants do the same. They ban speech on the entire campus for 90% of the week and open 0.0015% of campus for 10% of it, unless they grant an exemption. Compl. ¶¶ 113–28. No one can speak, even in the speech zones, without permission. *Id.* ¶¶ 136–39. Like LAX's, Defendants' policy "reaches the universe of expressive activity, and, by prohibiting *all* protected expression, purports to create a virtual "First Amendment Free Zone" on campus. *Jews for Jesus*, 482 U.S. at 574; Compl. Ex. 3 at 1; Compl. ¶¶ 230–33 (banning conversations). Such bans are unconstitutional in any forum: "We think it is obvious that such a ban cannot be justified even if LAX were a nonpublic forum because no conceivable governmental interest would justify such an absolute prohibition on speech." *Jews for Jesus*, 482 U.S. at 575.[17]

A policy unreasonable in airports cannot be reasonable for students in the "marketplace of ideas," *Cornelius*, 473 U.S. at 789 (noting reasonableness "must be assessed in light of the purpose of the forum"), especially when Defendants have discretion to grant exceptions (via permits). *See supra* Part III.A.1.

### 3. Both of Defendants' policies are overbroad as they restrict a substantial amount of protected speech.

For over forty years, it has been clearly established that a law is overbroad if it "penaliz[es] a substantial amount of speech that is constitutionally protected." *Forsyth Cnty.*, 505 U.S. at 130. Facial challenges are proper "where

---

[17] *Accord Int'l Soc'y for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 830, 831 (1992) (striking leafleting ban in nonpublic fora inside airport (while allowing it on sidewalks outside) as First Amendment violation); *id.* at 687, 985–92 (O'Connor, J. concurring) (finding the ban unreasonable)

every application creates an impermissible risk of suppression of ideas, such as an ordinance that delegates overly broad discretion to the decisionmaker, and in cases where the [policy] sweeps too broadly, penalizing a substantial amount of speech that is constitutionally protected." *Horton v. City of St. Augustine*, 272 F.3d 1318, 1331 (11th Cir. 2001); *DA Mortg., Inc. v. City of Miami Beach*, 486 F.3d 1254, 1269 (11th Cir. 2007) (same).

Both of Defendants' policies suffer from both flaws. *See supra* Part I (noting amount of speech curtailed); Part III.A.1 (discussing unbridled discretion and limits on offensive speech); Part III.A.2.d.ii–iii (discussing lack of tailoring).

Thus, courts have struck down speech codes narrower than Defendants' as overbroad. *See, e.g.*, *DeJohn*, 537 F.3d at 316–18 (striking ban on "creating an intimidating, hostile, or offensive environment" as overbroad as its "broad and subjective" words could "conceivably be applied to cover any speech"); *McCauley*, 618 F.3d at 250–51 (striking ban on causing "emotional distress" as overbroad as it is "entirely subjective" and "is driven by the subjective experience of the individual," even "a lone individual who has a negative reaction").

"[D]isturb[ing] the peace and/or comfort of person(s)" is more expansive than causing "emotional distress." But the Speech Code restricts every word a student speaks. Compl. ¶¶ 163–64, 178. Anything he says risks disturbing someone's "peace" or "comfort." As "[t]his is a heavy weight for students to bear," *McCauley*, 618 F.3d at 252, Plaintiffs pleaded plausible overbreadth claims.

## B. Both of Defendants' policies violate Plaintiffs' clearly established free exercise rights.

"To plead a valid free exercise claim, [Plaintiffs] must allege that

[Defendants have] impermissibly burdened one of [their] 'sincerely held religious beliefs.'" *Watts*, 495 F.3d at 1294. Both policies do this as they "impact[] [their] ability to . . . act pursuant to that belief." *GeorgiaCarry.Org, Inc. v. Georgia*, 687 F.3d 1244, 1256–57 (11th Cir. 2012). Based on "their firmly-held Christian beliefs," Plaintiffs "believe it is their duty" to share the Gospel via conversations, leafleting, and public speaking. Compl. ¶¶ 20–23. Enforcing their policies, Defendants stopped Mr. Uzuegbunam from leafleting and conversing about his faith, *id.* ¶¶ 204–37, and from speaking publicly, *id.* ¶¶ 238–315. Facing sanctions, Plaintiffs have had to stop acting on their beliefs. *Id.* ¶¶ 316–59.

