# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

|  |  |  |
|---|---|---|
| CHIKE UZUEGBUNAM and | ) | |
| JOSEPH BRADFORD, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Civil Action No. |
| v. | ) | 1:16-cv-04658-ELR |
| | ) | |
| STANLEY C. PRECZEWSKI, et al., | ) | |
| | ) | |
| Defendants. | ) | |

# UNITED STATES' STATEMENT OF INTEREST

**TABLE OF CONTENTS**

**PAGE**

INTEREST OF THE UNITED STATES…………………………………………. 1

FACTUAL AND PROCEDURAL BACKGROUND...…………………….…… 4

ARGUMENT……………………………………………………………….…... 9

    I.     PLAINTIFFS' COMPLAINT ADEQUATELY PLEADS FIRST AND
            FOURTEENTH AMENDMENT CLAIMS AGAINST GGC'S
            CONTENT-BASED SPEECH PRACTICES.............................……... 10

            A. GGC's Speech Policies and Practices Were Not Content-Neutral.... 12

            B. GGC Has Offered No Adequate Justification For Its Content-
               Based Restriction On Plaintiffs' Religious Speech But Instead
               Codified An Unconstitutional Heckler's Veto.................................. 15

CONCLUSION.................................................................................................. 19

i

# TABLE OF AUTHORITIES

**CASES:**                                                                    **PAGE**

*Atlanta Journal & Constitution v. City of Atlanta Dept. of Aviation*,
    322 F. 3d 1298 (11th Cir. 2003) .........................................................................19

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) ................................................4

*Bible Believers v. Wayne Cty., Mich.*, 805 F.3d 228 (6th Cir. 2015) .............. 12, 14

*Bloedorn v. Grube*, 631 F.3d 1218 (11th Cir. 2011) ...............................................11

*Bronx Household of Faith v. Bd. of Educ.*, 331 F.3d 342 (2d Cir. 2003).................3

*Burk v. Augusta-Richmond Cty.*, 365 F.3d 1247 (11th Cir. 2004) .........................19

*Capitol Square Review & Advisory Bd. v. Pinette*, 515 U.S. 753 (1995)............9, 11

*Chaplinsky v. New Hampshire*, 315 U.S. 568 (1942) ...............................................16

*Child Evangelism Fellowship of Md., Inc. v. Montgomery Cty. Pub. Sch.*,
    373 F.3d 589 (4th Cir. 2004) ...................................................................................3

*Child Evangelism Fellowship of N.J., Inc. v. Stafford Twp. Sch. Dist.*,
    386 F.3d 514 (3d Cir. 2004) ....................................................................................3

*Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432 (1985)................................10

*Cohen v. San Bernardino Valley Coll.*, 92 F.3d 968 (9th Cir. 1996) .....................17

*Coll. Republicans v. Reed*, 523 F. Supp. 2d 1005 (N.D. Cal. 2007) ......................16

*Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629 (1999) .......................................16

*Doe v. Univ. of Mich.*, 721 F. Supp. 852 (E.D. Mich. 1989)..................................17

*Donovan v. Punxsutawney Area Sch. Bd.*, 336 F.3d 211 (3d Cir. 2003)..................3

**CASES (continued):**                                                              **PAGE**

*Epperson v. Arkansas*, 393 U.S. 97 (1968)................................................................12

*Faith Ctr. Church Evangelistic Ministries v. Glover*,
   480 F.3d 891 (9th Cir. 2007) ..................................................................................3

*Forsyth Cty. v. Nationalist Movement*, 505 U.S. 123 (1992) ......................... *passim*

*Good News Club v. Milford Cent. Sch.*, 533 U.S. 98 (2001)....................................11

*Healy v. James*, 408 U.S. 169 (1972) ......................................................................9

*Keyishian v. Bd. of Regents of the Univ. of the State of N.Y.*,
   385 U.S. 589 (1967) ..............................................................................................2

*Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*,
   508 U.S. 384 (1993) .......................................................................................3, 11

*McCauley v. Univ. of the Virgin Islands*, 618 F.3d 232 (3d Cir. 2010) ........... 17, 18

*Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37 (1983) ....... 10, 11

*Pleasant Grove City, Utah v. Summum*, 555 U.S. 460 (2009) ........................ 11, 15

*Rosenberger v. Rectors & Visitors of Univ. of Va.*,
   515 U.S. 819 (1995) ................................................................................ 3, 11, 14

*Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200 (3d Cir. 2001)...........................17

*Shelton v. Tucker*, 364 U.S. 479 (1960)...................................................................2

*Texas v. Johnson*, 491 U.S. 397 (1989) ................................................................16

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503 (1969) ........... 2, 16, 19

*United States v. Frandsen*, 212 F.3d 1231 (11th Cir. 2000)...................................10

*Virginia v. Black*, 538 U.S. 343 (2003) .................................................................16

iii

**CASES (continued):**                                                     **PAGE**

*Ward v. Rock Against Racism*, 491 U.S. 781 (1989)................................................11

*Widmar v. Vincent*, 454 U.S. 263 (1981)........................................................ *passim*

**STATUTES:**                                                              **PAGE**

20 U.S.C. § 1011(a)(2)................................................................................1

20 U.S.C. § 1092.......................................................................................16

20 U.S.C. § 1681.......................................................................................16

28 U.S.C. § 517.........................................................................................1

29 U.S.C. § 794.........................................................................................16

42 U.S.C. § 2000(d)...................................................................................16

42 U.S.C. § 2000c-6....................................................................................3

42 U.S.C. § 2000h-2....................................................................................3

Ga. Code Ann. § 16-11-39............................................................................5

**OTHER AUTHORITIES:**                                                     **PAGE**

Virginia Resolutions (Dec. 21, 1798), *in* 5 THE FOUNDERS' CONSTITUTION, 135,
    136 (Philip B. Kurland & Ralph Lerner, eds., 1987) ............................................1

The United States respectfully submits this Statement of Interest pursuant to 28 U.S.C. § 517, which authorizes the Attorney General "to attend to the interests of the United States in a suit pending in a court of the United States."  In the view of the United States, and for the reasons explained below, Plaintiffs have properly pleaded claims under the First and Fourteenth Amendments—namely, that the speech regulations imposed by Georgia Gwinnett College ("GGC" or "the College") violated Plaintiffs' constitutional rights.

## INTEREST OF THE UNITED STATES

The United States has an interest in protecting the individual rights guaranteed by the First Amendment.  The right to free speech lies at the heart of a free society and is the "effectual guardian of every other right."  Virginia Resolutions (Dec. 21, 1798), *in* 5 THE FOUNDERS' CONSTITUTION, 135, 136 (Philip B. Kurland & Ralph Lerner, eds., 1987).  Content-based restrictions on speech in public fora require "the most exacting scrutiny," *Widmar v. Vincent*, 454 U.S. 263, 277 (1981), and state-run colleges and universities are no exception from this rule, *id.* at 267–68.

The United States has a significant interest in the vigilant protection of constitutional freedoms in institutions of higher learning.  Congress has declared that "an institution of higher education should facilitate the free and open exchange of ideas." 20 U.S.C. § 1011(a)(2).  In recent years, however, concerns have been raised

1

that some institutions of higher education have failed to answer this call, and that free speech has been under attack on campuses across the country. Such failure is of grave concern because freedom of expression is "vital" on campuses, *Shelton v. Tucker*, 364 U.S. 479, 487 (1960), which are "peculiarly the 'marketplace of ideas,'" *Keyishian v. Bd. of Regents of the Univ. of the State of N.Y.*, 385 U.S. 589, 603 (1967).

Colleges and universities must protect free speech and may not discriminate out of a concern that listeners might find the content of speech offensive or uncomfortable. As a general matter, "[l]isteners' reaction to speech is not a content-neutral basis for regulation." *Forsyth Cty. v. Nationalist Movement*, 505 U.S. 123, 134 (1992). To the contrary, "'[t]he Nation's future depends upon leaders trained through wide exposure to that robust exchange of ideas which discovers truth 'out of a multitude of tongues, (rather) than through any kind of authoritative selection.'" *Keyishian*, 385 U.S. at 603. "[O]ur history says that it is this sort of hazardous freedom—this kind of openness—that is the basis of our national strength and of the independence and vigor of Americans who grow up and live in this relatively permissive, often disputatious, society." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 508–09 (1969).

