# IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

CHIKE UZUEGBUNAM and     *
JOSEPH BRADFORD,     *
    *
      Plaintiffs,     *
    *
      v.     *     1:16-CV-04658-ELR
    *
STANLEY C. PRECZEWSKI, President *
of Georgia Gwinnett College, in his     *
official and individual capacities, et al.,     *
    *
      Defendants.     *
    *

---

# ORDER

---

Presently before the Court are Defendants' Motion to Dismiss and Motion to Dismiss for Mootness. As explained below, because the Court finds that this case is now moot, the Court grants both of Defendants' Motions and dismisses this case.

## I. Background

Plaintiffs Chike Uzuegbunam and Joseph Bradford bring this suit against Defendants Stanley C. Preczewski, Lois C. Richardson, Jim B. Fatzinger, Tomas Jiminez, Aileen C. Dowell, Gene Ruffin, Catherine Jannick Downey, Terrance Schneider, Corey Hughes, Rebecca A. Lawler, and Shenna Perry (collectively, "Defendants") in their individual and official capacities pursuant to 42

U.S.C. § 1983 for violation of Plaintiffs' constitutional rights. As alleged in the 83-page, 470-paragraph First Amended Complaint, at the time of filing this suit, Plaintiffs were students at Georgia Gwinnett College ("GGC"). [Doc. 13]. Defendants each have official roles at GGC; for example, Defendant Preczewski is the President and Defendant Dowell is the Director of the Office of Student Integrity.[1]

As alleged in the First Amended Complaint, in July 2016, Plaintiff Uzuegbunam, while a student at GGC, began distributing religious literature (or leafleting) in a plaza on the GGC campus, and a short time later, Defendant Perry, a Campus Safety/Security Officer for Campus Police, stopped Plaintiff Uzuegbunam and explained that he was not allowed to distribute literature at that location. Upon Plaintiff Uzuegbunam's inquiry, Defendant Downey, the Head of Access Services and Information Commons at GGC, later explained to Plaintiff Uzuegbunam that he could not distribute written materials outside of GGC's two speech areas and that he would need to reserve a speech area before he could distribute his literature.

In August 2016, Plaintiff Uzuegbunam applied for, and was granted, a reservation of the speech area for three separate dates, including August 25, 2016. Thereafter, on August 25, 2016, Plaintiff Uzuegbunam went to the reserved speech area, stood on a stool, verbally shared his religious views, and distributed his

---

[1] While the parties debate whether some Defendants can be held liable in this case, the Court need not address this issue because the case is moot.

religious literature. After approximately thirty minutes, Defendant Hughes, a Lieutenant for Campus Police, informed Plaintiff Uzuegbunam that he could not speak publicly in the area because GGC had received calls from people complaining about Plaintiff Uzuegbunam's expression. Defendant Hughes further explained that Plaintiff Uzuegbunam's speaking constituted "disorderly conduct" because it was disturbing the peace and tranquility of individuals in the area, was in violation of GGC policy, and that if Plaintiff Uzuegbunam continued to speak, he could be prosecuted. Plaintiff Uzuegbunam stopped speaking publicly and left the area.

Plaintiff Bradford desires to engage in similar expressive activities on campus like Plaintiff Uzuegbunam, including literature distribution and public speaking, but claims that Defendants' policies and practices prevent him from doing so.

There were two GGC policies at the time that these events occurred: (1) Prior Speech Zone Policy and (2) Prior Speech Code Policy (collectively, "Prior Policies").[2] These Prior Policies are discussed in detail below, but for background, the Court summarizes the Prior Policies here. The Prior Speech Zone Policy limited public speech to speech zones on campus, which were available only on certain days and times. The Prior Speech Zone Policy did not allow public speech on campus, including leafleting, unless the speaker applied for a reservation with GGC and

---

[2] These Prior Policies are titled, "GGC Freedom of Expression Policy" and "Student Code of Conduct" respectively. However, for consistency, the Court has referred to the Prior Policies using the same language as Plaintiffs.

received permission from GGC to speak in the speech zone. If GGC granted permission, then the speech was regulated to the speech zone at a specific date and time. The Prior Speech Code Policy prohibited behavior which disturbed the peace and/or comfort of persons.

Plaintiffs bring facial and as applied challenges to the Prior Policies, alleging that the Prior Policies violate their freedom of speech and exercise of religion under the First Amendment to the United States Constitution and due process and equal protection under the Fourteenth Amendment. Plaintiffs seek declaratory and injunctive relief as well as damages, as discussed more fully *infra*.

Importantly, after Plaintiffs filed suit against Defendants, GGC amended its Speech Zone and Speech Code Policies. The Court will refer to these amended policies collectively as "Amended Policies" and individually as the "Amended Speech Zone Policy" and "Amended Speech Code Policy."

