**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | | |
|---|---|---|
| **CHIKE UZUEGBUNAM and** | ) | |
| **JOSEPH BRADFORD,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| **v.** | ) | **Civil Action No.:** |
| | ) | **1:16-cv-04658-ELR** |
| **STANLEY C. PRECZEWSKI, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| _____ | ) | |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'**
**MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT**

## I.    INTRODUCTION

This case arises from Plaintiff Chike Uzuegbunam's challenges to the

constitutionality of Georgia Gwinnett College's former Speech Policy and

Disorderly Conduct Policy.  GGC revised both policies early on in the case, only

two months into the litigation.  As a result, this Court has previously dismissed

Uzuegbunam's requests for injunctive and declaratory relief as moot.

Now all that remains is his request for nominal damages.  However, as

explained in more detail below, that request should be dismissed too.  GGC's

revisions to the former policies render Uzuegbunam's facial and overbreadth

challenges moot.  And qualified immunity bars his First Amendment claims

because he cannot show that, at the time of the alleged violations, the law was

"clearly established" that the GGC officials violated his constitutional rights.

1

Additionally, he has failed to adequately plead an equal protection claim because he has failed to identify any comparators that were "similarly situated" to him in all material respects.

However, Uzuegbunam's claims suffer from an even more fundamental problem: they are moot under Article III. On January 19, 2022, the GGC officials sent Uzuegbunam a check for nominal damages, or one dollar. By doing so, the GGC officials unequivocally delivered to him the only relief he is entitled to recover in this case: nominal damages. This remittance of complete relief moots Uzuegbunam's claims because he retains no personal interest in the outcome of the litigation and this Court is left with no means of redressing his alleged harms.

For all of these reasons, this Court should dismiss Uzuegbunam's First Amended Complaint.

## II.    STATEMENT OF FACTS

For the purpose of this motion, the allegations in the First Amended Complaint are accepted as true. Those allegations show the following:

### A.    GGC's Former Speech Policy

The purpose of GGC's former Speech Policy was to "provid[e] a forum for free and open expression of divergent points of view by students, student organizations, faculty, [and] staff and visitors," while simultaneously fostering a "secure learning environment which allows members of the community to express their views in ways which do not disrupt the operation of the College." Doc. 13-3

2

at 1.  To that end, the former policy provided two speech areas[1] on campus for

"speeches, gatherings, distribution of written materials, and marches."  *Id.* at 1.

The former policy applied only to these types of public expression, and not to one-

on-one conversations between individuals.  *Id.* at 2.

The speech areas were available eighteen hours each week "from 11:00 a.m.

to 1:00 p.m. and 5:30 p.m. to 7:30 p.m., Monday through Thursday, and 11:00 a.m.

to 1:00 p.m. on Friday."  *Id.*  Individuals were allowed to use the speech areas at

least once every thirty days.  *Id.*  To use the speech areas, individuals were

required to submit a "free speech form," along with any publicity materials, to a

designated Student Affairs official three business days in advance.  Doc. 13-3 at 2.

Authorization of the "speech, event or demonstration" was contingent on

compliance with fifteen different criteria and requirements, one of which was that

"[d]isorderly conduct is prohibited."  *Id*. at 3-5.  Additionally, as the former policy

expressly stated, requests would be granted "in accordance with the principle of

content neutrality" to "allow[] for a diversity of viewpoints to be expressed."  *Id.* at

1-2.

---

[1] The speech areas were located in "the concrete area/walkway between Student Housing and the Student Center," and the concrete area in front of the Food Court. Doc. 13-3 at 2.

3

**B.    GGC's Former Disorderly Conduct Policy**

GGC regulates its students' conduct through a Student Code of Conduct that is set forth in its Student Handbook.  Doc. 13-9.  The Student Code of Conduct prohibits students from, *inter alia*, engaging in disorderly conduct, and—in the former version at issue here—listed thirteen examples of such conduct.  *Id.* at 26.  The first example of disorderly conduct (that was removed during the revisions) was "behavior which disturbs the peace and/or comfort of person(s)."  *Id.*  When determining whether a student has engaged in disorderly conduct, the Student Code of Conduct required GGC officials to apply First Amendment principles of free speech:

> In recognition and support of the First Amendment of the United States Constitution, freedom of expression and academic freedom shall be considered in investigating and reviewing these types of alleged conduct violations.

*Id.* at 27.