### 1.  Both policies are individualized governmental assessments.

For free exercise purposes, "[f]acial neutrality is not determinative." *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 534 (1993). "The Free Exercise Clause . . . extends beyond facial discrimination" to "forbid[] subtle departures from neutrality." *Id.* (quotations omitted). One such departure occurs when there is "a system of 'individualized governmental assessment of the reasons for the relevant conduct.'" *Id.* at 537 (quoting *Emp't Div. v. Smith*, 494 U.S. 872, 884 (1990)). When "individualized exemptions . . . are available," the state must protect religious exercise or face strict scrutiny. *Id.*

The Speech Zone Policy requires officials to review every permit request and gives them unbridled discretion. *See supra* Part III.A.1.a.i. But it lacks protections, *see supra* Parts IIII.A.1.b.i, III.A.2.c., including for religious exercise.

Speech Code requires officials to assess each speaker who allegedly "disturb[s] [anyone's] peace and/or comfort." Compl. ¶ 170. These malleable terms

grant unbridled discretion, *see supra* Part III.A.1.a.ii; lack any safeguards, *see supra* Parts III.A.1.b.i–ii, III.A.2.c, including for religious exercise.

As these policies are not neutral, they are subject to strict scrutiny, *Lukumi*, 508 U.S. at 546, which neither can withstand. *See supra* Part III.A.2.e.

### 2. Both policies violate the hybrid rights doctrine.

Plaintiffs also pleaded plausible claims under the hybrid rights doctrine as Defendants' policies violate "the Free Exercise Clause in conjunction with . . . the freedom of speech." *Smith*, 494 U.S. at 881; *see supra* Parts III.A, III.B.1.

### C. Both of Defendants' policies violate Plaintiffs' clearly established Fourteenth Amendment Rights.

### 1. Both of Defendants' policies are vague.

Plaintiffs need not show the policies are "impermissibly vague" in all of their applications as the Supreme Court does not apply this standard in facial claims. *Horton*, 272 F.3d at 1330. *But see* Defs.' MTD Br. at 35. The policies must simply "fail to give fair warning of what constitutes a wrongdoing or that [they] lack objective enforcement standards." *DA Mortg.*, 486 F.3d at 1271. It is clearly established that a policy is vague if it fails to "give [students] of ordinary intelligence a reasonable opportunity to know what is prohibited," lacks "explicit standards for those who apply [it]," or chills constitutional freedoms. *Grayned v. City of Rockford*, 408 U.S. 104, 108–09 (1972); *accord City of Chi. v. Morales*, 527 U.S. 41, 56 (1999). Here, "a more stringent vagueness test should apply" as these policies "interfere[] with the right of free speech." *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 499 (1982); *accord Wollschlaeger v. Gov. of Fla.*, __ F.3d __, 2017 WL 632740, *15–16 (11th

Cir. Feb. 16, 2017) (en banc) (same).

Defendants' Speech Zone Policy grants five layers of unbridled discretion. *See supra* Part III.A.1.a.i. So students cannot know how to structure their requests, and Defendants can grant permits in a discriminatory way. That Defendants and their counsel differ on whether the policy limits conversations, Compl. ¶¶ 230–33, confirms the vagueness. *Williams*, 2012 WL 2160969, at *7–8 (finding speech zone vague as it lacked "objective criteria" and "the University and its own employees have different understandings of [its] terms").

The Speech Code lacks explicit standards for "peace" and "comfort." As "different people find different things offensive," students have no idea what they can safely say. *Dambrot*, 55 F.3d at 1184. Hence, courts find these policies vague. *See id.* at 1182, 1184 (striking as vague ban on "intimidating, hostile or offensive . . . environment[s]" as students must make a "subjective reference," leaving them without "fair notice" of prohibited speech); *DeJohn*, 537 F.3d at 317 (striking similar policy as its "sufficiently broad and subjective" terms could "conceivably cover any speech" that offends someone); *Doe*, 721 F. Supp. at 867 (striking as vague a ban on "stigmatizing or victimizing" others as both "terms are general and elude precise definition").

"[Students] of common intelligence must necessarily guess at [both policies'] meaning"; officials will "necessarily . . . differ as to [their] application." *Connally v. Gen. Constr. Co.*, 269 U.S. 385, 391 (1926). Both are clearly vague.