It is in the interest of the United States to lend its voice to enforce First Amendment rights on campus.  Additionally, in this case, the United States has a heightened interest because the Plaintiffs' First Amendment claims are intertwined with allegations of disparate treatment based on religion.  Indeed, as the Supreme Court has explained, the exclusion of religious viewpoints from colleges and universities "risks the suppression of free speech and creative inquiry in one of the vital centers for the Nation's intellectual life." *Rosenberger v. Rectors & Visitors of Univ. of Va.*, 515 U.S. 819, 836 (1995).  Moreover, the Equal Protection Clause of the Fourteenth Amendment and the Civil Rights Act of 1964 prohibit discrimination on the basis of religion, and the Attorney General is charged with vindicating this right.  *See* 42 U.S.C. § 2000h-2; 42 U.S.C. § 2000c-6.  The United States regularly seeks to prohibit religious discrimination in the education setting.  *See, e.g.*, *Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*, 508 U.S. 384 (1993); *Faith Ctr. Church Evangelistic Ministries v. Glover*, 480 F.3d 891 (9th Cir. 2007); *Child Evangelism Fellowship of N.J., Inc. v. Stafford Twp. Sch. Dist.*, 386 F.3d 514 (3d Cir. 2004); *Child Evangelism Fellowship of Md., Inc. v. Montgomery Cty. Pub. Sch.*, 373 F.3d 589 (4th Cir. 2004); *Donovan v. Punxsutawney Area Sch. Bd.*, 336 F.3d 211 (3d Cir. 2003); *Bronx Household of Faith v. Bd. of Educ.*, 331 F.3d 342 (2d Cir. 2003).

## FACTUAL AND PROCEDURAL BACKGROUND

Because the case comes before the Court on a motion to dismiss, the Court must take all of Plaintiffs' well-pleaded allegations as true. *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007). Thus, for purposes of this Statement of Interest, the United States takes Plaintiffs' well-pleaded allegations as true. The United States takes no view regarding whether Plaintiffs will succeed in proving those allegations at trial.

According to the Complaint, Plaintiffs are students at GGC, a four-year public college within the state-run University System of Georgia. Doc. 13 ¶¶ 17, 26 (First Amended Verified Complaint). They bring facial and as-applied First and Fourteenth Amendment challenges to the College's Freedom of Expression Policy ("Speech Zone Policy") and Student Code of Conduct in effect at the time they filed their complaint. *Id.* ¶¶ 2–3.

The Speech Zone Policy limited public expression on campus in at least three principal ways. First, the Speech Zone Policy designated two "Free Speech Zones"—which collectively occupied less than 0.0015% of the campus—and limited the time for expressive activities within those Free Speech Zones to only eighteen pre-selected hours per week, and only one instance of expression per applicant every thirty days. *Id.*; *see also id.*, Ex. 3 at 2; *id.*, Ex. 8 at 1. The Policy

also provided, without further elaboration, that "[o]n occasion upon written request, other areas and other times may be authorized, and the College reserves the right to modify the free speech areas based on the operational needs of the institution." *Id.*, Ex. 3 at 2.

Second, the policy required students to obtain authorization from the College before engaging in speech in the Free Speech Zones. The policy required students to apply for authorization at least three business days in advance and to submit any "publicity materials" related to their expressive activities with the application. *Id.* ¶¶ 2–3, 111, Ex. 3 at 3.

Third, the Speech Zone Policy also prohibited any "disorderly conduct." *Id.*, Ex. 3 at 4. The Speech Zone Policy incorporated the definition of "disorderly conduct" from the Student Code of Conduct, which defined that term to include "behavior which disturbs the peace *and/or comfort* of person(s)." *Id.*, Ex. 9 at 26; *Id.* ¶ 170 (emphasis added). That definition diverged sharply from the definition of "disorderly conduct" under Georgia law. *See* Ga. Code Ann. § 16-11-39 ("disorderly conduct" requires "[a]cts in a violent or tumultuous manner" or "fighting words").