Defendants move to dismiss Plaintiffs' claims pursuant to Fed. R. Civ. P. 12(b)(6). Defendants also move to dismiss Plaintiffs' claims due to mootness.[3]

## II. Discussion

> It is well established that "[u]nder Article III of the Constitution, federal courts may adjudicate only actual, ongoing cases or controversies." Lewis v. Cont'l Bank Corp., 494 U.S. 472, 477, 110 S.Ct. 1249, 1253, 108 L.Ed.2d 400 (1990). At a minimum, this

---

[3] The United States filed a Statement of Interest arguing that the Prior Policies violated Plaintiffs' constitutional rights. [Doc. 37]. Importantly, however, the United States specifically stated that it "does not advance any position as to whether Plaintiffs' claims are moot," on which the Court's opinion turns. [Id. at 9].

requirement means that "a litigant must have suffered, or be threatened with, an actual injury traceable to the defendant and likely to be redressed by a favorable judicial decision." Id. at 477, 110 S.Ct. at 1253. Moreover, this "actual controversy must be extant at all stages of review, not merely at the time the complaint is filed." Arizonans for Official English v. Arizona, 520 U.S. 43, 67, 117 S.Ct. 1055, 1068, 137 L.Ed.2d 170 (1997) (quoting Preiser v. Newkirk, 422 U.S. 395, 401, 95 S.Ct. 2330, 2334, 45 L.Ed.2d 272 (1975)). As a result, the Supreme Court has routinely cautioned that a case becomes moot "if an event occurs while a case is pending on appeal that makes it impossible for the court to grant 'any effectual relief whatever' to a prevailing party." Church of Scientology of Cal. v. United States, 506 U.S. 9, 12, 113 S.Ct. 447, 449, 121 L.Ed.2d 313 (1992) (quoting Mills v. Green, 159 U.S. 651, 653, 16 S.Ct. 132, 133, 40 L.Ed. 293 (1895)). Thus, even a once-justiciable case becomes moot and must be dismissed "when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." Powell v. McCormack, 395 U.S. 486, 496, 89 S.Ct. 1944, 1951, 23 L.Ed.2d 491 (1969).

Flanigan's Enters. Inc. of Georgia v. City of Sandy Springs, Ga., 868 F.3d 1248, 1255 (11th Cir. 2017) (hereinafter "Flanigan's").

In supplemental responses filed by the parties, there is no dispute that Plaintiff Uzuegbunam graduated from GGC in August 2017. Therefore, there is no reasonable expectation that he will be subjected to the same alleged injury again, such that the Court could grant him declaratory or injunctive relief, and as a result, his claims for declaratory and injunctive relief are moot. Adler v. Duval Cty. Sch. Bd., 112 F.3d 1475, 1478 (11th Cir. 1997) (upon graduation from high school, students' claims for a violation of their First and Fourteenth Amendment rights

became moot).  Plaintiffs acknowledge as much.  Pls.' Resp. in Opp'n to Defs' Suppl. Br. at 1 [Doc. 40].

Therefore, as to Plaintiff Bradford only, first, the Court must determine whether GGC's amendments to the Prior Speech Zone and Prior Speech Code Policies have rendered Plaintiff Bradford's claims for declaratory judgment and injunctive relief moot.  See Flanigan's, 868 F.3d at 1255.  Then, if these claims are moot, the Court must determine whether Plaintiffs' claim for damages will save this case.  See id.

## A. Declaratory and Injunctive Relief

As noted above, a case generally becomes moot when the issues are no longer "live or the parties lack a legally cognizable interest in the outcome."  Id. (quotation omitted).  This may result when "subsequent events made it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur."  Id. (quotation omitted).  "[I]ntervening events will render a case moot only when [the Court has] 'no reasonable expectation that the challenged practice will resume after the lawsuit is dismissed.'"  Id. at 1255-56 (quoting Jews for Jesus, Inc. v. Hillsborough Cty. Aviation Auth., 162 F.3d 627, 629 (11th Cir. 1998)) (further quotation omitted).  "The key inquiry in this mootness analysis therefore is whether the evidence leads [the Court] to a reasonable expectation that [Defendants] will

reverse course and reenact the allegedly offensive portion of its [Prior Policies] should this Court grant [Defendants'] motion to dismiss." Id. at 1256.

In conducting this mootness analysis, the Court considers three broad factors as follows:

> First, [the Court] ask[s] whether the change in conduct resulted from substantial deliberation or is merely an attempt to manipulate [the Court's] jurisdiction. Thus [the Court] will examine the timing of the repeal, the procedures used in enacting it, and any explanations independent of this litigation which may have motivated it. Second, [the Court] ask[s] whether the government's decision to terminate the challenged conduct was "unambiguous." This requires [the Court] to consider whether the actions that have been taken to allegedly moot the case reflect a rejection of the challenged conduct that is both permanent and complete. Third, [the Court] ask[s] whether the government has consistently maintained its commitment to the new policy or legislative scheme. When considering a full legislative repeal of a challenged law—or an amendment to remove portions thereof—these factors should not be viewed as exclusive nor should any single factor be viewed as dispositive. Rather, the entirety of the relevant circumstances should be considered and a mootness finding should follow when the totality of those circumstances persuades the court that there is no reasonable expectation that the government entity will reenact the challenged legislation.