**C.    Uzuegbunam's Speech**

Uzuegbunam is an evangelical Christian who, at the time of the incidents in question, was a GGC student.  In late July 2016, Uzuegbunam distributed religious literature to the pedestrian traffic outside of the GGC library.  Doc. 13 at ¶¶ 204, 206-207.  It is undisputed that this area was not a speech area and that Uzuegbunam had not submitted a request to distribute the literature.  *Id.* at ¶¶ 220, 228.  As a result, Defendant Shenna Perry (a Campus Safety/Security Officer for

4

Campus Police at GGC) approached him and asked him to stop, explaining that he was "not allowed to distribute religious literature at that location."  *Id.* at ¶¶ 98, 216.

Officer Perry then instructed Uzuegbunam to come inside the library and speak with Defendant Catherine Jannick Downey (Head of Access Services and Information Services at GGC) to learn about the former Speech Policy.  *Id.* at ¶¶ 79, 217.  Inside the library, Defendant Downey pulled the former policy up on her computer, explained it to Uzuegbunam, and "confirmed" that he could not distribute his religious literature outside of the library.  *Id.* at ¶¶ 219, 221.  Shortly thereafter, Uzuegbunam went to the Office of Student Integrity and spoke with its director, Defendant Aileen Dowell, about the former Speech Policy.  *Id.* at ¶¶ 66, 224.  She explained that he could not distribute his literature unless he submitted a request to reserve one of the speech areas.  *Id.* at ¶ 228.

The following month (August 2016), Uzuegbunam submitted a "Free Speech Area Request Form" to the Office of Student Integrity.  Doc. 13 at ¶¶ 238, 246.  He requested use of a speech area on August 25, 2016; September 8, 2016; and September 22, 2016, from 10:00 A.M. to 4:00 P.M.  Doc. 13-17.  He also attached to the form a religious tract that he intended to distribute.  *Id.*  GGC approved all three of his requests.  Doc. 13 at ¶ 247.

On August 25, 2016, Uzuegbunam and his friend arrived at the speech area outside of the food court, where "many students were lingering . . . eating,

5

studying, or visiting with each other." *Id*. at ¶¶ 248, 255.  While Uzuegbunam's friend prayed and distributed literature, Uzuegbunam stood on a stool and began to publicly speak about his religious beliefs.  *Id.* at ¶¶ 251-253.

After Uzuegbunam had been speaking for approximately twenty minutes, Defendant Corey Hughes (a lieutenant for Campus Police) approached him and asked him to stop his open-air speaking because he had "received calls complaining about his expression."  *Id.* at ¶¶ 90, 259, 271.  Lt. Hughes explained that Uzuegbunam had obtained permission only to "distribute literature and have one-on-one conversations with individuals," not to "conduct that additional mode of expression" (i.e., open-air speaking).  *Id.* at ¶¶ 270, 275.  He therefore asked Uzuegbunam to "restrict his expressive activities to distributing literature and having one-on-one conversations."  *Id*. at ¶ 272.  He further explained that Uzuegbunam was engaging in disorderly conduct by "disturbing the peace and tranquility of individuals who were congregating in that area," which "had generated complaints."  *Id.* at ¶¶ 277, 278, 282.

Defendant Rebecca Lawler (a Community Outreach and Crime Prevention Sergeant for Campus Police), who had joined Lt. Hughes at the scene, then confirmed that Uzuegbunam's open-air speaking constituted disorderly conduct because "people are calling us because their peace and tranquility is being disturbed and we've asked you to stop."  *Id.* at ¶¶ 94, 288, 289.  Lt. Hughes then suggested that Uzuegbunam engage in one-on-one conversations with people and

6

distribute literature, which is what members of the Church of Jesus Christ of Latter-Day Saints ("LDS") do when they reserve a speech area. *Id.* at ¶¶ 293-295.

Uzuegbunam therefore ceased his open-air speaking and left the speech area. *Id.* at ¶ 303. He went to the Office of Student Integrity and "spoke with Defendant Dowell." *Id.* at ¶ 305. During that conversation, Defendant Dowell allegedly stated that "it is a violation of GGC policy for anyone to express a 'fire and brimstone message' on campus." *Id.* at ¶¶ 304-305. There are no allegations that Defendant Dowell ever interrupted, limited, or restricted Uzuegbunam's speech or that Uzuegbunam, based on her comment, decided to stop speaking.