### 2. Both of Defendants' policies violate equal protection.

The Equal Protection Clause "directs that all persons similarly

circumstanced shall be treated alike." *Plyler v. Doe*, 457 U.S. 202, 216 (1982).[18]

Plaintiffs pleaded facts showing Defendants did not do this, facts that must be

accepted as true. *Chaparro*, 693 F.3d at 1335.

Defendants stopped Mr. Uzuegbunam from leafleting and conversing about

his faith outside the speech zones, Compl. ¶¶ 215–33. But they allowed:

- others to "use amplified sound . . . outside the speech zones," *id.* ¶ 285;
- a percussion group to perform weekly outside the speech zones, though did not get a permit, *id.* ¶¶ 307–12;
- other religious groups "to distribute literature [and] engage students in conversations about their religious beliefs . . . outside the speech zones," even though they never got the required permit. *Id.* ¶¶ 313–15.

Though similarly situated, Mr. Uzuegbunam was not treated like these speakers.

Defendants stopped him from speaking due to complaints. *Id.* ¶¶ 238–315.

Yet they allowed others to broadcast "vulgar, lewd, and obscene music," *id.* ¶

285, and to continue "very loud[]," amplified expression, both of which are more

likely to "disturb [someone's] peace and/or comfort" than a solitary speaker. *Id.*

¶¶ 307–312. Again, similarly situated speakers were not treated alike.[19]

## CONCLUSION

Plaintiffs pleaded facts showing Defendants' policies violate their clearly

established rights, as articulated by the Supreme Court and the Eleventh Cir-

cuit. As those facts must be "accept[ed] . . . as true and constru[ed]" in their

favor, Defendants' motion should be denied. *Chaparro*, 693 F.3d at 1335.

---

[18] As these policies burden fundamental rights, they are "presumptively in-vidious" (*i.e.*, discriminatory intent is presumed). *Plyler*, 457 U.S. at 216–17.

[19] Facts alleged "upon information and belief" are sufficient to withstand a motion to dismiss when they are "peculiarly within the possession and control of the defendant." *Boateng v. Ret. Corp. of Am. Partners, L.P.*, 2013 WL 12061901, at *4 (N.D. Ga. Mar. 5, 2013) (quotations & citations omitted), as are the facts at issue. Compl. ¶¶ 285, 310–15.

Respectfully submitted this the 7th day of April 2017,

*/s/ Travis C. Barham*
DAVID A. CORTMAN
Georgia Bar No. 188810
TRAVIS C. BARHAM
Arizona Bar No. 024867
Georgia Bar No. 753251
ALLIANCE DEFENDING FREEDOM
1000 Hurricane Shoals Rd. NE,
Suite D-1100
Lawrenceville, Georgia 30043
Telephone:  (770) 339–0774
Facsimile:  (770) 339–6744
dcortman@ADFlegal.org
tbarham@ADFlegal.org

M. CASEY MATTOX*
Virginia Bar No. 47148
ALLIANCE DEFENDING FREEDOM
440 1st Street, NW, Ste. 600
Washington, D.C. 20001
Telephone:  (202) 393–8690
Facsimile:  (202) 347–3622
cmattox@ADFlegal.org

* Admitted *pro hac vice*.

*Attorneys for Plaintiffs*

## <u>C</u><u>ERTIFICATE OF</u> <u>F</u><u>ORMATTING</u>

I hereby certify that the foregoing document has been prepared in Century Schoolbook, thirteen point font and fully complies with the font and point selection requirements of L.R. 5.1(B), N.D. Ga.

Respectfully submitted on this the 7th day of April, 2017.

*/s/ Travis C. Barham*
Travis C. Barham
*Attorney for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on the 7th day of April, 2017, I electronically filed a true and accurate copy of the foregoing document with the Clerk of Court using the CM/ECF system, which automatically sends an electronic notification to the following attorneys of record:

> CHRISTOPHER CARR
> Attorney General
> KATHLEEN M. PACIOUS
> Deputy Attorney General
> DEVON ORLAND
> Senior Assistant Attorney General
> ELLEN CUSIMANO
> Assistant Attorney General
> 40 Capitol Square, Southwest
> Atlanta, Georgia 30334-1300
> Telephone: (404) 463–8850
> Facsimile: (404) 651–5304
> dorland@law.ga.gov
> ecusimano@law.ga.gov
> *Attorneys for Defendants*

Respectfully submitted on this the 7th day of April, 2017.

> */s/ Travis C. Barham*
> Travis C. Barham
> *Attorney for Plaintiffs*

48