Plaintiffs allege that Defendants' adoption and implementation of the Speech Zone Policy and the Student Code of Conduct prevented them from communicating

religious messages and distributing religious materials on campus.   One such incident occurred when Mr. Uzuegbunam made a concerted effort to comply with the Free Speech Policy.   Plaintiffs allege that Mr. Uzuegbunam applied for and obtained a permit to speak and distribute religious tracts in one of the Free Speech Zones on August 25, 2016.   Doc. 13 ¶¶ 238–48.   When Mr. Uzuegbunam spoke in the Free Speech Zone, "he did not carry signs or utilize amplification."   *Id.* ¶ 256. Rather, he "merely spoke loud enough to be heard, using his unaided voice, for about fifteen or twenty minutes to the students congregated in the area at the time."   *Id.* Plaintiffs allege that Mr. Uzuegbunam "did not utilize inflammatory rhetoric or personally attack any individual," *id.* ¶ 257; rather he presented his religious message, *id.* ¶ 258.

According to Mr. Uzuegbunam, after he had been speaking for approximately twenty minutes, a campus police officer approached him and asked him to stop speaking.   *Id.* ¶¶ 90, 259–60.   The officer explained that he had come to the scene because "we just got some calls on you."   *Id.* ¶ 261.   After conferring briefly with Mr. Uzuegbunam and a campus official, the officer ordered that Mr. Uzuegbunam "could not speak publicly" in the Speech Zone.   *Id.* ¶ 268.   The officer explained that "the only reason" he interrupted Mr. Uzuegbunam's speaking "was because GGC

officials had received calls from people complaining about his expression." *Id.* ¶ 271.

Mr. Uzuegbunam further alleges that the officer told him that his religious expression "was disturbing the peace and tranquility of individuals who were congregating in that area because it had generated complaints." *Id.* ¶ 278. The officer warned Mr. Uzuegbunam that if he continued speaking, "he could face discipline under the *Student Code of Conduct*, particularly if GGC officials received additional complaints about his speaking." *Id.* ¶ 282. The officer then instructed Mr. Uzuegbunam and his friend "to 'respect the community' by ceasing any efforts to share their religious beliefs through open-air speaking" in one of the Free Speech Zones. *Id.* ¶ 284.

A second officer on the scene, *id.* ¶¶ 94, 287, confirmed that Mr. Uzuegbunam's open-air speaking was "disorderly conduct" because "people are calling us because their peace and tranquility is being disturbed and we've asked you to stop." *Id.* ¶ 289. The second officer "stated that the mere fact that someone complains about expression converts that expression into disorderly conduct." *Id.* ¶ 290.

Following this encounter with the campus police, Mr. Uzuegbunam discussed the College's policies with the Director of the Office of Student Integrity. *Id.* ¶¶ 66,

304. That official informed Mr. Uzuegbunam that "it is a violation of GGC policy for anyone to express a 'fire and brimstone message' on campus, even within the speech zones." *Id.* ¶ 305.

Plaintiffs allege that the College has allowed a variety of other forms of expression inside and outside the Free Speech Zones "without interference," including:

- "[A] percussion group that plays its drums and other instruments very loudly, especially as it utilizes amplification";
- Speakers and events "us[ing] offensive language (including broadcasting of vulgar, lewd . . . music using amplification), but [which] were still allowed to continue expressing their message"; and
- Members of the Church of Jesus Christ of Latter-day Saints, who share a religious message that does not result in "GGC officials . . . receiv[ing] complaints."

*Id.* ¶¶ 285, 293–96, 307, 312–15.