Id. at 1257 (citation omitted).[4]

While some of the language quoted above refers specifically to government legislation, which is not at issue here, intervening governmental action need not rise to the level of legislation for this mootness analysis to apply. Id. at 1256. "Indeed, even where the intervening governmental action does not rise to the level of a full

---

[4] The parties debate who has the burden of proof in this analysis. The Court need not decide this issue because even if Defendants have the burden, they have met it.

legislative repeal," court have held that "'a challenge to a government policy that has been unambiguously terminated will be moot in the absence of some reasonable basis to believe that the *policy* will be reinstated if the suit is terminated.'" Id. (quoting Troiano v. Supervisor of Elections, 382 F.3d 1276, 1285 (11th Cir. 2004) (emphasis added)); see Harrell v. The Fla. Bar, 608 F.3d 1241, 1266 (11th Cir. 2010) (applying the same reasonable basis standard even where the government action at issue falls "short of so weighty a legislative act"); Students for Life USA v. Waldrop, 90 F. Supp. 3d 1265, 1271 (S.D. Ala. 2015) (applying this mootness analysis to a state university policy).

The Court now turns to apply these foregoing principles to the facts of this case to determine whether the totality of the circumstances indicates that there is a reasonable expectation that GGC will reenact or reinforce the Prior Speech Zone and Prior Speech Code Policies. In conducting this analysis, the Court will rely on two affidavits presented by Defendants. First is the Affidavit of Defendant Dowell, who is the Director of Student Integrity at GGC. Dowell Aff. at ¶ 2 [Doc. 21-2]. Defendant Dowell is "responsible for implementing programmatic and policy changes, supervising the Office of Student Integrity staff, and adjudicating all disciplinary and non-disciplinary infractions for GGC, including academic integrity violations, disorderly conduct, etc." Id. at ¶ 3. Second is the Affidavit of Marc

Cadinalli, who is the Executive Director of Legal Affairs at GGC. Cardinalli Aff. at ¶ 2 [Doc. 21-3].

### 1. Substantial Deliberation

As for the first factor, substantial deliberation, both Defendant Dowell and Mr. Cardinalli state in their affidavits that "[o]n February 28, 2017, the GGC Cabinet approved revisions to GGC's Freedom of Expression Policy [Prior Speech Zone Policy], as well as revisions to the Student Code of Conduct Section [Prior Speech Code Policy] in the GGC Student Handbook for 2016-2017." Dowell Aff. at ¶ 4; Cardinalli Aff. at ¶ 3. While these statements at a minimum inform the Court that there is a GGC Cabinet and the revisions to the Prior Policies were approved by that Cabinet, it is unclear what deliberation may have occurred. Importantly, however, there is no allegation or evidence to suggest that GGC acted in secrecy or departed from its own procedures, such that the Court has "pause about the level of deliberation attending a change in policy." Flanigan's, 868 F.3d at 1260 (citing to cases where policy was changed in secrecy behind closed doors and where the governmental actors departed from their own procedures).

The Court also considers the timing of the changes to the Prior Policies. Plaintiffs filed suit on December 19, 2016. GGC changed the Prior Policies on February 28, 2017, or approximately 10 weeks later. Such a quick change to the

Prior Policies, while not dispositive, counts in Defendants' favor.[5]  See id. at 1259-60 (timing was not dispositive but finding case was moot when repeal occurred three years into the litigation after the appellate court agreed to hear the case en banc); Nat'l Advert. Co. v. City of Miami, 402 F.3d 1329, 1331 (11th Cir. 2005) (finding controversy was moot where city began process of amending its regulations ten months after litigation began); Jews for Jesus, Inc., 162 F.3d at 629 (finding case was moot where policy was changed one month after the commencement of the lawsuit).

The motivation for GGC's changes to its Prior Policies is unclear.  While motivation is a consideration, it is not dispositive nor the Court's focus.  Nat'l Advert. Co., 402 F.3d at 1334.  Rather, the most important inquiry is whether the Court believes that GGC will reenact the Prior Policies.  Id.  Because the Court ultimately concludes based on the totality of the circumstances that GGC will not reenact these Prior Policies, discussed *infra*, the Court need not dwell on GGC's motivation.  Id. at 1331 n.3.