### III.    PROCEDURAL HISTORY

#### A.    Initial District Court Proceedings

On December 19, 2016, Uzuegbunam filed this suit against the GGC officials under 42 U.S.C. § 1983. Doc. 1. He asserted both facial and as-applied challenges to GGC's former Speech Policy and former Disorderly Conduct Policy, claiming that they violated his First Amendment right to free speech, First Amendment right to free exercise, due process rights, and equal protection rights. *Id.* He sought nominal damages, an injunction to prohibit future enforcement of the policies, and a declaration that the policies violated his rights under the First and Fourteenth Amendments. *Id.*

The GGC officials moved to dismiss the case on February 1, 2017, for failure to state a claim. Additionally, GGC revised both of its policies 27 days

later (and a little over two months after the lawsuit was filed) on February 28, 2017.  In response, Uzuegbunam filed a First Amended Complaint that included Joseph Bradford as an additional plaintiff and asserted the same claims against the GGC officials.  Doc. 13.  Bradford was, at the time, a GGC student who wanted to engage in similar speech but was refraining from doing so because he feared it would "expose him to enforcement and disciplinary action."  *Id.* at ¶ 184. Uzuegbunam and Bradford's First Amended Complaint is the operative complaint in the case.

The GGC officials moved to dismiss the First Amended Complaint on March 17, 2017, for failure to state a claim.  Doc. 18.  Then several weeks later, on March 31, 2017, the GCC officials moved to dismiss Uzuegbunam and Bradford's claims for injunctive and declaratory relief as moot based on GGC's revisions to the challenged policies.  Doc. 21.

About a year later, on April 19, 2018, the GGC officials filed a supplemental brief in support of their motion to dismiss for mootness, arguing that, based on a then recent Eleventh Circuit case, *Flanigan's Enters. v. City of Sandy Springs*, 868 F.3d 1248 (11th Cir. 2017), the Court should dismiss Uzuegbunam and Bradford's claim for nominal damages as moot.  Doc. 39.  On May 25, 2018, this Court granted the GGC officials' motion, dismissed the claims for injunctive and declaratory relief as moot, and dismissed the remaining nominal damages claims and the case as moot under *Flanigan's*.  Doc. 41.  In so ruling, the

8

Court held that a request for nominal damages does not save an otherwise moot case from dismissal. *Id*.

**B.    Eleventh Circuit and Supreme Court Proceedings**

On appeal, the Eleventh Circuit affirmed the dismissal in an unpublished decision, explaining that, based on *Flanigan's*, Uzuegbunam and Bradford's claims "for nominal damages cannot save their otherwise moot constitutional challenge to the Prior Policies." *Uzuegbunam v. Preczewski*, 781 Fed. App'x 824 (11th Cir. 2019).

The Supreme Court, however, granted Uzuegbunam and Bradford's petition for certiorari review and ultimately reversed the Eleventh Circuit's ruling on March 8, 2021. *Uzuegbunam v. Preczewski*, 141 S. Ct. 792 (2021). The Supreme Court held that, because an award of nominal damages can redress a completed constitutional violation, the case was not moot. *Id*. at 802. It therefore remanded the case back to this Court for further proceedings. *Id*.

**C.    Proceedings on Remand**

Upon remand, the GGC officials moved for leave to deposit nominal damages into the Court's registry under Rule 67, an order directing the payment of those funds to Uzuegbunam and Bradford, and an order dismissing the case as moot. Doc. 58. This Court denied that motion on December 22, 2021. Doc. 67.

On January 19, 2022, the GGC officials mailed two checks to Uzuegbunam and Bradford (through their lawyers), each in the amount of one dollar. A true and

9

correct copy of both checks and their accompanying cover letter are attached hereto as Exhibit 1.  On February 9, 2022, Uzuegbunam's counsel returned both checks to the GGC officials undeposited.  A true and correct copy of that correspondence is attached hereto as Exhibit 2.  That same day, Bradford voluntarily dismissed his claims against the GGC officials.  Doc. 77.

Thus, all that remains in this case is Uzuegbunam's claim for nominal damages based on his assertion that GGC's former Speech Policy and former Disorderly Conduct Policy violated (facially and as-applied) his First Amendment right to free speech, First Amendment right to free exercise, Fourteenth Amendment right to due process, and Fourteenth Amendment right to equal protection.  The GGC officials now move to dismiss Uzuegbunam's remaining claims for the reasons set forth below.