On March 17, 2017, Defendants filed a motion to dismiss, arguing that the challenged policies were valid on their face and as applied. Doc. 18 (Memorandum of Law in Support of Defendants' Motion To Dismiss Plaintiffs' Amended Complaint). Two weeks later, on March 31, 2017, Defendants filed a second motion to dismiss. Doc. 21 (Brief In Support Of Defendants' Motion To Dismiss For Mootness). In this motion, Defendants asserted they had amended their speech and disorderly conduct policies, and that these revisions now render the case moot. Both parties fully briefed the two motions, and they are pending before this Court. *See*

Docs. 22 (Response In Opposition To Motion To Dismiss Plaintiffs' Amended Complaint), 27 (Response In Opposition To Motion To Dismiss For Mootness), 30 (Reply In Support Of Defendants' Motion To Dismiss Plaintiffs' Amended Complaint), 32 (Reply In Support of Defendants' Motion To Dismiss For Mootness).

The United States does not advance any position as to whether the Plaintiffs' claims are moot or whether qualified immunity applies to the individual claims. Taking the facts alleged as true, the United States is satisfied, for the reasons below, that Plaintiffs have stated claims for violations of the First and Fourteenth Amendments.

## ARGUMENT

The free speech protections of the First Amendment are as applicable to private religious speech as they are to secular speech, *Capitol Square Review & Advisory Bd. v. Pinette*, 515 U.S. 753, 760 (1995), and are as applicable to state-run universities as they are to any other government institution, *Healy v. James*, 408 U.S. 169, 180 (1972). Plaintiffs' allegations, if proven, demonstrate that GGC's speech policies and practices were not content-neutral, enshrined an impermissible heckler's veto, and did not satisfy strict scrutiny. Plaintiffs therefore have stated a claim under the First Amendment. Plaintiffs also have stated a claim under the

9

Fourteenth Amendment because the College's content-based policies and practices discriminate against Plaintiffs' religious message.  *See Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985).[1]

## I.   PLAINTIFFS' COMPLAINT ADEQUATELY PLEADS FIRST AND FOURTEENTH AMENDMENT CLAIMS AGAINST GGC'S CONTENT-BASED SPEECH PRACTICES

Under the First Amendment, the power of the government to regulate speech on college and university campuses is contingent on the character of the forum in question.  *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 44 (1983) ("[t]he existence of a right of access to public property and the standard by which limitations upon such right must be evaluated differ depending on the character of the property at issue"); *United States v. Frandsen*, 212 F.3d 1231, 1237 (11th Cir. 2000) ("an initial step in analyzing whether the regulation is unconstitutional is determining the nature of the government property involved").  A "public forum" is "public property which the state has opened for use by the public as a place for expressive activity," either by tradition or designation.  *Perry Educ. Ass'n*, 460 U.S. at 45.  In a "public forum," the government may impose "[r]easonable time, place, and manner restrictions . . . but any restriction based on the content of the speech

---

[1] The United States also notes that Plaintiffs have challenged the Speech Zone Policy's authorization requirement as an unconstitutional prior restraint.  Doc. 13 ¶¶ 379–83; *Forsyth Cty.*, 505 U.S. 123 at 133–34.

must satisfy strict scrutiny, that is, the restriction must be narrowly tailored to serve a compelling government interest and restrictions based on viewpoint are prohibited." *Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 469 (2009) (citations omitted); *see also Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989); *Perry Educ. Ass'n*, 460 U.S. at 45–46; *Bloedorn v. Grube*, 631 F.3d 1218, 1234–35 (11th Cir. 2011).

Moreover, "private religious speech, far from being a First Amendment orphan, is as fully protected under the Free Speech Clause as secular private expression." *Capitol Square Review & Advisory Bd.*, 515 U.S. at 760.   Thus, deliberately treating religious speakers differently than non-religious speakers constitutes impermissible viewpoint discrimination.  *See, e.g.*, *Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 112 (2001) ("speech discussing otherwise permissible subjects cannot be excluded from a limited public forum on the ground that the subject is discussed from a religious viewpoint"); *Widmar*, 454 U.S. at 277 (once a university creates a forum generally open to student groups, it cannot enforce a content-based exclusion of religious speech).  Accordingly, policies that restrict religious messages while allowing non-religious messages are generally impermissible under the First and Fourteenth Amendments.  *Rosenberger*, 515 U.S. at 830–31; *Lamb's Chapel*, 508 U.S. at 393–94.  Likewise, restrictions that

discriminate against certain religious messages but not others generally violate the First and Fourteenth Amendments. *Epperson v. Arkansas*, 393 U.S. 97, 106–07 (1968) (First Amendment "forbids alike the preference of a religious doctrine or the prohibition of theory which is deemed antagonistic to a particular dogma"); *Bible Believers v. Wayne Cty., Mich.*, 805 F.3d 228, 256–57 (6th Cir. 2015) (finding First and Fourteenth Amendment violations in county's disparate treatment of one religious group because the group's "speech was found to be objectionable by a number of people").