---

[5] Plaintiffs argue that the delay was actually much longer because GGC was aware at least in 2013 that its Prior Policies were unconstitutional, having received a letter from Plaintiffs' counsel at that time.  As Defendants argue, this may have been a routine letter from Plaintiffs' counsel, evidenced by the fact that it refers to "ABAC," an acronym for Abraham Baldwin Agricultural College, rather than GGC. [Doc. 1-16, at 3].  Moreover, under Plaintiffs' theory, anytime counsel sends a demand letter suggesting that policies are unconstitutional, the recipient would be required to change its policies immediately.

## 2. Unambiguous Change to Prior Policies

Next, the Court considers whether GGC's changes to its Prior Policies are "plainly an unambiguous termination of the challenged conduct." Flanigan's, 868 F.3d at 1261.

### i. Termination of Challenged Conduct

> [W]hen an ordinance is repealed by the enactment of a superseding statute, then the 'superseding statute or regulation moots a case only to the extent that it removes challenged features of the prior law. To the extent that those features remain in place, and changes in the law have not so fundamentally altered the statutory framework as to render the original controversy a mere abstraction, the case [is] not moot.'

Coal. for the Abolition of Marijuana Prohibition v. City of Atlanta, 219 F.3d 1301, 1310 (11th Cir. 2000) (quoting Naturist Soc., Inc. v. Fillyaw, 958 F.2d 1515, 1520 (11th Cir. 1992)). "If the repeal is such that the allegedly unconstitutional portions of the [challenged] ordinance no longer exist, the appeal is rendered moot because any decision [the Court] would render would clearly constitute an impermissible advisory opinion." Tanner Advert. Grp., L.L.C. v. Fayette Cty., GA, 451 F.3d 777, 790 (11th Cir. 2006) (quotation omitted) (alteration in original). Therefore, the Court must examine whether the features of the Prior Policies – challenged by Plaintiffs – have been substantially altered by the Amended Policies. Coal. for the Abolition of Marijuana Prohibition, 219 F.3d at 1312. In other words, the Court examines whether the alleged constitutional violations of which Plaintiffs originally

complained in the Prior Policies will continue with the enforcement of the Amended Policies. Id. at 1315.

## 1. Speech Zone Policy

The Prior Speech Zone Policy applied to students, like Plaintiffs, and the non-GGC community. Prior Speech Zone Policy at 1 [Doc. 13-3]. It identified "free speech expression areas" on campus and limited the availability of these areas to certain hours and days. Id. at 2. GGC reserved the right to modify the speech areas, and the Policy allowed for other areas and times to be authorized, upon written request. Id. A designated GGC official was responsible for authorizing the use of the free speech expression area and the reservation. Id. The Prior Speech Zone Policy set forth a reservation procedure. Id. An individual was required to submit to a GGC official a specific form at least three business days prior to the requested use of the area and attach any publicity materials to their form. Id. The Prior Speech Zone Policy then listed fifteen criteria that must be met for GGC to authorize the speech, event, or demonstration. Id. at 3-5. An individual could also appeal the GGC official's decision regarding authorization to the Dean of Students. Id. at 2. Individuals "failing to comply with the [Prior Speech Zone Policy] may be asked to leave." Id. at 5. In short, if individuals wanted to engage in public speech on campus, including leafleting, they had to receive authorization from GGC, and

upon approval, their speech would then be limited to the assigned speech area at a certain time of day.

The Amended Speech Zone Policy provides as follows:

> This policy in no way prohibits members of the GGC community from engaging in conversations on campus and does not apply to College-sponsored activities or classroom instruction or participation, but rather only establishes as designated public forums certain outdoor areas of GGC's campus and sets forth requirements for forum reservations in the following limited circumstances: (1) members of the GGC community who plan an event with 30 or more persons; and, (2) individuals or groups who are not members of the GGC community who wish to speak on GGC's campus. By placing reasonable limitations on time, place, and manner of speech, GGC does not take a position on the content or viewpoint of the expression, but allows for a diversity of viewpoints to be expressed in an academic setting.

Amended Speech Zone Policy at 1 [Doc. 21-2].

The Amended Speech Zone Policy further provides that for GGC community members "who plan to engage in expressive activity on campus in a group that is expected to consist of 30 or more persons" or individuals who are not enrolled or employed at GGC, individuals are required to submit a reservation request form to GGC two business days prior to the speech. Id. at 2. GGC officials must respond to the request within one business day of receipt of the request. Id. at 2-3. A denial of the request is appealable to GGC's Senior Vice President for Academic and Student Affairs and Provost, and these officials or their designee must respond to the appeal within one business day. Id. at 3. The individual must attach any written materials