## IV.   LEGAL ARGUMENT AND CITATION OF AUTHORITY

### A.   Uzuegbunam's nominal damages claims are moot.

The law is well settled that, to satisfy Article III standing, a plaintiff must have a "personal stake in the outcome." *Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 478 (1990) (citation omitted). This requirement persists throughout a lawsuit. *Id.* at 477.  Thus, "[i]f an intervening circumstance deprives the plaintiff of a 'personal stake in the outcome of the lawsuit,' at any point during litigation, the action can no longer proceed and must be dismissed as moot." *Genesis Healthcare Corp. v. Symczyk*, 569 U.S. 66, 72 (2013).  For plaintiffs, the necessary personal stake is

shown by establishing the elements of standing: a "[1] personal injury [2] fairly traceable to the defendant's allegedly unlawful conduct and [3] likely to be redressed by the requested relief." *Allen v. Wright*, 468 U.S. 737, 751 (1984), abrogated on other grounds by *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014).

Here, Uzuegbunam cannot satisfy the last element of redressability. On January 19, 2022, the GGC officials provided him (through his attorneys) with a check in the amount of $1. By doing so, the GGC officials unequivocally delivered to him the only relief that he is entitled to recover in this case: nominal damages. *Carey v. Piphus*, 435 U.S. 247, 266–67 (1978) (holding that if plaintiffs were entitled to nominal damages for [a] violation, "the damages should not exceed one dollar"); PATTERN CIV. JURY INSTRUCTIONS 11TH CIR. 5.13 (2020) (referring to "nominal damages of $1.00"). This remittance of complete relief moots Uzuegbunam's claims because he retains no personal interest in the outcome of the litigation. *See, e.g.*, *Rand v. Monsanto Co.*, 926 F.2d 596, 598 (7th Cir. 1991) ("Once the defendant offers to satisfy the plaintiff's entire demand, there is no dispute over which to litigate and a plaintiff who refuses to acknowledge this loses outright . . . because he has no remaining stake."); *see also* 13A Charles Alan Wright & Arthur R. Miller, Fed. Practice and Procedure: Jurisdiction 2d § 3533.2, at 236 (2d ed. 1984) ("Even when one party wishes to persist to judgment, an offer to accord all of the relief demanded may moot the

11

case."); *see also Harrison v. United Mine Workers of Am. 1974 Benefit Plan & Trust*, 941 F.2d 1190 (11th Cir. 1991) (a claim is moot when the plaintiff receives the relief he requested); *Chen v. Allstate Ins. Co.*, 819 F.3d 1136, 1144 (9th Cir. 2016) ("[A] lawsuit—or an individual claim—becomes moot when a plaintiff actually receives all of the relief he or she could receive on the claim through further litigation.").

This is not a new concept. Take, for example, cases where a plaintiff seeks prospective injunctive relief.  Defendants have long been able to moot such cases unilaterally by voluntarily and unambiguously ceasing the allegedly unconstitutional conduct—i.e., giving the plaintiff all they asked for.[2]  *See, e.g., Beta Upsilon Chi Upsilon Chapter v. Machen*, 586 F.3d 908, 917 (11th Cir. 2009) (collecting cases). There is no reason the same conclusion from those "voluntary cessation" cases should not follow in cases involving an unequivocal remittance of all of the money damages that could be recovered in the case, i.e., nominal damages.

Indeed, the United States Supreme Court left this option open in *Campbell-Ewald Co. v. Gomez,* 577 U.S. 153 (2016). There, the Court held only that "[a]n unaccepted settlement offer or offer of judgment does not moot a plaintiff's case," because they have "no force."  *Id.* at 156. But it expressly left open the question of

---

[2] This case is a perfect example.  Uzuegbunam's claims for injunctive and declaratory relief were mooted by GGC's unilateral modification of its former Speech Policy and former Disorderly Conduct Policy.

whether the result would be different if the defendant deposited the full amount into an account payable to the plaintiff. *Id.* at 166. Two members of the Court, Chief Justice Roberts and Justice Alito, wrote to make clear not only that such a payment would end the case or controversy, but also that no admission of liability and no judgment would be required as an additional step to moot the case when such a payment was made. *See id.* at 184 (explaining that the Court's "precedents ... plainly establish that an admission of liability is not required for a case to be moot under Article III") (Roberts, J., dissenting); *see id.* at 188 (explaining that "today's decision ... does not prevent a defendant who actually pays complete relief—either directly to the plaintiff or to a trusted intermediary—from seeking dismissal on mootness grounds") (Alito, J., dissenting). Two members of the Court then revisited this option when this case was before it. *Uzuegbunam v. Preczewski*, 141 S. Ct. 792, 808 (2021) (explaining that "[w]here a plaintiff asks only for a dollar, the defendant should be able to end the case by giving him a dollar, without the court needing to pass on the merits of the plaintiff's claims") (Roberts, C.J., dissenting); *see also id.* at 802 (Kavanaugh, J., concurring).