Defendants concede that the Free Speech Zones were designated public fora. Doc. 11-1 at 12. Therefore, because Plaintiffs' allegations, if proven, would demonstrate that Defendants' policies and practices were neither content-neutral nor narrowly tailored, Plaintiffs have stated First and Fourteenth Amendment claims.

### A.    GGC's Speech Policies and Practices Were Not Content-Neutral

Plaintiffs have adequately alleged that GGC's implementation of its Speech Zone Policy and Student Code of Conduct to foreclose their religious expression amounted to unconstitutional content-based restrictions. The Supreme Court's decision in *Widmar* is instructive. There, the Supreme Court considered a policy of the University of Missouri at Kansas City that made the University's facilities generally available for activities of registered student groups, but prohibited use of

those facilities "for purposes of religious worship or religious teaching." 454 U.S. at 265. A registered school group claimed that the policy's exclusion of religious expression "violated their rights . . . under the First and Fourteenth Amendments." *Id.* at 266.

The Supreme Court agreed. *Id.* The Supreme Court noted that "our cases leave no doubt that the First Amendment rights of speech and association extend to the campuses of state universities." *Id.* at 268–69. Turning to the University's policy, the Supreme Court held that it was "content-based" in violation of the First Amendment because it "discriminated against student groups and speakers based on their desire to use a generally open forum to engage in religious worship and discussion." *Id.* at 269–70.

Here as well, Plaintiffs have alleged that the College imposed a content-based exclusion against Mr. Uzuegbunam based on his "use [of] a generally open forum to engage in religious worship and discussion." *Id.* Defendants have conceded that the Speech Zones on campus were generally open public fora, *see* Doc. 11-1 at 12, and the Speech Zone Policy purported to commit the College to authorizing use of those zones "in accordance with the principle of content neutrality," Doc. 13, Ex. 3 at 2. But Plaintiffs have adequately alleged that, in practice, College officials applied the policies to exclude their religious expression from the Speech Zones. In particular,

13

GGC forbade "anyone to express a 'fire and brimstone message' on campus, even within the speech zones."  Doc. 13 ¶ 305.  Yet GGC did not exclude other forms of expression, including "offensive language," "lewd" and "vulgar" music, and religious expression by representatives of the Church of Jesus Christ of Latter-day Saints that did not meet the College's definition of "fire and brimstone."  *Id.* ¶¶ 285, 293–96, 307, 312–15.  Such "discriminat[ion]" against religious expression amounts to a "content-based exclusion[]" under the First and Fourteenth Amendments. *Widmar*, 454 U.S. at 269–70; *see also Rosenberger*, 515 U.S. at 836–37; *Bible Believers*, 805 F.3d at 256–57.

Defendants may contend that the "fire and brimstone" prohibition was a mere time, place, or manner restriction.  But Plaintiffs' factual allegations, if proven, would demonstrate that the "fire and brimstone" prohibition referred to the content, specifically the viewpoint, of Mr. Uzuegbunam's religious expression, not its manner.  According to the Complaint, GGC took no action to stop expression that was far louder—and more disruptive to the public—than Mr. Uzuegbunam's expression.  In particular, Plaintiffs aver that while Mr. Uzuegbunam "merely spoke loud enough to be heard, using his unaided voice," Doc. 13 ¶ 256, GGC took no action to shut down "a percussion group" playing "its drums and other instruments very loudly, especially as it utilizes amplification" or "music using amplification,"

*id.* ¶¶ 285, 306–07.  Thus, Plaintiffs' allegations, if proven, would show that GGC's prohibition of "fire and brimstone" speech did not turn on whether the expression was "open-air" or confined to "one-on-one conversations," *id.* ¶ 294, but instead on the content of Mr. Uzuegbunam's religious message, *id.* ¶¶ 258–315.