in connection with the speech to the reservation request form. Id. The Amended Speech Zone Policy provides that GGC "may not deny any request to distribute written materials based on the content or viewpoint of the expression." Id. The Amended Speech Zone Policy further states that a GGC official may only deny a reservation request for seven specific reasons, summarized as follows: (1) the form is not fully completed; (2) the form contains a material falsehood or misrepresentation; (3) the area has been previously reserved, in which case, an alternate location, date or time will be provided; (4) the speech would conflict or disturb previously planned programs by GGC; (5) the area is not large enough to accommodate the group, in which case GGC will provide an alternate location to safely accommodate the applicant if the applicant is a member of the GGC community; (6) the speech intended would present a danger to the applicant, GGC community, or the public; and (7) the speech is prohibited by law or GGC policy. Id. at 3-4. The Amended Speech Zone Policy further provides that "[w]hen assessing a reservation request, the Student Affairs official must not consider or impose restrictions based on the content or viewpoint of the expression." Id. at 4. If the reservation request is granted, the Amended Speech Zone designates two zones as the GGC public forums, and makes these areas available from 9:00 a.m. to 7:00 p.m., Monday through Friday, provided that the area is not already reserved. Id. at 1.

Additionally, the Amended Speech Zone Policy sets forth that if a GGC community member attracts a group of 30 or more persons while engaged in the expressive activity, a representative from the group is to provide GGC with as much notice as possible. Id. at 2. GGC reserves the right to direct the group to an available area of campus to provide for safety and crowd control and limit disruption to GGC operations. Id.

The Amended Speech Zone Policy specifically states that GGC community members may distribute non-commercial pamphlets and other written materials "on a person-to-person basis in open outdoor areas of the campus." Id. at 4. In short, the Amended Speech Zone Policy provides that students may speak on campus and distribute literature on a person-to-person basis in open outdoor areas of the campus. Prior reservations to speak and the limiting of that speech to the speech areas are only required for GGC community members who plan to speak in a group expected to consist of 30 or more persons or by non-GGC community members.

In order for the changes to the Prior Policies to moot the issues presented by Plaintiffs, the "'gravamen of [Plaintiffs'] complaint' must have been changed in some fundamental respect." Coal. for the Abolition of Marijuana Prohibition, 219 F.3d at 1311 (quoting Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville, Fla., 508 U.S. 656, 662 (1993)). The gravamen of Plaintiffs' First Amended Complaint is that Plaintiffs want to distribute religious literature and

exclaim their religious beliefs anywhere on campus at any time, without first having

to obtain a permit. See Pls.' First Am. Compl. at ¶ 2 (Prior Policies restrict all

speech to two small areas of campus, prohibit students from speaking on campus

spontaneously, and require students to obtain a permit before engaging in expressive

activity). As a student,[6] Plaintiff Bradford wants to engage in spontaneous speech

and spontaneous leafleting. Pls.' Resp. to Defs.' Mot. to Dismiss for Mootness at

23. [Doc. 27]. This is now allowed under the Amended Speech Zone Policy, and

thus, the gravamen of Plaintiffs' First Amended Complaint has been changed in a

fundamental respect.[7] See Jews for Jesus, Inc., 162 F.3d at 629 (finding case was

moot where "the airport's change of policy has already given Jews for Jesus the

relief they seek—the ability to distribute literature at the airport—and there is

---

[6] The Amended Speech Zone Policy provides that an "individual who is not a member of the GGC community may only distribute written materials within the Public Forum Areas and only during the time in which the individual has reserved Public Forum Area." Amended Speech Zone Policy at 4-5. However, Plaintiffs' First Amended Complaint is based on their positions as students, and they have not argued the Prior Policies' constitutionality with respect to non-GGC community members, including Plaintiff Uzuegbunam's status as a non-GGC community member upon his graduation.

[7] Plaintiffs spend considerable time attacking the Amended Speech Zone Policy as unconstitutional. Importantly, the Court refrains from deciding whether the changes to the Prior Policies "would nullify *any* potential constitutional infirmities in the" Amended Policies. Nat'l Advert. Co., 402 F.3d at 1335 (emphasis in original). Instead, the Court holds that the changes to the Prior Policies "rendered all the complaints raised by [Plaintiffs] in this suit moot. Whatever defects may remain in the [Amended Policies] are not properly before [the Court] and [the Court] do[es] not address them." Id. The Court is mindful of the restraint it must exercise, such that it must "generally decline to pass on the constitutionality of [policies] unless 'as a necessity in the determination of real, earnest, and vital controversy between individuals.'" Flanigan's, 868 F.3d at 1269 (quoting Ashwander v. Tennessee Valley Auth., 297 U.S. 288, 346 (1936)). "It is not the habit of the court to decide questions of a constitutional nature unless absolutely necessary to a decision of the case." Ashwander, 297 U.S. at 347. Rendering opinions on whether all parts of the Amended Policies are constitutional are not "absolutely necessary" to a decision of this case.

therefore no meaningful relief left for the court to give. The only remaining issue is whether the airport's policy was constitutional—which, at this stage, is a purely academic point.").