The GGC officials recognize that this Court rejected its motion for leave to deposit nominal damages into the Court's registry under Rule 67, to direct payment of that amount to Uzuegbunam, and to thereafter dismiss this action as moot. Doc. 58. But this motion and the circumstances that underlie it are different: the GGC officials have unconditionally remitted to Uzuegbunam the nominal damages to

which he would be entitled if he were to prevail on his claims.  He returned the dollar, rather than accepting it, but "[a] plaintiff cannot thwart mootness by refusing complete relief presented on a silver platter." *Campbell-Ewald*, 577 U.S. at 184 (Alito, J., dissenting).  Uzuegbunam's claims are moot, and he cannot manufacture a case or controversy—or keep a case or controversy alive—by the expedient refusal to accept the very relief he requested in his complaint.

**B.   Uzuegbunam's facial and overbreadth challenges to the policies are moot.**

This Court has already ruled that GGC's act of revising its policies on February 28, 2017, mooted Uzuegbunam's claims for injunctive and declaratory relief.  Doc. 41.  That revision, however, also mooted Uzuegbunam's facial challenges to the policies.  "A facial challenge is an attack on a statute itself as opposed to a particular application." *City of Los Angeles v. Patel*, 576 U.S. 409 (2015); *see also AFSCME Council 79 v. Scott*, 717 F.3d 851 (11th Cir. 2013) (explaining that a facial challenge "seeks to invalidate a statute or regulation itself").  And the remedy for a successful facial attack "is the striking down of the regulation." *Eide v. Sarasota County*, 908 F.2d 716 (1991).  As a result, "[the Eleventh Circuit] and the Supreme Court have repeatedly held that the repeal or amendment of an allegedly unconstitutional statute moots legal challenges to the legitimacy of the repealed legislation." *Nat'l Adver. Co. v. City of Miami*, 402 F.3d 1329, 1332 (11th Cir. 2005).  This is because "any decision [a court] would

14

render would clearly constitute an impermissible advisory opinion." *Id*. at 1335.

This Court should therefore dismiss Uzuegbunam's facial challenges to the former

Speech Policy and former Disorderly Conduct Policy as moot.

This Court should likewise dismiss Uzuegbunam's due process claim—which

is based on overbreadth—as moot because "an overbreadth analysis is

inappropriate if the statute being challenged has been amended or repealed."

*Massachusetts v. Oakes*, 491 U.S. 576 (1989).

## C.    Qualified immunity bars Uzuegbunam's First Amendment claims.

The defense of qualified immunity "completely protects" "government

officials performing discretionary functions from suit in their individual capacities

unless their conduct violates clearly established statutory or constitutional rights of

which a reasonable person would have known." *Caldwell v. Warden, FCI

Talladega*, 748 F.3d 1090, 1099 (11th Cir. 2014).  To overcome qualified

immunity, plaintiffs must satisfy a two-prong inquiry. *Id.* at 1099.  *First*, they

must establish the existence of a constitutional violation. *Id.  Second*, they must

show that, at the time the conduct occurred, the existing law "clearly established"

that the conduct was unconstitutional. *Id.*  These two prongs can, however, be

decided in any order.  *Melton v. Abston*, 841 F.3d 1207, 1221 (11th Cir. 2016).

Thus, courts may skip the first inquiry and "instead proceed directly to analyzing

whether the right was clearly established." *Lewis v. City of West Palm Beach*, 561

F.3d 1288, 1291 (11th Cir. 2009).

15

That is what the Court should do here. Pretermitting whether any First Amendment violation actually occurred, Uzuegbunam's claims fail because he cannot satisfy the second "clearly established" prong. Under that prong, the dispositive question is whether the law gave the government official "fair warning that his conduct was unconstitutional." *Wade v. United States*, 13 F.4th 1217 (11th Cir. 2021). "[T]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Corbitt v. Vickers*, 929 F.3d 1304, 1311 (11th Cir. 2019).