### B.     GGC Has Offered No Adequate Justification For Its Content-Based Restriction On Plaintiffs' Religious Speech But Instead Codified An Unconstitutional Heckler's Veto

Plaintiffs' allegations, if proven, would demonstrate that GGC's content-based restriction of Mr. Uzuegbunam's religious speech does not "satisfy strict scrutiny" because it is not "narrowly tailored to serve a compelling government interest and restrictions based on viewpoint are prohibited."  *Pleasant Grove*, 555 U.S. at 469.  As the Supreme Court explained in *Widmar*, neither seeking to provide a "secular education" nor seeking to avoid an unconstitutional establishment of religion allows a public university or college to impose a content-based exclusion of religious speech from generally available public fora on its campus.  *See* 454 U.S. at 270–77.

Moreover, "[i]n order for the State in the person of school officials to justify prohibition of a particular expression of opinion, it must be able to show that its action was caused by something more than a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint."  *Tinker*, 393 U.S.

at 509.  *See also Coll. Republicans v. Reed*, 523 F. Supp. 2d 1005, 1014 (N.D. Cal. 2007) (quoting *Tinker*, 393 U.S. at 508).  In other words, as a general matter, "[l]isteners' reaction to speech is not a content-neutral basis for regulation." *Forsyth Cty.*, 505 U.S. at 134.[2]

Indeed, "[i]f there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." *Texas v. Johnson*, 491 U.S. 397, 414 (1989); *see also Street v. New York*, 394 U.S. 576, 592 (1969) ("It is firmly settled that under our Constitution the public expression of ideas may not be prohibited merely because the ideas are themselves offensive to some of their

---

[2] This general rule admits of certain exceptions.  Three such exceptions—fighting words, harassing speech that creates a hostile environment, and "true threats"—are particularly important in the context of college speech restrictions. *See, e.g.*, *Chaplinsky v. New Hampshire*, 315 U.S. 568, 572 (1942) (defining fighting words as those which "by their very utterance inflict injury or tend to incite an immediate breach of the peace"); *Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 651 (1999) (establishing liability standards for damages under Title IX based on school district's failure to respond to hostile environment created by student-on-student sexual harassment); *Virginia v. Black*, 538 U.S. 343, 359 (2003) (defining true threats as speech that intends "to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals."). Institutions of higher education have a duty to protect students' physical safety, and the United States recognizes and enforces this important requirement.  20 U.S.C. § 1092; 20 U.S.C. § 1681; 29 U.S.C. § 794; 42 U.S.C. § 2000(d).  But this case, as pled, is not about violence, threats of violence, incitement to violence, or discriminatory harassment.  It is about pure speech, protected by the First Amendment.

hearers.").  "The Supreme Court has held time and again, both within and outside of the school context, that the mere fact that someone might take offense at the content of speech is not sufficient justification for prohibiting it."  *Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200, 215 (3d Cir. 2001).

Accordingly, a public college that restricts speech simply because it might offend some listeners violates the tenet of content neutrality by codifying a "heckler's veto."  *Forsyth Cty.*, 505 U.S. at 135; *Doe v. Univ. of Mich.*, 721 F. Supp. 852, 863 (E.D. Mich. 1989) ("Nor could the University proscribe speech simply because it was found to be offensive, even gravely so, by large numbers of people.").  Indeed, federal courts have repeatedly invalidated college speech codes that adopted heckler's vetoes.  *See Cohen v. San Bernardino Valley Coll.*, 92 F.3d 968 (9th Cir. 1996); *McCauley v. Univ. of the Virgin Islands*, 618 F.3d 232 (3d Cir. 2010).