## 2. Speech Code Policy

The Prior Speech Code Policy which Plaintiffs challenged prohibited "behavior which disrupts the peace and/or comfort of person(s)." Prior Speech Code Policy at 23 [Doc. 13-15]. The Amended Speech Code Policy deletes this provision entirely, making no reference to behavior that might disturb the peace. Once again, the gravamen of Plaintiffs' First Amended Complaint has been changed in a fundamental respect.

### ii. Ambiguity

Because the Court finds that the challenged conduct has been terminated by the Amended Policies, the Court must now examine whether that termination is unambiguous. First, GGC has assured the Court that it has no intention of reenacting the Prior Policies. In her affidavit, Defendant Dowell states that "GGC has no intention of returning to or enforcing the former policies." Dowell Aff. at ¶ 14; see Flanigan's, 868 F.3d at 1262-63 (finding strong evidence of mootness from the defendant's representation in filings with the court that it disavowed any intent to adopt the challenged regulation in the future or reenact it); Coral Springs St. Sys., Inc. v. City of Sunrise, 371 F.3d 1320, 1332–33 (11th Cir. 2004). Second, rather

than keep the Prior Policies in place, GGC has fundamentally changed them, including for the Prior Speech Code Policy, removing the challenged portion altogether. See Flanigan's, 868 F.3d at 1261. Third, Defendant Dowell states that the Amended Policies are available to the public and have been published on GGC's website. Dowell Aff. at ¶14; cf. Flanigan's, 868 F.3d at 1262-63 (finding mootness based in part on the defendant's public commitment not to reenact the repealed provision).

Plaintiffs argue that Defendants have continued to defend the Prior Policies, including in this litigation and by filing a motion to dismiss. However, this is "weak evidence," at best, that the changes were ambiguous and GGC will return to the Prior Policies. Flanigan's, 868 F.3d at 1262. Instead, GGC's actions in changing the Prior Policies and proclaiming that it has no intention of returning to them suggests an unambiguous termination from which the Court is "unable to draw a reasonable expectation that [GGC] will reenact the challenged [Prior Policies]." Id.

### 3. Commitment to the Amended Policies

The Court next considers whether GGC has maintained its commitment to the Amended Policies. GGC adopted the Amended Policies over a year ago, on February 28, 2017. Plaintiffs have not presented any evidence that GGC has changed the Amended Policies or reenacted or enforced the Prior Policies. In addition, GGC has taken actions to implement the Amended Policies. Mr.

Cardinalli states in his affidavit that legal counsel for the Georgia Board of Regents has provided GGC employees with four training sessions on the Prior Speech Zone Policy. Cardinalli Aff. at ¶ 5. He further states that approximately forty-nine GGC employees attended this training, including employees from offices and departments encompassing Defendants. Id. at ¶ 6. See Troiano, 382 F.3d at 1285 (government official consistently followed new policy and took actions to implement it). Additionally, Mr. Cardinalli states that "[a]dditional training will be on-going as needed." Cardinalli Aff. at ¶ 8. All of this, together with GGC's stated intention of not returning to or enforcing the Prior Policies, sufficiently show GGC's commitment to the Amended Policies. Flanigan's, 868 F.3d at 1262-63.

After consideration of all of these factors and viewing the totality of the circumstances, the Court finds that GGC has unambiguously terminated the Prior Policies and there is no reasonable basis to expect that it will return to them. See id. at 1263; Jews for Jesus, Inc., 162 F.3d at 629. Therefore, Plaintiff Bradford's claims for injunctive and declaratory relief are moot.

## B. Nominal Damages

Having found that Plaintiffs' claims for declaratory and injunctive relief are moot, the Court must now determine whether Plaintiffs' remaining claim for damages is sufficient to support standing and save this case. Plaintiffs argue that the Court may still render an opinion on the Prior Policies and whether they violated

Plaintiffs' constitutional rights because Plaintiffs have alleged damages. Defendants argue that Plaintiffs have only prayed for nominal damages and attorneys' fees, and neither is sufficient to save this case from being dismissed as moot. Plaintiffs argue in response that they pleaded in their First Amended Complaint for an award of monetary damages and for damages in an amount to be determined by the evidence and the Court. Plaintiffs assert that the Court must construe their First Amended Complaint broadly for a claim of actual, compensatory damages.