"[C]learly established law consists of holdings of the Supreme Court, the Eleventh Circuit, or the highest court of the relevant state." *Sebastian v. Ortiz*, 918 F.3d 1301 (11th Cir. 2019). While the case need not be directly on point, "it must be close enough to have put the statutory or constitutional question beyond debate." *Gaines v. Wardynski*, 871 F.3d 1203, 1209-10 (11th Cir. 2017). Stated differently, the preexisting law must "dictate[], that is, truly compel[], the conclusion for all reasonable, similarly situated public officials that what Defendant was doing violated Plaintiffs' federal rights." *Evans v. Stephens*, 407 F.3d 1272, 1282 (11th Cir. 2005) (en banc). As the Eleventh Circuit has repeatedly emphasized, if the caselaw has not "staked out a bright line," then qualified immunity "almost always protects the defendant." *Oliver v. Fiorino*, 586 F.3d 898, 907 (11th Cir. 2009). This is particularly true in the First Amendment context, where qualified immunity is "difficult to overcome." *Gaines*, 871 F.3d at

16

1210; *see also Maggio v. Sipple*, 211 F.3d 1346, 1354 (11th Cir. 2000) ("a defendant in a First Amendment suit will only rarely be on notice that his actions are unlawful"); *Hansen v. Soldenwagner*, 19 F.3d 573, 576 (11th Cir. 1994) (stating that decisions in the First Amendment context "tilt strongly in favor of immunity"); *Dartland v. Metropolitan Dade Cty.*, 866 F.2d 1321, 1323 (11th Cir. 1989) (noting that only "the extraordinary case" will survive qualified immunity in the First Amendment context).

Uzuegbunam cannot meet this high burden. At the time of his speech in July and August of 2016, controlling caselaw made it clear that students' First Amendment rights "must be analyzed in light of the special characteristics of the school environment." *Bloedorn v. Grube*, 631 F.3d 1218, 1232 (11th Cir. 2011). Those cases noted that, on the one hand, "state colleges and universities are not enclaves immune from the sweep of the First Amendment." *Healy v. James*, 408 U.S. 169 (1972). But on the other hand, "[a] university's mission is education," and so it has "authority to impose reasonable regulations compatible with that mission upon the use of its campus and facilities." *Widmar v. Vincent*, 454 U.S. 263 (1981). To that end, a university has the right to "exclude even First Amendment activities that violate reasonable campus rules or substantially interfere with the opportunity of other students to obtain an education." *Id*. at 277. While courts "owe no deference to universities" when considering First Amendment questions in the educational context, the Supreme Court has

"cautioned courts . . . to resist substitut[ing] their own notions of sound educational policy for those of the school authorities which they review." *Id.*

These are, however, merely broad, abstract principles. And "[g]eneral propositions have little to do with the concept of qualified immunity." *Gaines v. Wardynski*, 871 F.3d 1203, 1213 (11th Cir. 2017). Courts must instead look at "how these abstractions have been applied in concrete circumstances." *Barts v. Joyner*, 865 F.2d 1187, 1194 (11th Cir. 1989). Yet, at the time of Uzuegbunam's speech, there was a paucity of cases applying these general principles to the "concrete circumstances" of students' public speech in the outdoor areas of a university campus. No cases had considered whether students have the right to distribute written material outside of a university's speech areas. Likewise, no cases had considered whether students have the right to engage in open-air speaking inside of a speech area when other students make content-neutral complaints. And no cases had resolved these issues when the student's proposed written material and open-air speaking was religious in nature.

The only case that came close to touching upon these issues was *Bloedorn v. Grube*, 631 F.3d 1218, 1232 (11th Cir. 2011). There, the plaintiff (a travelling preacher) sought to enjoin Georgia Southern University's speech policy, which required outside, non-sponsored speakers like himself to obtain a permit to speak in a designated "free speech area." *Bloedorn*, 631 F.3d at 1225. The Eleventh Circuit concluded that the plaintiff was not substantially likely to succeed in

18

showing that the policy violated his First Amendment rights.  The Court did not,

however, reach any conclusions about the constitutionally of the university's

policy as it applied to *students'* speech.  *Bloedorn* therefore did not clearly

establish the law for the case at bar.

In short, this case involves two competing interests in the events that

transpired on GGC's campus in July and August of 2016: Uzuegbunam's First

Amendment rights and the GGC officials' significant interest in providing a

peaceful, orderly learning environment for its students.  In the absence of any

factually similar caselaw "dictating" or creating a "bright line" for how the GGC

officials should have balanced those interests, Uzuegbunam cannot meet the

"clearly established" prong of the qualified immunity analysis.  This Court should

therefore dismiss Uzuegbunam's First Amendment claims against the GGC

officials based on qualified immunity.[3]  *Smith v. Mattox*, 127 F.3d 1416, 1419

(11th Cir. 1997) ("[I]f case law, in factual terms, has not staked out a bright line,

qualified immunity almost always protects the defendant.").