For example, in *McCauley*, the Third Circuit struck down on First Amendment grounds a public university's code of conduct prohibiting student speech that caused "emotional distress" to listeners.  618 F.3d at 250.  Noting that "emotional distress" is "a very loose concept" that could "mean anything," the Third Circuit held that the policy impermissibly provided "no shelter for core protected speech" and, thus, could lead to a breakdown of intellectual life on campus.  *Id.* at 249–50.  "[M]inority students may feel emotional distress when other students

protest against affirmative action; a pro-life student may feel emotional distress when a pro-choice student distributes Planned Parenthood pamphlets on campus." *Id.* at 251.  The university's policy was "not based on the speech at all" but "on a *listener's reaction to speech*" and therefore violated the First Amendment.  *Id.* (emphasis added).

GGC's sole stated justification for shutting down Mr. Uzuegbunam's religious expression in the Speech Zone fails for precisely the same reason: it rests on "a listener's reaction to speech," not the speech itself.  *Id.*  According to the Complaint, GGC's rationale for its "fire and brimstone" prohibition was that Mr. Uzuegbunam's religious message generated complaints from other people that he was disturbing "their peace and tranquility."  Doc. 13 ¶ 289.  Indeed, the campus police officer explained that "the only reason" he interrupted Mr. Uzuegbunam's speaking "was because GGC officials had received calls from people complaining about his expression."  *Id.* ¶ 271; *see also id.* ¶¶ 268–72, 289–90.

Thus, GGC officials branded Mr. Uzuegbunam's speech as "disorderly conduct" under the Student Code of Conduct because it "disturb[ed] the peace and/or comfort of person(s)."  Doc. 13, Ex. 9 at 26; Doc. 13 ¶¶ 289–90.  This "mere desire to avoid the discomfort and unpleasantness" among listeners is not a compelling government interest, let alone sufficient to justify the content-based restriction of

18

Mr. Uzuegbunam's religious speech. *Tinker*, 393 U.S. at 509. Instead, GGC applied a "heckler's veto" that allowed every listener to become a regulator unto himself and to shut down expression simply because the listener found it "uncomfortable." For this reason alone, GGC's content-based restriction fails strict scrutiny, and Plaintiffs have adequately pleaded claims under the First and Fourteenth Amendments. *See, e.g., id.*; *Forsyth Cty.*, 505 U.S. at 134–35; *Burk v. Augusta-Richmond Cty.*, 365 F.3d 1247, 1258–59 (11th Cir. 2004); *Atlanta Journal & Constitution v. City of Atlanta Dept. of Aviation*, 322 F. 3d 1298, 1305–06 (11th Cir. 2003).

## CONCLUSION

The United States respectfully requests that the Court consider the foregoing in resolving the pending motion to dismiss.

Dated:  September 26, 2017

Respectfully submitted:

/s/ John M. Gore
JOHN M. GORE
Acting Assistant Attorney General

TARA HELFMAN (NY #4586251)
Special Counsel to the Assistant Attorney General
ERIC W. TREENE (NY #2568343)
Special Counsel for Religious Discrimination
Office of the Assistant Attorney General
THOMAS CHANDLER (DC #358010)
Deputy Chief, Appellate Section
SHAHEENA A. SIMONS (CA #225520)
Chief, Educational Opportunities Section
RENEE M. WOHLENHAUS (IA #14194)
Deputy Chief, Educational Opportunities Section
Civil Rights Division
United States Department of Justice
950 Pennsylvania Avenue, NW
Washington, D.C. 20530
Telephone: (202) 514-4092
Facsimile: (202) 514-8337

20

## L.R. 7.1(D) CERTIFICATION

I certify that this brief has been prepared with one of the font and point selections approved by the Court in Local Rule 5.1(C).  Specifically, this brief has been prepared using 14-pt Times New Roman Font.

/s/  Aileen Bell Hughes
AILEEN BELL HUGHES
Assistant U.S. Attorney
Ga. Bar 375505

## CERTIFICATE OF SERVICE

I hereby certify that I have this day filed the foregoing document with the Clerk of Court using the CM/ECF system, which automatically sent counsel of record e-mail notification of such filing.

This 26th day of September, 2017

/s/  Aileen Bell Hughes
AILEEN BELL HUGHES
Assistant U.S. Attorney