Plaintiffs are correct that in several instances in their First Amended Complaint they request "monetary damages and equitable relief." First Am. Compl. at ¶¶ 417-418, 434-435, 450-451, 469-470. However, monetary damages can encompass both compensatory and nominal damages. Quinlan v. Pers. Transp. Servs. Co., 329 F. App'x 246, 249 (11th Cir. 2009) (defining monetary damages to include compensatory or punitive damages); Virdi v. DeKalb Cty. Sch. Dist., 216 F. App'x 867, 873 (11th Cir. 2007) (finding request for monetary damages to include nominal damages). Throughout their First Amended Complaint, Plaintiffs do not elaborate on the type of damages they seek. Instead, the only place where they specify the type of damages sought is in their Prayer for Relief, as follows: "Nominal damages for the violation of Plaintiffs' First and Fourteenth Amendment rights from the Defendants sued in their individual capacities." First Am. Compl. at 79, ¶ G. Thus, in their Prayer for Relief, wherein they set forth the exact relief they

20

seek including an injunction and declaratory relief, Plaintiffs specify that they are seeking nominal damages.

Furthermore, Plaintiffs' after-the-fact contentions now – that they are seeking compensatory damages – are not supported by the First Amended Complaint. "[C]ompensatory damages in a § 1983 suit [must] be based on actual injury caused by the defendant rather than on the 'abstract value' of the constitutional rights that may have been violated." Slicker v. Jackson, 215 F.3d 1225, 1230 (11th Cir. 2000). Plaintiffs do not allege in their First Amended Complaint that they suffered an actual injury, and instead, they plead that their constitutional rights have been violated.[8] Plaintiffs argue that they pleaded in their First Amended Complaint that they were entitled to "damages in an amount to be determined by the evidence and this Court" and "[a]ll other further relief to which Plaintiffs may be entitled." First Am. Compl. at ¶¶ 418, 435, 451, 470, I. However, such blanket statements do not automatically lend themselves to a claim for compensatory damages and instead

---

[8] For example, in the context of a § 1983 case, such as this one, compensatory damages can encompass monetary loss, physical pain and suffering, mental and emotional distress, impairment of reputation, and personal humiliation. Slicker, 215 F.3d at 1231. Plaintiffs have alleged no such injuries. Instead, Plaintiffs mention an "injury" two times in their First Amended Complaint, and neither time do they set forth any facts that would support a compensatory damages claim. See First Am. Compl. at ¶ 6 ("In taking these actions, [Defendants] implemented the challenged GGC policies, violated Mr. Uzuegbunam's constitutional rights, and inflicted irreparable injury upon him."); ¶ 368 ("Unless the policies and conduct of Defendants are enjoined, Mr. Uzuegbunam and Mr. Bradford will continue to suffer irreparable injury.").

could also support a claim for nominal damages.  See Flanigan's, 868 F.3d at 1254 n.3.

Thus, the Court concludes that upon viewing Plaintiffs' First Amended Complaint in its entirety, Plaintiffs only sought nominal damages, rather than compensatory damages.  To find otherwise would require ignoring Plaintiffs' own Prayer for Relief.  Even construing Plaintiffs' First Amended Complaint in their favor, the Court cannot stretch or interpret a complaint to find allegations or relief that are not there.

In this particular case, where Plaintiffs' constitutional challenges to the governmental policies are now moot, where the Court can grant Plaintiffs no practical relief in the form of an injunction or a declaratory judgment, and where Plaintiffs did not plead for compensatory damages, the lone remaining claim of nominal damages is insufficient to save this otherwise moot case.  Flanigan's, 868 F.3d at 1264-70.[9]

Plaintiffs argue that the United States Court of Appeals for the Eleventh Circuit in Flanigan's left open the possibility that a claim for nominal damages will not moot a case and can still be adjudicated, even where other claims are moot. While such an exception may be true, this case is not the exception.  Instead, this

---

[9] Additionally, Plaintiffs seek attorneys' fees pursuant to 42 U.S.C. § 1988, but this is insufficient to create a case or controversy.  See Flanigan's Enters. Inc. of Georgia, 868 F.3d at 1263 n.11.

case is akin to Flanigan's, and therefore, Plaintiffs' sole claim for nominal damages will not sustain this case.

First, this case is strikingly similar to Flanigan's. In Flanigan's, the plaintiffs challenged a municipal ordinance, alleging that the ordinance violated their First Amendment and Fourteenth Amendment rights. 868 F.3d at 1253-54; see also Flanigan's Enters. Inc. v. City of Sandy Springs, GA, No. 1:13-CV-03573-HLM, 2014 WL 12685907, at *3 (N.D. Ga. Oct. 20, 2014). The plaintiffs sought declaratory and injunctive relief, striking down the ordinance as unconstitutional and permanently enjoining its enforcement. Flanigan's, 868 F.3d at 1254. They also specifically requested an award of nominal damages, and they did not seek compensatory damages. Id. at 1254, 1263 n.11, 1265. The Eleventh Circuit Court of Appeals found that the claims for declaratory and injunctive relief were moot after the challenged ordinance was repealed. Id. at 1255-63.