---

[3] This analysis applies to Uzuegbunam's free speech *and* free exercise claims under the First Amendment.  With respect to his free exercise claims, however, qualified immunity applies for the additional reason that no constitutional violation occurred.  For such claims, a neutral and generally applicable law must merely be rationally related to a legitimate government interest, and it is presumed to be constitutional.  *Keeton v. Anderson-Wiley*, 664 F.3d 865, 879-80 (11th Cir. 2011). GGC's former policies easily meet this test: they explicitly applied to all speech, regardless of whether it was religious or secular in nature, and the object of both policies was to advance GGC's legitimate interests in creating a safe learning environment and minimalizing disruptions.

19

**D.    Uzuegbunam failed to allege sufficient facts in his First Amended Complaint to state an equal protection claim.**

The Equal Protection Clause provides that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const. amend. XIV, § 1.  The purpose of the clause is to "keep[] governmental decisionmakers from treating differently persons who are in all relevant respects alike." *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992).  The "threshold inquiry in an Equal Protection case is whether the plaintiff and the proposed comparator are similarly situated."  The plaintiff must allege sufficient facts to show that he and the proposed comparator are "prima facie identical in *all relevant respects*."  *Griffin Indus. v. Irvin*, 496 F.3d 1189, 1205 (11th Cir. 2007) (emphasis in original).

Here, Uzuegbunam identifies only two proposed comparators: a percussion group that allegedly plays approximately once a week outside of the speech areas, and members of LDS that he has allegedly seen distributing literature and engaging students in conversations outside of the speech areas.  Doc. 13 at ¶¶ 307, 313.  But these groups are not "similarly situated" to Uzuegbunam for several reasons.  As an initial matter, there are no allegations that any of the GGC officials knew about these instances of allegedly unauthorized expression.  In any event, there are no factual allegations showing that the groups were operating without a permit.[4]  This

---

[4] While Uzuegbunam alleges that the groups "[u]pon information and belief . . . did not obtain a permit before engaging in some or all of these expressive

omission is significant because, under GGC's former Speech Policy, GGC could authorize expressive activity in "other areas" outside of the speech areas.  Doc. 13-3 at 2.  Consequently, the fact that these groups were seen engaging in expressive activity outside of a speech area does not automatically make them "similarly situated" to Uzuegbunam.  Additionally, there are no allegations that the percussion group or LDS members' expressive activity (unlike Uzuegbunam's open-air speech) ever disturbed the tranquility of other individuals or had generated complaints.  For both of these reasons, Uzuegbunam has failed to identify any similarly situated comparators.

Uzuegbunam's equal protection claim also fails because he is alleging that the GGC officials "unequally applied facially neutral" policies.  The law is clear that the "unlawful administration by state officers of a state statute fair on its face, resulting in unequal application to those who are entitled to be treated alike, is not a denial of equal protection unless there is shown to be present in it an element of intentional or purposeful discrimination."  *E & T Realty v. Strickland*, 830 F.2d 1107 (11th Cir. 1987).  There are not, however, any allegations in the First

---

activities," Doc. 13 at ¶¶ 311, 314, such allegations are too conclusory to be entitled to the presumption of truth.  *Mann v. Palmer*, 713 F.3d 1306, 1315 (11th Cir. 2013); *see also Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 551 (2007) (declining to take as true the conclusory allegation "upon information and belief" that the companies had entered a conspiracy without enough facts to make that statement plausible).

Amended Complaint that any of the GGC officials acted with discriminatory intent in allegedly treating him differently from the percussion group and LDS members.

**E.      Uzuegbunam's supervisory liability claims fail as a matter of law.**

Supervisory liability exists under § 1983 only when the supervisor personally participates in the alleged unconstitutional conduct or when there is a causal connection between the actions of the supervisor and the alleged constitutional deprivation. *Amnesty Int'l, USA v. Battle*, 559 F.3d 1170, 1180 (11th Cir. 2009). The necessary causal connection can be established "when a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he fails to do so." *Cottone v. Jenne*, 326 F.3d 1352, 1360 (11th Cir. 2003). The causal connection may also be established when a supervisor's "custom or policy . . . result[s] in deliberate indifference to constitutional rights." *Id.* (internal citations omitted). "The standard by which a supervisor is held liable in [his] individual capacity for the actions of a subordinate is *extremely rigorous*." *Id.* (emphasis added).