The remaining claim was for nominal damages, and the Eleventh Circuit held that such a lone prayer for nominal damages was insufficient to sustain the case. Id. at 1263-1270. The appellate court determined that because the challenged ordinance had been repealed with no likelihood of reenactment, the plaintiffs had received all the relief that they had requested. Id. at 1264. Thus, the appellate court could offer the plaintiffs no practical remedy that would affect the rights or obligations of the parties. Id. The availability of a practical remedy is a prerequisite to Article III

jurisdiction, and therefore, because no such remedy was available, the plaintiffs could not proceed before the court on a claim solely for nominal damages. Id. at 1264, 1270.

The same is true here. Plaintiffs contend that the Prior Policies violated their First and Fourteenth Amendment rights. They sought declaratory and injunctive relief, along with nominal damages, and they did not seek compensatory damages. The Court has found that Plaintiff Uzuegbunam's claims for declaratory and injunctive relief are moot because he has graduated from GGC. The Court has also found that Plaintiff Bradford's claims for declaratory and injunctive relief are moot because GGC has unambiguously terminated the Prior Policies and there is no reasonable basis to expect that GGC will return to them. As explained above, a fair reading of Plaintiffs' First Amended Complaint reveals that all of their alleged injuries would be remedied by the removal of the Prior Policies. See Flanigan's, 868 F.3d at 265. The Prior Policies have been removed with no reasonable basis to believe that GGC will reenact them. As a result, there is no practical remedy for this Court to offer Plaintiffs. See id. at 1264. "There is simply nothing left for [the Court] to do." Id. at 1265. Just as in Flanigan's, the only redress the Court could possibly offer Plaintiffs is "judicial validation, through nominal damages, of an outcome that has already been determined," and perhaps joy in seeing the Court vindicate their cause. 868 F.3d at 1268. Yet, "absent an accompanying practical

effect on the legal rights or responsibilities of the parties[, the Court is] without jurisdiction to give them that satisfaction." Id. Finally, any opinion the Court would render now on the constitutionality of the Prior Policies would be an impermissible advisory one. Id. The Prior Policies, and with them, the necessity of deciding their constitutionality, "has ceased to exist and [are] now no more real than any other hypothetical statute on which the federal courts should routinely decline to pass judgment." Id. at 1269. As well stated in Flanigan's, to allow Plaintiffs' remaining claim for nominal damages to sustain this case would result in a manipulation of the jurisdiction of the Court, a circumvention of the mootness doctrine, and a requirement that the Court decide a case that could have no practical effect on the legal rights or obligations of the parties. 868 F.3d at 1270.

Second, contrary to Plaintiffs' arguments, this case does not present the exceptions discussed or contemplated in Flanigan's. In these exceptional cases, a live controversy existed regarding compensatory damages throughout the entire litigation or an award of nominal damages would have a practical effect on the parties' rights or obligations. Id. at 1263-67, n.18, 1270, n.23. This case presents neither of those situations.[10]

---

[10] To the extent there are any other exceptions or the Eleventh Circuit wants to create an exception for this case, those are matters for the Eleventh Circuit to decide. This Court is bound by precedent in Flanigan's and finds that this case is moot pursuant to this precedent.

Therefore, the Court concludes that Plaintiffs' "prayer for nominal damages will not save the case from dismissal." Id. at 1264.[11]

## III. Conclusion

For the foregoing reasons, the Court **GRANTS** Defendants' Motion to Dismiss for Mootness [Doc. 21]; **GRANTS** Defendants' Motion to Dismiss [Doc. 18]; **DENIES** Plaintiffs' Motion for Oral Argument [Doc. 35]; and **DISMISSES WITHOUT PREJUDICE** this case.

**SO ORDERED**, this _25th_ day of May, 2018.

Eleanor L. Ross
United States District Judge
Northern District of Georgia

---

[11] In their Response in Opposition to Defendants' Supplemental Brief, while Plaintiffs maintain that their case should not be dismissed, they assert that any dismissal must be without prejudice and they request leave to amend if the Court deems it necessary. The Court denies Plaintiffs' request for leave to amend. Burgess v. Religious Tech. Ctr., Inc., 600 F. App'x 657, 665 (11th Cir. 2015) ("We repeatedly have held that plaintiffs cannot amend their complaint through a response to a motion to dismiss . . . our precedent is clear: the proper method to request leave to amend is through filing a motion, and such motion for leave to amend should either set forth the substance of the proposed amendment or attach a copy of the proposed amendment."); Rosenberg v. Gould, 554 F.3d 962, 967 (11th Cir. 2009) ("Where a request for leave to file an amended complaint simply is imbedded within an opposition memorandum, the issue has not been raised properly."). For the reasons stated herein, the Court will dismiss Plaintiffs' claims without prejudice but need not go as far as to direct Plaintiffs to file a motion for leave to amend. Quinlan, 329 F. App'x at 250 (court did not have to give the plaintiff an opportunity to amend where the court dismissed the complaint without prejudice). It is up to Plaintiffs to decide how to litigate their case.