Here, Uzuegbunam has sued multiple GGC officials who had no involvement in his attempts to distribute literature and engage in open air speaking in July and August of 2016. He instead appears to be suing these officials based solely on their positions at GGC: Defendants Preczewski (GGC's former President), Richardson (former VP of Academic and Student Affairs), Fatzinger (former Senior Associate Provost for Student Affairs), Jiminez (former Dean of

22

Students), Ruffin (former Dean of Library Services), and Schneider (Associate VP of Public Safety and Emergency Preparedness/Chief of Police).  While Uzuegbunam alleges that these officials are "responsible for the enactment and enforcement of [GGC's] policies, including the policies challenged herein" and "possess[] the authority to change and enforce the policies challenged herein," such allegations are conclusory and formulaic in nature.  Doc. 13 ¶¶ 27-78. Uzuegbunam has therefore failed to allege sufficient facts showing that those GGC officials caused the alleged constitutional violations in this case.  His § 1983 claims against them should be dismissed.

**F.      Uzuegbunam has failed to state a claim under the Due Process Clause.**

The Due Process Clause of the Fourteenth Amendment states "nor shall any State deprive any person of life, or property, without due process of law."  U.S. Const. XIV, § 1.  "[T]he core of the concept [of due process is] to be protect[ed] against arbitrary action."  *County of Sacramento v. Lewis*, 523 U.S. 833, 845 (1998).  Two kinds of constitutional protections are derived from the Fourteenth Amendment: procedural due process and substantive due process.  *McKinney v. Pate*, 20 F.3d 1550, 1555 (11th Cir. 1994) (en banc).  Uzuegbunam appears to be asserting a substantive due process violation.

The substantive component of the Due Process Clause protects those rights that are "fundamental," that is, rights that are "implicit in the concept of ordered liberty."  *Palko v. Connecticut*, 302 U.S. 319, 325 (1937); *see also Washington v.*

23

*Glucksberg*, 521 U.S. 702, 720-21 (1997) (explaining that substantive due process protections are afforded only to fundamental rights and liberties arising under the United States Constitution).  A finding that a right merits substantive due process protection means that the right is protected "against 'certain government actions regardless of the fairness of the procedures used to implement them.'"  *Collins v. City of Harker Heights*, 503 U.S. 115, 125 (1992).

Here, Uzuegbunam's substantive due process claim appears to be based on the First Amendment right to free speech and free exercise.  Doc. 13 at ¶¶ 436-445.  Both of these rights however, are protected by "a particular amendment [that] 'provides an explicit textual source of constitutional protection' against a particular sort of government behavior, [and therefore] 'that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims.'"  *Albright v. Oliver*, 510 U.S. 266, 273 (1994).  Thus, to the extent that Uzuegbunam's due process claim is premised on speech, it is coextensive with his First Amendment claim and should be dismissed.

## V.   CONCLUSION

For the reasons stated above, the GGC officials respectfully ask the Court to grant this motion and dismiss Uzuegbunam's remaining claims.

Respectfully submitted,

CHRISTOPHER M. CARR        112505
Attorney General

KATHLEEN M. PACIOUS        558555
Deputy Attorney General

ROGER A. CHALMERS        118720
Senior Assistant Attorney General

*/s/ Ellen Cusimano*
ELLEN CUSIMANO        844964
Assistant Attorney General


Please address all communications to:
Ellen Cusimano
Assistant Attorney General
State Law Department
40 Capitol Square SW
Atlanta, GA  30334
Tel: (404) 463-8850
Fax: (404) 651-5304
Email: ecusimano@law.ga.gov

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that the foregoing document has been prepared in Times New Roman (14 point) and fully complies with the font and point selection requirements of LR 5.1(B), N.D. Ga.

*/s/ Ellen Cusimano*
ELLEN CUSIMANO

## CERTIFICATE OF SERVICE

I hereby certify that on this date I have electronically filed the foregoing

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION**

**TO DISMISS PLAINTIFFS' AMENDED COMPLAINT** using the CM/ECF

system which will automatically send electronic mail notification of such filing to

all counsel of record.

This 8th day of March, 2022.           */s/ Ellen Cusimano*
                                        ELLEN CUSIMANO
                                        Assistant Attorney General